IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| R.C. by his next friend, the ALABAMA DISABILITIES ADVOCACY, PROGRAM, on behalf of himself and those similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 2:88cv1170-D |
| | ) | WO |
| PAGE WALLEY, as Commissioner of the Alabama Department of Human Resources, | ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Before the court is a motion for dismissal and termination of the Consent Decree which has governed in the case since 1991. (Doc. No. 714.) The motion which is accompanied by a memorandum brief (Doc. No. 715) was filed by the Honorable Page Walley, the Commissioner of the Alabama Department of Human Resources ("DHR"). The motion is opposed by Plaintiffs. (Doc. Nos. 717, 736.)

Almost seventeen years ago, on November 15, 1988, this class action lawsuit was commenced on behalf of a minor who is known by his initials "R.C." When the lawsuit was filed, R.C. was an eight-year-old boy who allegedly had been abused by his mother

and later neglected by his father.  Ultimately, R.C. was placed in the custody of DHR. (Compl. at 1-4 (Doc. No. 1).)

While in the custody of DHR, R.C.'s welfare allegedly was not much better than it was when he lived with his parents.  R.C. was subjected to a series of short-term placements, including confinement in psychiatric hospitals.  It was alleged that R.C. was heavily medicated with psychotropic drugs and denied visitation with his father. Eventually, R.C. was placed in a long-term residential treatment facility many miles from home.  (Id. at 5-6.)

R.C.'s plight was alleged to be symbolic of the fate of numerous other children under the care of DHR.  R.C., on behalf of a class, alleged that the conditions and practices in the child welfare system in Alabama were constitutionally deplorable and in violation of federal statutes.  Through class certification, R.C. sought to alleviate these systemic deprivations within DHR's child welfare system.  (Am. Compl. at 16 (Doc. No. 22).)  R.C., whose class ultimately was certified by the court, represents a class of children with diagnosed or perceived emotional or behavioral disorders who are in foster care or DHR custody or who are at imminent risk of placement with DHR.  (Order (Doc. No. 73); Order (Doc. No. 130).)

Two years into the lawsuit, the parties negotiated a settlement in the form of a Consent Decree which was approved by the court in December 1991.  (Consent Decree, entered June 11, 1991 (Doc. No. 235); (Order approving Consent Decree, entered Dec. 18, 1991 (Doc. No. 252).)  The Consent Decree averted litigation which DHR conceded

2

would have resulted in "a clear victory for the plaintiffs" and exposed "devastating" facts.[1]  The initials "R.C." now have become synonymous with this Consent Decree which has been the catalyst for the overhaul and reform of DHR's child welfare system.

At the core of the Consent Decree is the mandate that DHR reform Alabama's child welfare system by developing a "system of care" which operates with the aim of achieving specified "goals" and in conformity with thirty "principles." (Consent Decree ¶ 31 (Doc. No. 235).)  Execution of the "system of care" is governed by specific standards and deadlines set forth in the Implementation Plan, also the product of joint agreement by the parties.  (Order approving Implementation Plan (Doc. No. 265).)

Termination of the Consent Decree and the Implementation Plan is provided for in paragraph 93 of the Consent Decree, as subsequently amended.  (Consent Decree ¶ 93, entered June 11, 1991 (Doc. No. 235), as amended by ¶ 10 of Consent Order Extending Time for Compliance at 3, entered Feb. 11, 1999 ("1999 Consent Order") (Doc. No. 511).)  Placing the burden on Defendant, the termination clause states that

> [o]n or after October 1, 2002, the defendant may move for termination of this Decree upon a showing that DHR is in substantial compliance with the requirements of the Decree and of the Implementation Plan and that DHR will remain in substantial compliance after termination of the injunction in this case.

(Id.)

---

[1] R.C. v. Nachman, 969 F. Supp. 682, 686 (M.D. Ala. 1997), aff'd, 145 F.3d 363 (11th Cir. 1998).

3

Having presided over the implementation of the Consent Decree for nine years, with the skilled assistance of the court monitor, the undersigned has an intimate understanding of the history and circumstances of this litigation.[2]  The undersigned also is very familiar with all facets of the Consent Decree and the Implementation Plan, including the purposes, provisions, and procedures set out therein, as well as with the progress made to date and the obstacles encountered along the way.

Defendant has made great progress and marked improvements in DHR's child welfare system, including but not limited to its staffing directives, its educational requirements for employees, its funding and its overall day-to-day functions.  The court also commends Defendant for DHR's ability and willingness to respond immediately to any complaint concerning child safety, as well as to cooperate with municipal, county and state law enforcement in all matters pertaining to child endangerment and the prevention of the same.  Moreover, the court recognizes Defendant's recent good faith efforts to comply with the requirements of the Consent Decree, to include Defendant's prompt response to the issues enumerated by the court at the December 2004 status conference.

Notwithstanding the exceptional strides by Defendant, the parties entered into a voluntary agreement in which they, not the court, set out the governing standards for compliance and the provision for termination of the Consent Decree.  While the court is

---

[2] Originally, the Honorable Truman M. Hobbs, now Senior United States District Judge for the Middle District of Alabama, presided over this case.  The undersigned inherited this case in April 1996.

ever mindful that consent decrees are "not intended to operate in perpetuity," Board of

Education v. Dowell, 498 U.S. 237, 248 (1991), termination is premature until such time

that Defendant has sustained his twofold burden of showing substantial compliance.

Having carefully considered the arguments of counsel, the relevant law and the

record as a whole, the court finds that Defendant has not submitted evidence sufficient to

sustain his burden of demonstrating that DHR "is" and "will remain" in substantial

compliance with the terms of the Consent Decree and of the Implementation Plan as

required for termination of said Decree.[3]  (Consent Decree ¶ 93, as amended by 1999

Consent Order.)  Defendant's motion, therefore, is due to be denied *at this time*.[4]

## II. JURISDICTION

The Consent Decree's provisions bestow upon the court the power to resolve

disputed matters, shared authority with the court monitor to determine compliance with

---

[3] The court emphasizes that its findings herein are the product of very serious consideration and deliberation.  As the court has stated previously, the court is constitutionally committed, as it should be, to safeguarding the abused and neglected children for whom the Consent Decree provides protection.  See R.C., 969 F. Supp. at 688, 705 & n.18.

[4] The court finds that the present record is factually adequate for resolving the instant matter without the need for a hearing.  The briefs and arguments clearly set forth the parties' respective positions and the evidence upon which the parties rely, and Defendant has not demonstrated how an evidentiary hearing would add anything of material value to the record.

the Consent Decree, and sole authority to terminate the Consent Decree upon motion of Defendant.  (Consent Decree ¶¶ 86, 91, 93, as amended by 1999 Consent Order.)

Not only is the court's jurisdiction over this matter explicitly set out in the Consent Decree, but also is implicit in the court's inherent jurisdiction over its decrees.  See Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1018 (6th Cir. 1994); Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985) ("Consent decrees are subject to continuing supervision and enforcement by the court.").  The court, thus, finds that it acts within its jurisdiction in ruling on the present motion to terminate the Consent Decree.

### III.  BACKGROUND

The Consent Decree, filed in June 1991, is the product of extensive negotiations and bargaining which occurred between the parties during the weeks preceding the scheduled trial date in this case.  (Consent Decree (Doc. No. 235).)  In December 1991, after independent consideration, the court approved the Consent Decree, finding that it was fair, adequate and reasonable.  (Order approving Consent Decree (Doc. No. 252).)

The Consent Decree contemplated that the parties initially would evaluate DHR's child welfare system to determine its resources, capabilities and needs.  Thereafter, the Consent Decree provided that DHR would develop an "Implementation Plan" through which DHR would incorporate into its child welfare system the goals and principles of the Consent Decree within specified timetables.  (Consent Decree ¶¶ 64-68 (Doc. No.

235).)  An Implementation Plan ultimately was approved by the court on November 1, 1993.  (Order approving Implementation Plan (Doc. No. 265).)

Due to the extent of reforms necessary to implement the Consent Decree, the Implementation Plan called for the phased-in "conversion" of Alabama's sixty-seven counties.  Each year, for seven consecutive years, specified counties were to be "converted" until all counties were functioning in compliance with the Consent Decree. The Implementation Plan was to be completed by October 1999, at which time the Consent Decree provided that Defendant could move for termination upon a showing of DHR's substantial compliance, both present and future, with the terms of the Consent Decree and the Implementation Plan.  (See Consent Decree ¶ 93 (footnote omitted) (Doc. No. 235).)

The Consent Decree also mandated the appointment of an independent court monitor who would serve as the court's agent and oversee and assist in the implementation process.  (Id. ¶¶ 75-82.)  On March 17, 1993, by agreement of the parties, the court appointed Dr. Ivor D. Groves, Ph.D., as the monitor in this lawsuit.  (Doc. No. 260.)  The court's five-page "order appointing monitor" sets out the monitor's roles and responsibilities which include assessing DHR's compliance with the Consent Decree and Implementation Plan, apprizing the court and the parties of DHR's progress, and mediating disputes between the parties.  (Id.)  Among other provisions, the order also dictates that the court monitor shall have access to all needed information, establishes guidelines for compensating the court monitor, authorizes the court monitor to hire staff,

7

and permits the court monitor to engage in *ex parte* communications with the parties and the court.  (Id.; see also Doc. No. 259, Ex. 2 (Contract at 7).)

Dr. Groves has remained the court monitor for the duration of this case.  He has been instrumental in the conversion process of each of Alabama's sixty-seven counties and has greatly assisted the court and the parties.

With the court monitor's assistance, the parties began the implementation of the Consent Decree.  In August 1996, pursuant to the authority bestowed upon him in the Consent Decree,[5] the court monitor determined that the first county to be in compliance with the requirements of the Consent Decree was Shelby County.  (Ct. Monitor Nov. 2004 Report at 6.)  The conversion process for each county generally is described by the court monitor in his November 2004 Report from which the court quotes:

> In order to be determined converted to practice that conforms to the requirements of the Consent Decree, each county has been required to demonstrate that child welfare services are being consistently provided in accordance with the operating principles of the decree. . . .
> A county-by-county review process was followed that included the following steps.  The first step was that either the monitor or the Family Services Partnership's Office of Quality Assurance conducted a review of a sample of randomly chosen children and families and a series of focus groups were conducted with key stakeholders such as family court judges,

---

[5] Paragraph 86 of the Consent Decree provides that "[o]nly this Court, the monitor, or another person or entity appointed by the Court shall have the authority to determine compliance with this decree."  (Consent Decree ¶ 86.)  The court has not exercised the provision which permits it to appoint another person or entity.  Also, since the inception of the Consent Decree, the court has permitted the court monitor to make determinations of compliance and to report the same to the court after a county asserts that it has implemented the required system of care.  It is notable that neither party ever has filed an objection with the court on the basis of such determinations made by the court monitor.

8

> service providers, guardian ad litems, caseworkers, quality assurance
> committee members, and DHR county management.  Upon reaching an
> acceptable level of performance, based on the child in-depth reviews,
> quantitative performance, and stakeholder input, the second step was to
> "release" the county to present the overall set of data and community
> partner perspectives that support an assertion of conversion of practice to
> compliance with the principles of the Consent Decree.  Following the
> assertion presentation attended by both the monitor and the plaintiff's
> counsel, an independent review by the plaintiff's attorneys was conducted
> in order to further assess compliance with practice expectations.  Lastly, the
> monitor reviewed all available information gained through these review
> activities and made a final determination of a county's compliance status.
> This compliance determination process has been utilized for all counties.

(Ct. Monitor Nov. 2004 Report at 7 (see infra footnote 7).)  The court monitor explains,

in general terms, that he declares a county converted "when 85% of child status and

system performance ratings are acceptable during an on-site compliance [review]."  (Id.

at 25.)

Although between August 1996 and the end of 1998, the court monitor determined

that fourteen counties, in addition to Shelby County, had "converted" their child welfare

practices in accordance with the terms of the Consent Decree, it became clear that DHR

would not be able to meet the October 1999 deadline set out in the Consent Decree.  The

parties, however, averted litigation and negotiated an agreed-upon two-year extension of

the conversion deadline to October 1, 2002.  Based on the agreement of the parties, the

court entered the detailed 1999 Consent Order.[6]  (1999 Consent Order (Doc. No. 511); Ct.

---

[6] The 1999 Consent Order noted that among the reasons for Defendant's non-compliance were as follows: lack of trained staff; failure to keep pace with the mandated schedule for conversion; hiring freezes; and restrictions on the availability of flex funds.

Monitor Nov. 2004 Report at 5.)  Its provisions specified that the final county would be

converted by October 1, 2001, and that, during the ensuing year (until October 1, 2002),

DHR would demonstrate that the counties were sustaining their conversions.  (Doc. No.

511, Ex. 2 ("Strategic Conversion Plan" at 9); Ct. Monitor Nov. 2004 Report at 29.)

Contemplating full compliance by October 1, 2002, the parties modified the termination

provision of the Consent Decree to provide as follows:

> On or after October 1, 2002, the defendant may move for termination of this
> Decree upon a showing that DHR is in substantial compliance with the
> requirements of the Decree and of the Implementation Plan and that DHR
> will remain in substantial compliance after termination of the injunction in
> this case.

(1999 Consent Order ¶ 10.)[7]

Also, during this time frame, to assist in the implementation of the Consent

Decree, the court entered two orders, one governing caseload standards and the other

governing licensing of staff.  (Doc. Nos. 452, 538.)  These orders were submitted as

proposed joint orders, like the majority of orders entered in this case.  The overall

objective of the 1998 order on caseload standards is to restrict the number of cases

assigned to social workers so that caseloads remain manageable.  Also, in a separate

order, the court directed Defendant to establish a policy governing licensing requirements

---

[7] In addition to extending the time for compliance, the amended termination
paragraph deleted the words "reasonable prospect" from the last clause.  The original
termination provision provided in the concluding clause that "the defendant may move for
termination of this decree upon a showing . . . that there is a reasonable prospect that he
will remain in substantial compliance."  (Consent Decree ¶ 93.)

for new social workers as a way to help ensure that DHR recruits the quality workers needed to implement the Consent Decree. (Doc. No. 538.) In December 1999, DHR finalized the latter policy, and the court approved it on January 1, 2000. (Id.) The policy, in sum and substance, created a new entry-level classification for social workers and provided that DHR would only hire applicants for this classification who had earned a Bachelor of Social Work. (Id.) The policy also implemented incentives for existing staff to obtain professional social work degrees, such as providing educational leave with pay. (Id.)

Notwithstanding the progress DHR was making as to county conversion and the efforts of DHR to improve caseload management and the quality of its workforce, the October 2002 goal for full conversion ultimately proved unrealizable. As of October 2002, seventeen counties still had not completed the conversion process and had not attained a favorable declaration of compliance from the court monitor. At a status conference held by the court on October 29, 2002, it was acknowledged that, although Defendant had "made significant progress in implementing the Consent Decree" and had for the preceding "two years demonstrated good faith in his diligent efforts to comply with the Orders of this Court," implementation of the system of care in all counties was not complete. (Mem. of Understanding, entered Dec. 5, 2002 (Doc. No. 650); see also Doc. No. 645 (minutes from status conference).) At the status conference, the court monitor stated that he anticipated that it would take an additional six to nine months for the remaining counties to attain compliance with the Consent Decree and that, thereafter,

11

for one year, a monitoring process would commence for the purpose of assessing DHR's ability to remain in compliance. (Doc. No. 645.)

After this status conference, the parties filed a Memorandum of Understanding, cited above. Therein, a new deadline was not set for the conversion of all counties; instead, the parties agreed that Defendant would "continue his diligent efforts to comply with orders of this Court in a timely manner" and that the parties would work toward achieving substantial compliance as quickly as possible. (Mem. of Understanding, entered Dec. 5, 2002 (Doc. No. 650).)

Since December 2002, the court has held several status conferences to resolve disputed issues and to assess the progress being made. (See, e.g., Doc. No. 663 (minutes from May 1, 2003 status conference); Doc. No. 670 (order setting June 12, 2003 status conference); Doc. No. 681 (minutes from August 26, 2003 hearing); Doc. No. 692 (minutes from Feb. 3, 2004 status conference).) At the request of the parties, the court also entered an order on November 5, 2003, to assist in the final phases of the conversion process. The order, among others things, dictated that, "[i]n connection with DHR's sustainability reviews of converted counties, the Defendant will develop and implement a report card or similar mechanism for publicly asserting and rating the quality of each county's practice." (Order (Doc. No. 687).) As further agreed by the parties, the order also streamlined the process for the conversion of the remaining counties. The order set deadlines for Defendant, Plaintiffs and the court monitor so that, once a county asserted that it was operating within the parameters of the Consent Decree, the parties would

12

receive written notification from the court monitor within forty-five days as to whether the county had attained the goal of conversion.  (Id.)

In October 2004, with only four counties remaining for conversion approval by the court monitor, the court entered an order setting a status conference for December 9, 2004.  The court directed that counsel for Plaintiffs, counsel for Defendant and the court monitor be present.  In the same order, the court ordered the court monitor to file a status report concerning Defendant's "compliance with the terms of the Consent Decree."  (Doc. No. 711 at 1.)  The court indicated that the court monitor could make any recommendations he deemed appropriate.  (Id.)  Furthermore, the court set a deadline by which counsel for Plaintiffs and Defendant were to file briefs, setting forth their respective positions as to whether Defendant had met his burden of demonstrating substantial compliance with the requirements of the Consent Decree.  (Id. at 1-2.)  The court also invited counsel to include in their briefs any comments concerning the court monitor's report.  (Id. at 2.)

Complying with the court's order, the court monitor submitted a 61-page report, titled "Final Report on Implementation of the R.C. vs. Walley Consent Decree," dated November 2004 ("Ct. Monitor Nov. 2004 Report").[8]  The court monitor's ultimate recommendations are contained on pages 60 and 61 of said Report where the court monitor states as follows:

---

[8] The court monitor's November 2004 Report was introduced in evidence at the December 9, 2004 status conference.  (See Doc. No. 723, minute entry.)

The monitor does not find that DHR has fully fulfilled the promise that was shown in the exemplary performance demonstrated by the many counties and, particularly, the early counties that were determined "converted." These performance levels demonstrated virtually 100% compliance with the Decree and the best child welfare practice in the country.

1.  The monitor does find, however, that the current performance levels are adequate and recommends that the court find that DHR is in substantial compliance with the Consent Decree.

2.  It is recommended that the independent monitoring of the Consent Decree be terminated.

3.  It is recommended that the court require that DHR produce at least two performance reports over the next 12 months to be submitted to the court that contain facts addressing the same areas of performance as the monitor's report.  The reports should also include the county ratings ordered by the court.  The reports should demonstrate that resources are being maintained, that performance improvements are continuing to be made, and that ongoing protective supervision and family engagement are being strengthened.

(Id. at 60-61.)

In response to the court monitor's November 2004 Report, Plaintiffs filed a brief, presenting, through argument and expert affidavit testimony, their position that the information in the court monitor's November 2004 Report demonstrates substantial "non-compliance."  (Doc. No. 717.)  Defendant simultaneously filed the instant "motion for order terminating consent decree and dismissing case," invoking the termination clause of the Consent Decree.  (Doc. Nos. 714-715.)  Therein, Defendant asserts that DHR is "in substantial compliance with the requirements of the Consent Decree and of the Implementation Plan and is likely to remain in substantial compliance."  (Id. at 1, ¶ 2.) As grounds, Defendant relies primarily on the court monitor's November 2004 Report

14

and the recommendations therein, arguing that DHR has implemented the system of care in all sixty-seven counties in the State and has formulated a sustainability plan "to assure compliance with the principles of the Consent Decree in the future." (Id. at 2.) Defendant attached the sustainability plan as an exhibit to his motion. (Ex. to Doc. No. 714.)

The sustainability plan to which Defendant refers is titled "Child Welfare Strategic Plan" ("Strategic Plan"). DHR implemented the Strategic Plan in May 2004 and updated it in September 2004. (Id.) Given Defendant's reliance on the recent formulation of this Strategic Plan and the court's recognition that the Strategic Plan is an indicator of DHR's good faith commitment to conforming child welfare practices to the goals and principles of the Consent Decree, more discussion as to this Plan is warranted.

The Strategic Plan's prologue states, in part, that DHR desires "to constantly strive for even better performance. . . . To that end, DHR presents an organizational plan for post-R.C. [practice]."[9] (Id.) The multifaceted functions of the Strategic Plan are outlined in the court monitor's November 2004 Report at pages 54 through 58, and, as stated, the entire plan is attached as an exhibit to document number 714. (Id. at 54-58; Ex. to Doc. No. 714.) The Strategic Plan addresses issues relating to: staffing and caseload management; recruitment and retention of qualified staff and ongoing professional

---

[9] As observed by the court monitor, "[t]he intent of this plan is to continue some of the initiatives developed during the duration of R.C., as well as to outline and implement additional strategies to continue improvement of the quality and consistency of child welfare practice." (Ct. Monitor Nov. 2004 Report at 54.)

development initiatives, including a reconfigured "child welfare consultation model"; strategies to improve permanency for children in out-of-home care; quality assurance; information systems development; and finance.

Regarding staffing and caseload management, DHR has established a "staffing committee" which meets "regularly" for the primary purpose of monitoring staff-to-caseload ratios. (Ct. Monitor Nov. 2004 Report at 55.) The staffing committee reviews county directors' requests for additional personnel and incorporates county consultant updates regarding county staffing needs. Also, in order to recruit and retain qualified and licensed social workers and to comply with the court's order on licensing standards, (see Doc. No. 538), DHR developed a Staff Development Office in 2001. (Ct. Monitor Nov. 2004 Report at 55.)

In the area of professional development, the Strategic Plan sets outs the various training programs which DHR offers for its social workers, many through national resource centers. (Id. at 56-57.) Another "major" initiative of the Strategic Plan related to professional development is the refinement of DHR's child welfare consultation model. (Id. at 56.) The goals of the consultation model are to employ full-time consultants who can assess counties' needs and quality of practice based on onsite evaluation and available data and provide follow-up actions. (Id.)

The Strategic Plan also describes specific steps to be taken by DHR at the state and county level to improve the attainment of permanency for children receiving foster care services. (Id. at 57.) Also, addressed are strategies to improve DHR's ability to meet the

16

needs of severely emotionally disturbed ("SED") children, including the establishment of

a statewide database to track the status of SED children and additional training for staff

regarding intervention strategies and techniques to address the needs of these children.

(Id.)  Finally, the Strategic Plan emphasizes that DHR is committed to continuing, and

even increasing, quality assurance mechanisms by which DHR evaluates each county's

child welfare practice.  (Id. at 58.)

After reviewing the pleadings submitted by Plaintiffs and Defendant and the court

monitor's November 2004 Report, on December 9, 2004, the court held a status

conference in chambers at which time counsel for Plaintiffs and Defendant and the

Commissioner of DHR articulated their positions as to whether DHR had attained the

goal of substantial compliance so that federal oversight can end.[10]

After careful consideration of the issues and arguments presented by the parties

and the court monitor at the status conference, the court entered an order on December

13, 2004.  (Doc. No. 725.)  Although recognizing the "monumental strides" and "great

success" in this case, the court declined to terminate the Consent Decree at that time and

---

[10] The court was honored to have in attendance at the status conference Governor
Bob Riley.  The court applauds the Governor's commitment to the State of Alabama's
child welfare system.
    The court also notes that it is particularly impressed with the fact that, pursuant to
an executive order, at the conclusion of this case, the Governor will appoint a blue-ribbon
commission for a period of time for the purpose of overseeing DHR's child welfare
system.  When the commission commences to operate, the court strongly recommends
that it inspect, instead of expect.  Continual inspection, encouragement and praise are
required of any organization this large and this important.

held Defendant's motion under advisement.  The court found that, at a minimum, four deficiencies outlined in the court monitor's November 2004 Report were barriers to a finding of substantial compliance.  (Id. at 2.)

The court summarized the four "problem areas" as follows:  (1) Defendant has not implemented into sanctioned DHR policy the 1998 court-ordered caseload standards.  (See Ct. Monitor Nov. 2004 Report at 55 (recommending that "DHR maintain the 1998 Court Order of Caseloads and Staffing by implementing policy measures to ensure current staff-to-caseload ratios are continued")); (2) Defendant never has complied with the court's November 4, 2003 Order which directed DHR to establish a mechanism to provide regular "report cards" describing the status of each county's performance with respect to the Consent Decree.  (See Nov. 4, 2003 Order which provides:  "In connection with DHR's sustainability reviews of converted counties, the Defendant will develop and implement a report card or similar mechanism for publicly asserting and rating the quality of each county's practice."); (3) Despite significant progress, Jefferson County which has five regions and the largest percentage of children in DHR's care manifests certain weaknesses which impede its ability to sustain substantial compliance (see, e.g., Doc. No. 717 at 11-13); and (4) the court monitor has not yet declared Baldwin County in compliance with the principles of the Consent Decree.  (Ct. Dec. 13, 2004 Order (Doc. No. 725).)

Consistent with the parties' prior practices, the parties agreed to meet and confer for the purpose of reaching a mutually satisfactory solution to each of the four areas

18

above.[11]  (Id.)  The court gave the parties a deadline of January 21, 2005, to confer jointly

and formulate a detailed written plan focused on strategies to rectify the above

deficiencies and to file a joint statement.[12]  Upon the request of the parties, the court

extended that deadline to February 4, 2005.  (Doc. No. 731.)

On February 4, 2005, unable to reach a joint resolution, Plaintiffs and Defendant

filed separate reports with the court.  Defendant noted that the parties and the court

monitor had five discussions, in person and by telephone, including one meeting with

Governor Bob Riley, for the purposes of resolving the issues outlined in the court's

---

[11] It was the opinion of the court that the parties should address any other matters
discovered during careful perusal of the entire case.

[12] Specifically, the court directed that the joint statement include particulars
regarding the following:  (1) the inclusion of the 1998 court-ordered caseload standards in
official DHR policy; (2) a mutually agreed-upon report card or similar mechanism for
publicly asserting and rating the quality of each county's practice; (3) the particular
compliance problems with and the unique needs of Jefferson County and the specific
methods DHR will implement to ensure adequate performance in the future in Jefferson
County; and (4) the status of Baldwin County's conversion.  (Ct. Dec. 13, 2004 Order
(Doc. No. 725).)

December 13 Order and reaching an agreement as to how to return Alabama's child welfare system to the State.[13]   (Doc. No. 735 at 1.)

In his report to the court, Defendant communicated the following: (1) that DHR had promulgated an "Emergency Rule," ultimately to be included as a permanent rule in DHR's Administrative Code, codifying the 1998 court-ordered caseload standards at Section 660-5-53 of the Alabama Administrative Code (see Ex. A to Doc. No. 735); (2) that, finally, in compliance with the November 2003 court order, DHR had prepared a "report card" rating system to be published twice a year describing the status of each county's performance with respect to the Consent Decree (see Ex. B to Doc. No. 735); and (3) that DHR had developed a written plan to address performance issues in Jefferson County. (See Ex. C to Doc. No. 735.)

---

[13]   At the status conference, the court was aware that, although each county had demonstrated "the *capacity* to perform in accordance with the principles of the R.C. Consent Decree," the actual ability of the counties to sustain substantial compliance after conversion was a concern to the court monitor.  (See e.g., Ct. Monitor Nov. 2004 Report at 60.)  Given this concern, the court considered issuing an order that day which imposed as an express requirement for termination of the Consent Decree that, in addition to implementing a public rating system of county performance as required by court order, Defendant must file at least one, if not more, report cards demonstrating DHR's ability to sustain substantial performance.  At the status conference, however, having been persuaded by the concerted vocalizations from the Commissioner, counsel for Defendant, and the Governor which further demonstrated DHR's solid commitment to attaining the goal of substantial compliance, the court refrained from directly ordering such a requirement.  The court was hopeful that this case could come to a conclusion, consonant with the parties' past practices, based on the conciliatory agreement of the parties, without further court intervention.

At the time the parties submitted their separate reports to the court (Doc. Nos. 735-36), the court monitor had not yet declared Baldwin County a "converted" county. On March 11, 2005, however, the court monitor declared that Baldwin County – the final and sixty-seventh county – "is consistently practicing in accordance with the Consent Decree and is declared a converted county."  (See Ct. Ex. 1, attached hereto.)

## IV. DISCUSSION

The Consent Decree resulted from the protracted, good-faith bargaining between Plaintiffs and Defendant.  It represents the settlement of this litigation between the parties.  Implementation of the Consent Decree has been supervised extensively by the court and the court monitor over the past decade.  The court has had continuing involvement, through regular communications with the court monitor, status conferences and hearings.  With the exception of a brief period in the mid-1990s in which DHR improvidently challenged the validity of the Consent Decree, see, e.g., R.C. v. Nachman, 969 F. Supp. 682 (M.D. Ala. 1997), aff'd, 145 F.3d 363 (11th Cir. 1998), to the credit of the parties, these proceedings have been primarily conciliatory, as opposed to adversarial. This case has evolved from one of contention to one of mediation with both sides exerting extensive and commendable efforts to resolve all disputes in the best interest of the children involved.

With that said, the proceedings have now turned adversarial with Defendant invoking the termination clause of the Consent Decree and Plaintiffs opposing termination.  The termination provision provides as follows:

> On or after October 1, 2002, the defendant may move for termination of this Decree upon a showing that DHR is in substantial compliance with the requirements of the Decree and of the Implementation Plan and that DHR will remain in substantial compliance after termination of the injunction in this case.

(See Consent Decree ¶ 93 (Doc. No. 235), as amended by ¶ 10 of 1999 Consent Order (Doc. No. 511).)  By the Consent Decree's express terms, Defendant bears the burden of establishing "substantial compliance."  (Id.)

Defendant contends that DHR is in substantial compliance with the provisions of the Consent Decree and the Implementation Plan, that "it has the capacity to sustain compliance," (Doc. No. 735 at 3), and that it is "likely to remain in substantial compliance."  (Doc. No. 714 at 1.)  Defendant relies primarily on the court monitor's recent assertion that "current performance levels are adequate" and the court monitor's recommendation that "the court find that DHR is in substantial compliance with the Consent Decree."  (Ct. Monitor Nov. 2004 Report at 60.)  Defendant also tenders that he has resolved the "four problem areas" which the court addressed at the December 9, 2004 status conference and that, therefore, the court should "terminate the Consent Decree in accordance with its terms."  (Doc. No. 735 at 1-3.)

As to present compliance, Defendant asserts that "DHR has established and implemented the required System of Care in all sixty-seven counties of Alabama pursuant

22

to an Implementation Plan developed by DHR and approved by the court." (Doc. No. 715 at 5.) Furthermore, with no citations to the record and in conclusory fashion, Defendant sets forth a bulleted list which he says represents "indicators of DHR's operation of the System of Care with the aim of achieving the goals of the Decree and in conformity with the 'principles' or 'standards' of the Decree[.]" (Id. at 5-6.)

As to the requirement that Defendant demonstrate that DHR will remain in substantial compliance, Defendant asserts that there is an established record of DHR's good faith compliance with the provisions of the Consent Decree and the court's orders. Defendant contends that DHR's record of good faith is further buttressed by DHR's diligent and cooperative work with Plaintiffs and the court monitor. To the extent that there have been "technical" violations with the "strict terms" of the Consent Decree, such as the failure of DHR to meet the October 2002 deadline, Defendant asserts that those violations were "unintentional" and not "systematic." (Id. at 7-8.)

Relying also on DHR's "institutionalization of procedures," Defendant emphasizes that DHR has incorporated into its "operating policies" the standards set forth in the Consent Decree and other directives, such as the court's order on caseload standards. (Id. at 9.) Defendant states that DHR has adopted a detailed, written Child Welfare Strategic Plan to ensure that the advances made to date remain in place and that improvements continue. Finally, Defendant asserts that DHR will publish public reports demonstrating DHR's performance of the Consent Decree's system of care. (Id. at 9-10.)

Plaintiffs do not undermine the "strides the State has made toward fulfilling the vision articulated in the R.C. Consent Decree."  (Doc. No. 736 at 2.)  Plaintiffs, though, contend that Defendant has not met his burden of demonstrating sustained substantial compliance by DHR.  Plaintiffs have submitted an affidavit from George E. Taylor, M.A., a proposed expert, who reviewed various documents in the case, including the court monitor's November 2004 Report.  Mr. Taylor does not introduce new data, but, rather, analyzes the court monitor's November 2004 Report and asserts that the evidence therein is incongruent with the court monitor's final recommendation of substantial compliance.  Mr. Taylor, in sum and substance, complains that the court monitor's report is conclusory, is lacking current data, and that the data demonstrates DHR's noncompliance and regression, not substantial compliance.  (Taylor Aff., Ex. 1 to Doc. No. 717.)

### A.    Governing Law for Termination of Consent Decrees

"'A consent decree is a strange hybrid in the law.'"  Vanguards of Cleveland, 23 F.3d at 1017 (quoting Brown v. Neeb, 644 F.2d 551, 560 (6th Cir. 1981)).  It is both "a voluntary settlement agreement which could be fully effective without judicial intervention" and "a final judicial order . . . plac[ing] the power and prestige of the court behind the compromise struck by the parties."  Id. (quoting Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983)).  A consent decree, therefore, is a "'settlement agreement subject to continued judicial policing.'"  Id.  "Once approved, the prospective provisions

of the consent decree operate as an injunction." Id. (citing Plumer v. Chemical Bank, 668 F.2d 654, 659 (2d Cir. 1982)).

The decision to terminate jurisdiction over a consent decree rests in the district court's discretion. See Johnson v. Florida, 348 F.3d 1334, 1341, 1349 (11th Cir. 2003); McDonald v. Carnahan, 109 F.3d 1319, 1321 (8th Cir. 1997). The court, though, when proclaiming its decision, should "make sufficiently detailed findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P., to advise the parties of the factual basis for its decision." Bradley v. Milliken, 772 F.2d 266, 272 (6th Cir. 1985); see also Bd. of Educ. of Oklahoma City Public Schools v. Dowell, 498 U.S. 237, 246 (1991) ("[i]f . . . a [consent] decree is to be terminated or dissolved, respondents . . . are entitled to a [precise statement] from the court").

To terminate a consent decree, "[t]he party seeking termination of the decree must show that the basic purposes of the decree have been fully achieved and that there is no significant likelihood of recurring violations of federal law once the decree has been lifted." Allen v. Alabama State Bd. of Educ., 164 F.3d 1347, 1350 (11th Cir. 1999)[14] (citing Dowell, 498 U.S. at 246-250 (1991)); United States v. City of Miami, 2 F.3d 1497, 1505 (11th Cir. 1993) (The court must "begin by determining the basic purpose of the

---

[14] The opinion in Allen was vacated by stipulation of the parties. See Allen v. Alabama State Bd. of Educ., 216 F.3d 1263 (11th Cir. 2000); see also Johnson v. Florida, 348 F.3d 1334, 1340 n.3 (11th Cir. 2003). The court finds that Allen remains persuasive authority as to the foregoing general principles governing termination of consent decrees. See Johnson, 348 F.3d at 1340 n.3.

decree" and whether its purpose has been "'fully achieved.'").  Consideration of the specific terms of the Consent Decree then is paramount.

Factors which may be relevant to whether the purposes have been fully achieved are:  (1) whether the defendant has complied in good faith with the terms of the consent decree since it was entered; (2) any specific terms providing for continued supervision and jurisdiction over the consent decree; (3) the length of time the consent decree has been in effect; and (4) whether the consent decree has eliminated the constitutional deficiencies "to the extent practicable."  Dowell, 498 U.S. at 249-50; Gonzales v. Galvin, 151 F.3d 526, 531 (6th Cir. 1998); Cody v. Hillard, 139 F.3d 1197, 1199 (8th Cir. 1998); City of Miami, 2 F.3d at 1505-06; Heath v. DeCourcy, 992 F.2d 630, 633 (6th Cir. 1993) (citing Dowell, 498 U.S. 237 & Youngblood v. Dalzell, 925 F.2d 954, 960-61 (6th Cir. 1991)).  Notwithstanding this list of factors, though, a court may not terminate its jurisdiction until it finds both compliance with the terms of the consent decree and achievement of the decree's objectives.  See Gonzales, 151 F.3d at 541.

Here, the Consent Decree provides that "substantial compliance" is the governing standard for termination.  Under the express terms of the Consent Decree, a dual "substantial compliance" inquiry is mandated:  (1) Has Defendant demonstrated that DHR is substantially complying with the requirements of the Consent Decree and the Implementation Plan?; and (2) has Defendant demonstrated that DHR will remain in substantial compliance therewith?  (Consent Decree ¶ 93, as amended by 1999 Consent Order.)  To determine whether Defendant has met his burden of demonstrating

"substantial compliance," the court must ascertain the meaning of "substantial

compliance."

Plaintiffs and Defendant, who negotiated the terms of the Consent Decree, agree as

to the general principles of law surrounding the definition of "substantial compliance."

"Substantial Compliance" is oft defined by what it is not.  "Substantial Compliance" is

not subject to rigid application, nor "susceptible of a mathematically precise definition."

Joseph A. by Wolfe v. N.M Dep't of Human Servs., 69 F.3d 1081, 1085 (10th Cir. 1995).

Substantial compliance is not "exact compliance" or perfection.  Id.; see Wyatt v.

Rodgers, 985 F. Supp. 1356, 1388 (M.D. Ala. 1997) (observing that substantial

compliance is something less than 100% compliance; "it would be impractical, and thus

unreasonable, to expect 100% compliance 100% of the time" with respect to the complex

requirements of a consent decree).  Rather, whether the goal of substantial compliance

has been attained requires a case-specific analysis.  See Fortin v. Comm'r of the Dep't of

Mass. Pub. Welfare, 692 F.2d 790, 795 (1st Cir. 1982)  ("[N]o particular percentage of

compliance can be a safe-harbor figure, transferable from one context to another.  Like

reasonableness, substantiality must depend on the circumstances of each case, including

the nature of the interest at stake and the degree to which noncompliance affects that

interest.").

In Joseph A. by Wolfe, relied upon by both Plaintiffs and Defendant, the Tenth

Circuit set forth some general guidelines as to what "substantial compliance" entails in

the context of consent decrees.  In that case, as here, the consent decree provided that

termination of the decree was contingent upon a showing by the defendant of substantial

compliance with its terms.  See Joseph A. by Wolfe, 69 F.3d at 1083.  Because the

contract terms imposed the requirement of "substantial compliance," the Tenth Circuit

applied the contract law definition.  See id. at 1085; see also Reynolds v. McInnes, 338

F.3d 1201, 1211 (11th Cir. 2003) (holding that court must "apply the same rules that

govern contract interpretation when [it] interpret[s] a consent decree, because a consent

decree is essentially a form of contract").  The court explained:

> [S]ubstantial compliance is:  "simply a doctrine to assist the court in
> determining whether conduct should, in reality, be considered the
> equivalent of compliance under the contract." . . .  Judge Cardozo, in the
> seminal substantial compliance case of *Jacob & Youngs, Inc. v. Kent,*
> concluded that performance of a contract will not be considered in
> substantial compliance of the contract if the deviation from the contract
> requirements . . . 'in any real substantial measure . . . frustrate[s] the
> purpose of the contract.'"  230 N.Y. 239, 129 N.E. 889, 891 (1921).  Thus,
> the touchstone of the substantial compliance inquiry is whether Defendants
> frustrated the purpose of the consent decree–i.e. its essential requirements.

Joseph A. by Wolfe, 69 F.3d at 1085-86.

In Joseph A. by Wolfe, however, the Tenth Circuit held that it could not determine

whether substantial compliance had been attained because the district court had not

complied with Rule 52(a) of the Federal Rules of Civil Procedure, by "fail[ing] to make

the specific and clear findings required" by the rule.  Id. at 1089.  Vacating the judgment

and remanding, the Tenth Circuit dictated that

> the district court should (1) apply the substantial compliance standard set
> forth in [its] opinion–i.e., consider whether Defendants satisfied the
> essential purposes of the decree . . .; (2) outline its reasoning why
> Defendants satisfied (or did not satisfy) the essential purposes of the

28

decree–i.e. justify its ultimate legal conclusions . . . ; (3) explain the
methodology employed to reach its factual findings . . .; and (4) specify the
subsidiary factual findings and reasoning necessary to support its judgment
as to Defendants' compliance with each of the overall goals and enumerated
criteria in the decree.

Id. at 1089.

In light of the foregoing, the court initially must examine the express terms of the

Consent Decree and Implementation Plan and ascertain their core purposes/requirements.

Next, applying the above principles of law, the court must determine whether Defendant

has satisfied his burden of demonstrating that DHR is substantially complying with those

requirements and will remain in substantial compliance therewith.


B. Terms of the Consent Decree

Compliance with the Consent Decree "means satisfying the requirements set out in

Paragraph 31 of the Consent Decree."  (See 1999 Consent Order at 2 n.1.)  Paragraph 31

of the Consent Decree contains four subsections, (a) - (d).  Defendant and Plaintiffs focus

on subsections (a) and (b), and, thus, the court confines its analysis to the same.[15]

_____

[15] Subsection (c) mandates that Defendant develop an Implementation Plan, as
provided in Section IX of the Consent Decree.  The parties jointly submitted an agreed-
upon Implementation Plan which the court approved on November 1, 1993.  (Doc. Nos.
264-265.)  Subsection (d) dictates that Defendant comply with certain procedural
requirements outlined in Sections X - XIV of the Consent Decree pertaining to counsel
for plaintiffs' right of access, the court monitor's role, the primacy of the decree, and
attorneys' fees for plaintiffs.

Subsections (a) and (b) of Paragraph 31 provide as follows:

> 31. Defendant shall ensure that DHR, pursuant to the timetable in the Implementation Plan:
>     a. Establishes a "system of care" for class members and their families;
>     b. Operates the "system of care" with the aim of achieving the goals described in Section VII below and in conformity with the "principles" or "standards" set forth in Section VIII below.

(Consent Decree at 13, § VII, ¶ 31 (Doc. No. 235).)

"The goals of the 'system of care,'" set out in Section VII, "shall be to":

> a.   Protect class members from abuse and neglect; and
> b.   Enable class members to:
>     (i).   Live with their families; and when that cannot be achieved through the provision of services, to live near their home;
>     (ii).   Achieve stability and permanency in their living situation;
>     (iii).   Achieve success in school; and
>     (iv).   Become stable, gainfully employed adults.

(Id. at 14, § VII, ¶ 33.)  As stated in a footnote in Section VII, "[t]he goals are meant, among other things, to explain the 'needs' to which services are to be addressed.  The object of services is to attain these goals."  (Id. at 14, § VII, ¶ 33 n.19.)  However, "[t]he statement of goals is not meant to guarantee attainment of the goals for every class member.  Instead, DHR is obliged to provide services needed to enable class members to attain the goals."  (Id.)

Section VIII[16] sets forth thirty "operating principles" or "standards."  (Id. at 15-32.)  The court has distilled the goals and operating principles into five broad

_____

[16] Due to a typographical error, Section VIII is incorrectly designated as "Section VI."

categories:[17]  (1) the prevention of out-of-home placements and the advancement of

family unification, but only when at-home placement provides an environment where the

child is safe from imminent and serious harm[18] (core purpose one); (2) the delivery of

comprehensive services, in a coordinated and therapeutic manner, by competent staff with

appropriate caseloads, to class members and families in home-based and community-

based settings, devised pursuant to individualized service plans ("ISPs"), for the purposes

of facilitating home placement, satisfying the unique physical, emotional, social,

educational and other needs of class members, and promoting smooth transitions for class

members when they "age out" of the system (core purpose two); (3) active participation

by the child, parent and foster parent in the planning and delivery of services, to include

informed involvement so that the child, parent and foster parent have full understanding

of these services and their rights and options (core purpose three); (4) child safety,

encompassing the prevention of sexual abuse and neglect and the timely intervention and

investigation of class members believed to be victims of sexual abuse and/or neglect (core

---

[17] These five categories do not purport to enumerate each and every goal and principle with particularity, but instead summarize the wide goals and principles upon which this case is based.  These categories, in sum and substance, mirror the areas of performance discussed in the court monitor's November 2004 Report and embody the requirements of the Consent Decree.

[18] **At this juncture, the court reiterates its strong position that no child is to be placed in a home from which he or she has been removed whereupon return he or she stands any chance of a repetition of the abusive behavior.  If DHR is to err, let it be on the side of the safety of the child, not on the side of home unification merely for the sake of bolstering the statistics.**

31

purpose four); and (5) stability and permanency in the class members' living situations, including, if in the children's best interest, that when children are removed from their homes, siblings are placed together and familial relationships are maintained through visitations and other means (core purpose five).  (See Consent Decree at 15-32; see also Ct. Monitor Nov. 2004 Report at 3-4.)


### C.  Analysis of Substantial Compliance

Over a period of almost nine years, the court monitor, working conjunctively with Plaintiffs and Defendant, has systematically evaluated each of Alabama's sixty-seven counties to determine whether each county is operating in accordance with the goals and principles of the Consent Decree, described above.  In August 1996, Shelby County was the first county to achieve conversion, and, finally, almost nine years later, in March 2005, the last county, Baldwin County, joined the "converted" ranks.  The court monitor now has declared every county "converted," meaning that, *at the time of conversion*, the counties were "consistently practicing in accordance with the Consent Decree."[19]  (See, e.g., Ct. Ex. 1, Ct. Monitor Letter, re: Baldwin County.)

---

[19] The court italicizes "at the time of conversion" because the court monitor further states that each county "should be declared 'converted,' for as long as the county can sustain the level of practice achieved through this process of conversion."  (See, e.g., Ct. Ex. 1, Ct. Monitor Letter, re: Baldwin County; see also Ct. Monitor Nov. 2004 Report, Appendix A (Ct. Monitor Letter, re: Shelby County ("The Monitor determines that Shelby County DHR is practicing in accordance with principles of the R.C. Consent Decree and is designated converted as long as the above conditions are maintained.").)

The conversion of all the counties, over this lengthy and laborious nine-year process, is a great accomplishment and is an appropriate starting point for determining whether Defendant has demonstrated that the core purposes of the Consent Decree and the Implementation Plan have been achieved.  The credit for this achievement appropriately is bestowed upon the parties.  Through the continuing efforts of Plaintiffs – their persistence in following up on compliance with the Consent Decree – much progress has been made, though the court recognizes not to Plaintiffs' complete satisfaction.  Also, Defendant has worked painstakingly, expeditiously and cooperatively with the court monitor and Plaintiffs, particularly in the last few years, to ensure that every county implemented the system of care outlined in the Consent Decree.  (See, e.g., id. at 29 (observing that DHR has "demonstrated a good faith effort to comply with the court's order to convert all counties before R.C. is concluded[;] for example, DHR has had 18 counties declared converted since October 2002").)  The court commends Plaintiffs and Defendant for their perseverance over the years in negotiating the terms of, and in striving for compliance with, the Consent Decree.

The court credits and adopts the court monitor's findings that, on their respective dates of conversion, the counties were "consistently practicing in accordance with the Consent Decree."  (Ct. Ex. 1, Ct. Monitor Letter, re: Baldwin County; see also Ct. Monitor Nov. 2004 Report, Appendix A (Ct. Monitor Letter, re: Shelby County).)  Defendant relies heavily on this great accomplishment, and appropriately so, and there is no challenge by Plaintiffs to the court monitor's conclusions that, on their dates of

33

conversion, Alabama's sixty-seven counties had satisfied the requirements for compliance with the Consent Decree.  As stated, the fact that the court monitor has declared each and every county "converted" is monumental, as paragraph 31 of the Consent Decree anticipated a county-by-county conversion, pursuant to staggered deadlines set out in the Implementation Plan.  With that said, however, the court finds that it cannot terminate the Consent Decree on that basis alone.

The Consent Decree and the Implementation Plan contemplate a continuing compliance by counties beyond their individual dates of conversion.  After the conversion of all sixty-seven counties, the Consent Decree and Implementation Plan set out the expectation that the counties simultaneously would be operating "with the aim of achieving the goals in Section VII . . . and in conformity with the 'principles' or 'standards' set forth in Section VIII[.]"  (Consent Decree ¶ 31 & n.18; see also Ct. Monitor Nov. 2004 Report at 2-3 (ultimate goal of the county-by-county system of reform "has been to change the practice of child welfare in Alabama in each of the 67 counties so that a child and family who becomes involved with [Alabama's] child welfare system as a result of allegations of abuse and neglect or other reason [are] served in accordance with the principles of the system of care").)

Moreover, as further espoused by the court monitor and not challenged by Defendant, the reason the Implementation Plan set staggered deadlines for county conversion was as follows:

> Clearly, the expectation expressed in the conversion chapter [of the Implementation Plan] and by the monitor is that as counties achieved a level of practice that was in compliance with the Consent Decree, they would continue to perform at that level[;] then when all 67 counties were converted, DHR would have implemented "the system of care" on a statewide basis.

(Ct. Monitor Nov. 2004 Report at 6; see also id. at 11 (observing that "the intent of converting a county was to instill capacity within the county to maintain progress gained and not to externally support a county so that it would become compliant with R.C. *for a minimal period of time*") (emphasis added).)

It is in the area of sustained substantial compliance and, relatedly, future substantial compliance which Plaintiffs challenge. If Defendant cannot demonstrate that, after conversion, counties are sustaining substantial compliance, then Plaintiffs contend that it cannot be found that DHR's system of care is operating in conformity with the requirements of the Consent Decree or that DHR will remain in substantial compliance. Plaintiffs emphasize that Defendant bears the burden of setting forth evidence that DHR is and will remain in substantial compliance with the Consent Decree (Doc. No. 717 at 2), but assert that the record does not support such findings.

Defendant, on the other hand, emphasizes that the court monitor has "certified" DHR's substantial compliance. (Doc. No. 714 at 2.) Specifically, in the concluding paragraphs of his November 2004 Report, the court monitor has recommended that the court find that "DHR is in substantial compliance with the Consent Decree." (Ct. Monitor Nov. 2004 Report at 60.) The court, though, cannot merely adopt the court

monitor's recommendation and fulfill its obligations under the law.  The court must ascertain whether the evidence upon which the court monitor relies supports the court monitor's recommendations.  Cf. Joseph A. By Wolfe, 69 F.3d at 1087-89 (holding that district court erred in adopting special master's findings because there was insufficient factual basis to support the legal conclusions reached by the special master).  As set out below, the court has been unable to reconcile the court monitor's recommendation of "substantial compliance" with the data and other information in the court monitor's November 2004 Report.  Stated differently, Defendant has chosen to rely on the court monitor's November 2004 Report and the recommendations therein, yet he has failed to connect the data to the court monitor's ultimate recommendations, and the court has been unable to do so.  Defendant, thus, has left the court without the necessary evidentiary foundation to declare that DHR is in substantial compliance and will remain in substantial compliance, as is required for termination of the Consent Decree.

1. *The Data in the Court Monitor's November 2004 Report*

The court monitor's recommendations on pages 60 and 61 of his November 2004 Report emerge after the court monitor's discussion of various statistical data in other sections of his report.  The data arises from two primary sources:  (1) sustainability reviews conducted by DHR's Family Services Partnership's Office of Quality

Assurance[20] ("SQA") (see Ct. Monitor Nov. 2004 Report at 22, 29-39); and (2) other

internal data compiled by SQA for the purpose of "assess[ing] the functioning" of the

system of care on a statewide basis.  (Id. at 39-52.)

Turning first to the SQA sustainability reviews, the court monitor's own valuation

of these reviews casts doubt on the reliability of the sustainability reviews as an effective

tool for measuring whether an individual county, or the system overall, is sustaining

substantial compliance.  Two variables are particularly problematic.  First, the pool of

children evaluated for the sustainability studies consisted of only 64 children.[21]  (See id.

at 30, 34.)  As observed by the court monitor,

> [a] limitation of these case review data is the small sample sizes used by the
> Family Services Partnership's Office of Quality Assurance when
> conducting on-site reviews.  As such, case review findings can be
> considered "random spot checks" on children who are actively receiving
> services from the county but statistically may not be fully representative of
> overall practice in a county.  Although each review participant is randomly
> selected for inclusion in the sustainability reviews, the total number of case
> reviews completed for each of these sustainability reviews ranged from four
> to eight.

---

[20] As stated by the court monitor, "the primary role of SQA is conducting on-site
reviews of county child welfare operations to determine whether counties are compliant
with the expectations for performance and practice principles, and to provide
consultation, training, and technical assistance to county-level QA staff and quality
assurance committees."  (Ct. Monitor Nov. 2004 Report at 23.)

[21] The sample pool may even be smaller.  The court monitor observes that the
aggregate findings from these reviews "[i]n some instances" are based on "fewer" than 64
children due to "missing or incomplete data" or due to the fact that at the time of the
review one or more factors were deemed "not applicable."  (Ct. Monitor Nov. 2004
Report at 30.)

(Id. at 34.)  This court is not the first to discount the weight of statistics derived from a small sample pool.  In other contexts, courts have recognized the problem of predicting particular outcomes when the data has been gathered from a sample pool of small size.  See Hazelwood School District v. United States, 433 U.S. 299 (1977) (statistics lacked probative weight given small size of pool); Pollis v. New School for Social Research, 132 F.3d 115, 121-123 (2nd Cir. 1997) (holding that "discrimination may not be proved by statistics involving so small a [sample] pool"); Sengupta v. Morrison-Knudsen Co., 804 F.2d 1072, 1076 (9th Cir. 1986) ("the problem with small labor pools is that slight changes in the data can drastically alter appearances").

Second, at the time the court monitor issued his November 2004 Report, only fifteen of Alabama's sixty-seven counties – or roughly 22 percent – had undergone sustainability reviews by the SQA during 2003 and 2004.  (Ct. Monitor Nov. 2004 Report at 30.)  The limited number of reviews included in the Report also leads the court to question the reliability of the data derived therefrom.

Neither the court monitor nor Defendant has presented any argument or grounds showing that this data is an accurate predictor of substantial compliance.  Similarly, neither has discussed why the foregoing limitations pertaining to the small sample pool and incompleteness do not circumscribe the usefulness of the sustainability reviews.  In particular, Defendant has not argued the weight which the court should give the data or how the data is relevant to a finding of substantial compliance.  In short, there is nothing in the record which demonstrates that the data is an accurate predictor of substantial

38

compliance, given the few number of children included in the reviews and the fact that less than 25 percent of the counties were reviewed during the two-year period; thus, the court is compelled to find that this data is too unreliable, at least in its present form, to sustain Defendant's burden of demonstrating substantial compliance.[22]

Even if the court considers the statistical results of the sustainability reviews as dispositive of the issue of substantial compliance, it is unclear to the court how the data supports a finding of substantial compliance. On page 35 of his November 2004 Report, the court monitor compiles the data from the sustainability reviews so as to assign each county an "overall system performance rating." (Id. at 35.) The sustainability reviews, which apparently are similar to the reviews initially performed to ascertain whether a county had attained the goal of conversion (see id. at 29), reveal that only three of the fifteen counties demonstrated an "overall system performance rating" satisfying the 85 percent threshold initially employed by the court monitor to declare a county converted. (See id. at 35; see also id. at 25 (explaining, in general terms, that the court monitor declared a county converted "when 85% of child status and system performance ratings

---

[22] The court recognizes that the SQA sustainability reviews are an important component of the State's quality assurance mechanisms, (see Ct. Monitor Nov. 2004 Report at 22-23), and, to this end, the court is not saying that the SQA sustainability reviews are not useful as one tool to gauge substantial compliance. The court merely is saying that Defendant has not demonstrated that, standing alone, the reviews included in the court monitor's November 2004 Report constitute a sufficient evidentiary foundation from which the court can find substantial compliance.

[were] acceptable during an on-site compliance [review]").)  Disturbingly, five of the fifteen counties received ratings of only 25 percent.[23]

Notably, there is no explanation by Defendant or the court monitor as to why these "overall system performance ratings" are not a barrier to a finding of substantial compliance.  At the December 9, 2004, status conference, the court monitor essentially conceded that the results of the sustainability reviews did not equate substantial compliance when he stated as follows:  "The biggest challenge is how to sustain the level of performance that [DHR] has, in fact . . . the capacity to do.  And I purposely chose the word 'capacity' and not 'was doing' because of the last 15 [sustainability] reviews. . . . The results of those reviews showed that nine of them were, in fact, not maintaining the level of practice that we really need to maintain."[24]  (Transcript from Dec. 9, 2004 status conference at 42 (Doc. No. 730).)

Moreover, also unfavorable to Defendant, are the results of the aggregate findings from the sustainability reviews which reveal that, in fourteen areas denoted as "key system performance indicators," the percentage of children who received "acceptable"

---

[23] Jackson County is one of the counties with a 25 percent performance rating.  The court monitor has noted that Jackson County, in particular, exhibited "significant problems with practice performance" and was 127% over caseload standards.  (Ct. Monitor Nov. 2004 Report at 16.)

[24] Other than Barbour, Lowndes and Washington counties, no other county scored 85 percent or higher.  Three counties, though, attained a 75 percent rating, and it may be that the court monitor deems those counties to be maintaining an acceptable level of practice.

ratings fell below 85 percent in thirteen of the fourteen areas.[25]  (Ct. Monitor Nov. 2004

Report at 32-33.)  To provide a specific example, of the fifteen counties reviewed, in the

categories of "Individualized Service Plan" and "ISP Implementation" (i.e., core purpose

two), only 41 percent and 64 percent, respectively, of the children reviewed received an

"acceptable" rating.  (Id. at 33.)  The court monitor also has observed that "the

functioning and adequacy" of ISPs are of concern.  (See id. at 34.)

     With that said, though, the court recognizes that the data is not completely

negative.  In contrast to the foregoing, in many of the fourteen areas denoted as "child and

family status ratings," a majority of the children received "acceptable ratings."  (Id.

at 31.)  Reliance on these positive findings as indicators of substantial compliance,

however, at the very least, requires an explanation of how the positive findings outweigh

the other negative factors.  Such an explanation is lacking from the court monitor and

Defendant.  To the contrary, the court monitor has indicated that a balancing does not

weigh in favor of DHR, given his ratings as to the counties' overall system performance

and his statement at the December 9, 2004, status conference, discussed *supra*.  (See

---

     [25] The percentage of children in the following fourteen areas who received an "acceptable" rating are as follows: (1) child/family engagement (64%); (2) functional assessment (44%); (3) long-term view (57%); (4) individual service plan (41%); (5) resource availability (88%); (6) ISP implementation (64%); (7) family preservation (78%); (8) family support (78%); (9) service coordination (57%); (10) urgent response (76%); (11) agency responsiveness (75%); (12) transitions (36%); (13) monitoring and modification (48%); and (13) effective results (68%).  (Id. at 33.)  "Overall performance" was rated at 58 percent.  (Id.; see also id., Appendix B (defining each "system performance indicator").

Transcript from Dec. 9, 2004 status conference at 42 (Doc. No. 730); see also Ct. Monitor

Nov. 2004 Report at 34 (summation of weaknesses in overall performance by the

participating counties appears to outnumber summation of strengths).)

 Moreover, at times, a concern of regression, which is obverse to a finding of

substantial compliance, emanates from the court monitor's discussion of the results of the

sustainability reviews.  The court is referring to the court monitor's judgment that the

sustainability reviews reveal "substantial variability in performance of practice

functions," demonstrate that "consistent performance of practice functions in compliance

with the practice principles of the Consent Decree is not occurring for some of the

children and families," and "show that the level of practice within some of the

participating counties has declined after the county was declared converted."  (Ct.

Monitor Nov. 2004 Report at 34.)  Furthermore, the court monitor notes that the "decline

in consistency of practice performance in some counties" has resulted in part due to "time

elapsed since a county was declared converted. . . ."  (Id. at 35.)

As stated, the sustainability reviews are not the sole source of data in the court monitor's November 2004 Report.[26]  DHR also has collected other internal data which the court monitor has examined.  Notwithstanding Defendant's absence of analysis as to how this data supports a finding of substantial compliance, the court independently has sifted through the data in an effort to find evidence thereof.  For the reasons to follow, the court has been unable to reach any conclusion other than that the data does not establish a sufficient evidentiary foundation from which the court can find that Defendant has sustained his burden of demonstrating that DHR is functioning in substantial compliance with the Consent Decree.  As explained, the data indicates that DHR is not fulfilling four of the five core purposes of the Consent Decree.

As to the goal of minimizing out-of-home placements (core purpose one), the data shows that, although the number of children in out-of-home care between 1989 and 1995 steadily decreased from 4802 to 3932, that number "has been steadily increasing since that time."  (Id. at 43.)  At the end of fiscal year 2003, 5988 children were in out-of-home care, and, as of the second quarter of fiscal year 2004 (i.e., the most recent data) that

_____

[26] The court recognizes that, in addition to these SQA sustainability reviews, there also exists county quality assurance committees which also perform reviews.  (See Ct. Monitor Nov. 2004 Report at 36-39.)  Although the court monitor recognizes the importance of these committees as a "critical component of a functional system of care," the court monitor has noted weaknesses in those reviews and the need to improve "inter-rater reliability" through training and other means.  (Id. at 38-39.)  It does not appear that the court monitor has relied to any significant extent on the county reviews in reaching his conclusions.  To the extent though that either the court monitor or Defendant are relying on this data, there is an absence of explanation as to the data's reliability.

number increased again to 6175.  According to the court monitor, these figures in 2003 and 2004 are "the highest total of children in out-of-home care since the implementation of R.C."  (Id.)

Although the court monitor postulates that the increase "may be" the result of a rise in methamphetamine abuse (id. at 45), an external factor outside of DHR's control, the court finds problematic to a finding of substantial compliance the court monitor's concern that regression also is a culprit.  The court monitor has linked, at least in part, the high number of children in out-of-home care to "substantial increases" in the number of children placed in foster care by counties after they have been declared "converted" and "released from monitoring."[27]  (Id. at 11; see also id. at 46; id at 47, Display 25 (representing that, subsequent to conversion, nineteen counties experienced increases in out-of-home care ranging from 22 percent to 250 percent).)

The court monitor further observes that "the path of least resistance is to take a child into foster care, and [that] it is more complex to work in the child's home and with the family to find a workable solution."  (Id. at 43.)  The court monitor states that there is a direct correlation between the deterioration of protective supervision for children and

---

[27] As stated by the court monitor, there has been a "general trend" that, when counties are in the process of achieving conversion, the number of children in foster care decreases.  (Ct. Monitor Nov. 2004 Report at 44-45.)  For example, the court monitor notes that, between 1998 and 2001, a time period representing a reduction in the number of children entering foster care, thirty-seven counties were released from court monitoring and, thus, performing at peak levels.  (Id.)  From aught that appears, though, that trend reverses once a county is released from court supervision.

the increase of out-of-home care.  (Id. at 42-43.)  The court monitor's assertion that statewide this correlation has proved true in recent years (id.), coupled with the court monitor's statement that increases in children in foster care have occurred in some counties after being released from court monitoring, gives the court grave concern as to whether the counties are continuing to practice at acceptable levels in the area of minimizing out-of-home placements.  (Id. at 44, 46.)  Importantly, Defendant has not presented any analysis or argument which negates or mitigates the court monitor's observations and has not submitted evidence which demonstrates that the core purpose pertaining to the prevention of out-of-home placement is being fulfilled.[28]

As to core purpose two, although internal data complied by DHR demonstrates that the counties have improved in the area of completing ISPs within timeframe expectations,[29] the court monitor has noted that, based on the sustainability reviews, a question arises as to whether the quality of the formulation and implementation of ISPs,

---

[28] Also part of core purpose one is the advancement of family unification, but the court has been unable to find any data or other evidence in the record concerning this goal, and Defendant has cited none.  Although, for example, the court monitor states that "there are fewer barriers to children maintaining bonds with their family members," that statement simply is too conclusory for the court to adopt as its own.  (Ct. Monitor Nov. 2004 Report at 59); see Joseph A. By Wolfe, 69 F.3d at 1087-89 (reversing judgment on the ground that district court erroneously adopted special master's findings because there was insufficient factual basis to support the legal conclusions reached by the special master).

[29] "Current policy expectations are that initial ISPs are completed within 30 days of the case being opened for services, whereas[] ISPs reviews (updated ISPs) are to occur on an as-needed basis and within six months of the most recent ISP."  (Ct. Monitor Nov. 2004 Report at 50.)

namely their "functioning and adequacy," is conforming with the principles of the Consent Decree.  (Id. at 34.)  The data in the court monitor's November 2004 Report pertaining to ISPs, as discussed herein, appears to contradict the court monitor's conclusion at page 59 of his November 2004 Report that the principles of the Consent Decree pertaining to ISPs are "being met with exceedingly high consistency."  (Id. at 59.) At the very least, the court finds that the Report is incomplete as to what facts form the basis of the court monitor's conclusion.[30]

Additionally, the court monitor has stressed that to maintain the integrity of DHR's system of care DHR must strive to comply with the court-ordered caseload standards. The essence of this directive is encompassed as part of core purpose two.  However, the failure of post-converted counties to sustain caseload levels within the court-ordered caseload standards has been of particular concern to the court monitor because a "benchmark" for determining compliance is a county's ability to maintain the caseload levels dictated in the court's order.  (Id. at 21 (noting that he has expressed this concern in written correspondence on at least four occasions, beginning in April 2003).)  The court monitor states that "the increased number of counties" with "caseloads over standards raises questions regarding a county's ability to sustain practice in compliance with the

---

[30] As another example of incompleteness, in the one area where the data shows significant compliance problems concerning timely completion of ISPs, DHR provides an explanation for the low statistic, but the court monitor indicates that he is unable to "verif[y] through currently available data systems" DHR's explanation.  (See Ct. Monitor Report at 52.)

Consent Decree."  (Id. at 22.)  The latter observations constitute further evidence that DHR is not fulfilling core purpose two.

Moreover, turning to core purpose three, the court has been unable to ascertain the factual basis for the court monitor's ultimate conclusion that "[f]oster parents are much more active participants in the individual service planning process[.]"  (Id. at 59.) Defendant has not assisted the court by citing the evidence which supports this conclusion.  Cf. Joseph A. By Wolfe, 69 F.3d at 1087-89 (reversing judgment on the ground that district court erroneously adopted special master's findings because there was insufficient factual basis to support the legal conclusions reached by the special master).

In other areas, the court monitor has announced that the data is insufficient for him to form a reasoned opinion as to compliance.  Specifically, as to core purpose five, the court monitor observes that "[t]he timely achievement of permanency [of a child's living situation]" is a "critical component of child welfare services as specified by the expectations of [the Consent Decree]."  (Ct. Monitor Nov. 2004 Report at 48.)  Yet, in his November 2004 Report, after reviewing the available data pertaining to permanency for fiscal years 2000 through 2003, the court monitor concludes that the issue of permanency "needs more data analysis and more detailed study" and that "[c]urrently there [is] not sufficient data to fully evaluate and judge DHR's performance on permanency."  (Id. at 50; see also id. at 57 (observing that "[t]he timely and consistent achievement of permanency remains a complex challenge for not only Alabama, but all state child welfare systems").)

As to the goal of providing a child who is in out-of-home care with a stable home environment, with minimal risk of placement disruption, another component of core purpose five, the court monitor again states that he lacks all of the data needed to evaluate performance in this area. (Id. at 50.) Specifically, while the court monitor observes that there is "some data available" which highlights trends regarding the "stability of placement for children in out-of-home care," he says that the data is incomplete without additional information regarding "distribution of placement." (Id.) The court monitor, however, states that he "does not have access to this distribution of placement data." (Id.) Defendant has not offered any additional evidence or countervailing argument to refute the court monitor's conclusion as to the absence and necessity of such data. Nor has Defendant indicated that any additional evidence is available. In sum, there is no evidence from which the court can ascertain whether the core purpose of stability and permanency has been fulfilled.

Positive data, though, does exist as to core purpose four pertaining to the prevention and timely interventions and investigations of class members believed to be victims of sexual abuse and/or neglect. The court monitor indicates that some "quantitative indicators" as to whether or not DHR is ensuring child safety are revealed through data compiled by DHR regarding the number of child abuse and neglect ("CAN") reports received, the timeliness of contact to these reports, and the timeliness of the resolution of the CAN report. (Ct. Monitor Nov. 2004 Report at 39.) According to the court monitor, the data demonstrates a steady and notable increase in the percentage of

48

cases having initial CAN contacts within the required five days. (Id.) To Defendant's credit, there is data that, in 91.4 percent of cases, DHR caseworkers are making contact with children who are the subject of CAN reports within five days, and percentages of initial CAN contacts have averaged approximately 90 percent during the previous three years. (Id. at 41.) The court monitor observes that these figures represent a "considerable increase since 1997" when only 49 percent of children were contacted by a social worker within five days.[31] (Id.)

Overall, though, having carefully studied the data in the court monitor's November 2004 Report, the court has been unable to reconcile the data with the court monitor's final conclusion that "current performance levels are adequate" and his recommendation "that the court find that DHR is in substantial compliance with the Consent Decree." (Ct. Monitor Nov. 2004 Report at 60.) In sum, for the reasons stated, the court finds that the data in the court monitor's November 2004 Report falls short of satisfying Defendant's burden.

---

[31] Furthermore, it is worth mentioning that, according to a United States government study conducted by the Children's Bureau and the Administration for Children and Families, located within the U.S. Department of Health and Human Services, Alabama achieved substantial conformity within the safety outcome titled "Children are, first and foremost, protected from abuse and neglect." (Ct. Monitor Nov. 2004 Report at 53.)

## 2.  Other Impediments to a Finding of Substantial Compliance

Two more reverberating themes emerge from the court monitor's November 2004 Report which seemingly contradict the monitor's recommendation of substantial compliance.  First, the court monitor has observed that DHR has the "capacity" to perform in substantial compliance with the Consent Decree.  Having the capacity or the ability to substantially comply with the Consent Decree, though, simply is not the equivalent of actual substantial compliance.  Only the latter – i.e, a demonstration of substantial compliance – satisfies Defendant's burden under the termination provision of the Consent Decree.

Specifically, in his concluding remarks, the court monitor states that "[t]he data in this report show that each county in Alabama has demonstrated the *capacity* to perform in accordance with the principles of the R.C. Consent Decree."  (Id. at 60 (first paragraph/ emphasis added); see also id. at 58 ("The system currently has the capacity to practice child welfare in accordance with the principles of the Consent Decree.").)  By choosing the word "capacity," the court monitor appears to be referring to the fact that, during the preceding nine years, he has proclaimed that each county has implemented the requirements of the Consent Decree.  (See, e.g., Ct. Ex. 1, Ct. Monitor Letter, re: Baldwin County.)  He, however, has made clear that a county must "sustain the level of practice achieved through this process of conversion" in order to retain the status of "converted." (See id.)  Recently, he has espoused a concern regarding the adeptness of counties to maintain a level of practice which equates substantial compliance.  Namely, at the

December 9, 2004, status conference, he stated that, although DHR had the "capacity" to sustain an acceptable level of performance, the sustainability reviews indicate that DHR was not performing up to its capacity. (Transcript from Dec. 9, 2004 status conference at 42 (Doc. No. 730).) In other words, although through county-by-county conversion DHR has established the required "system of care," as required by paragraph 31(a) of the Consent Decree, the court monitor appears to be saying that DHR is having difficulties "operat[ing] the 'system of care'" in accordance with the Consent Decree's goals and principles, as required by paragraph 31(b). (Consent Decree at 13, § VII, ¶ 31(a)-(b).)

Second, as mentioned herein, the court monitor has indicated a problem of regression. Although the court monitor says that Defendant "deserves commendation for asserting conversion in all counties," he qualifies his praise by observing that "there continues to be quantitative and qualitative data that show that the significant improvement of practice made through the conversion process has not been consistently maintained in all of the counties that have been declared converted." (Ct. Monitor Nov. 2004 Report at 11.)

In fact, in his November 2004 Report, the court monitor alludes to a problem of regression multiple times. (Id. at 11 (observing "substantial increases" in the number of children placed in foster care by counties after they have been declared "converted" and "released from monitoring"); id. at 34 (remarking that certain "review findings show that the level of practice within some of the participating counties has declined after the county was declared converted"); id. at 13 (observing recent trend of counties "losing

51

allocated staff positions" after having been declared compliant; "since September 2003, a total of 62 allocated positions have been lost from counties previously determined to be converted, despite the total statewide allocated staffing level decreasing by 20 during this same timeframe."); id. at 21 (noting a "trend[]" of "staff reductions in converted counties"); id. at 22 (noting that "the increased number of counties" with "caseloads over standards raises questions regarding a county's ability to sustain practice in compliance with the Consent Decree").)

The foregoing observations of the court monitor, in the opinion of the court, demonstrate a tendency of converted counties to regress, rather than to sustain substantial compliance, once the court is no longer overseeing the counties' progress. Moreover, the court monitor's recent emphasis on DHR's "capacity" and de-emphasis on actual, satisfactory performance suggests that the court monitor is assuming that Defendant will bring performance up to par. The court, though, is not at liberty to make the same assumption because the Consent Decree expressly provides that Defendant must demonstrate that DHR "is" in substantial compliance and "will remain" in substantial compliance, and, as discussed herein, evidence to support Defendant's burden is lacking. (Consent Decree ¶ 93, as amended by 1999 Consent Order.)

3.  *Consideration of Other Factors*

(a)  good faith

Good faith also is a factor relevant to the court's inquiry of whether to terminate a

consent decree.  See Johnson, 348 F.3d at 1343-44; Gonzales, 151 F.3d at 531; City of

Miami, 2 F.3d at 1505-06.  The court has not ignored Defendant's good faith efforts made

in this case.  For example, although Defendant did not meet the October 1, 2001, deadline

for conversion, Plaintiffs have acknowledged that Defendant attempted to do so in good

faith, and the court concurs.  (Mem. of Understanding, entered Dec. 5, 2002 (Doc. No.

650).)  Defendant also worked diligently and in good faith in promptly addressing the

specific "problem areas" the court enumerated at the December 9, 2004 status conference.

Moreover, the court has studied and is impressed with DHR's Child Welfare

Strategic Plan and DHR's institutionalization of those procedures.  Implementation of the

Strategic Plan demonstrates DHR's strong commitment to complying with the

requirements of the Consent Decree and to the children who come into DHR's care.[32]

Furthermore, Defendant is to be credited for DHR's efforts in ensuring that budgetary

---

[32] The court notes, though, that, while DHR's Child Welfare Strategic Plan includes numerous laudable strategies directed toward sustaining child welfare practice within converted counties, including the goal of conducting "full, onsite reviews" of each county at least once every three years (Child Welfare Strategic Plan, at 43 (Ex. 1 to Doc. No. 714); see also Ct. Monitor Nov. 2004 Report at 23, 29), the Strategic Plan was implemented only last Spring.  Defendant has not presented evidence as to whether the strategies have achieved the purposes for which they were implemented.  It may be that such evidence is unavailable given that the Strategic Plan has been in existence for only a year.

restraints do not adversely impact DHR's child welfare services.  The court also does not question the current Commissioner's commitment to this case and Alabama's child welfare system.  The court, however, finds that Defendant's good faith, in and of itself, cannot justify a finding of substantial compliance.  See Gonzales, 151 F.3d at 531 (observing that, "notwithstanding" a defendant's good faith, "a district court may not terminate its jurisdiction until it finds both that Defendants are in compliance with the decree's terms and that the decree's objectives have been fulfilled"); cf. Fortin v. Commissioner, 692 F.2d 790, 796-97 (1st Cir. 1982) ("the Department's evidence of diligence alone" did not satisfy its burden of demonstrating impossibility of compliance with consent decree so as to avoid contempt); Palmigiano v. DiPrete, 700 F. Supp. 1180, 1194 (D.D.C. 1996) (good faith effort of defendants to comply with consent decree is not valid defense in civil contempt proceedings).

(b)  specific terms providing for continued supervision
and jurisdiction over the consent decree

Another consideration for the court in deciding whether to terminate the Consent Decree is whether the Decree contains any specific terms providing for continued supervision and jurisdiction.  See Gonzales, 151 F.3d at 531; City of Miami, 2 F.3d at 1505-06.  The 1999 Consent Order, which amended the Consent Decree, provided that, after the conversion of all sixty-seven counties which was to be completed by October 1, 2001, Defendant could not move for termination of the Consent Decree until one year had elapsed.  (1999 Consent Order ¶ 11 & Ex. 1 (attached thereto).)  The purpose of the one-

54

year period was to allow for continued monitoring and reviews to "assure compliance with all requirements [] of the decree" and to "assure that conversion has been achieved." (Id., Ex. 2 ("Strategic Conversion Plan" at 3, 8-9)); see also Ct. Monitor Nov. 2004 Report at 29 ("The 1999 [Consent] Order also specified that after the conversion of all counties, the following year (until October 2002) was a time period for the counties to demonstrate that the level of practice achieved through the conversion process would be sustained.").)

Defendant, though, did not meet the October 1, 2001 deadline.  It took Defendant three-and-a-half more years than anticipated to attain the goal of conversion of all counties:  Baldwin County, the final county to attain conversion status, was not declared converted by the court monitor until March 11, 2005.  Despite having only recently attained this goal, Defendant now argues for immediate termination of the Consent Decree without presenting any reason or evidence to justify the elimination of a monitoring period.  In sum, the Consent Decree's expectation that, after all the counties had converted, court supervision would continue for at least a year to monitor sustainability is another factor which weighs against termination of the Consent Decree.

Relatedly, the court finds somewhat troublesome Defendant's rush for closure when, from aught that appears, Defendant was dilatory in implementing the court-ordered report card mechanism which the parties and the court monitor agreed would assist in

measuring the counties' ability to sustain substantial compliance.[33]  (See Nov. 4, 2003

Order (Doc. No. 687).)  Defendant also urges the court to terminate the Consent Decree

prior to the publication of any of the report cards.  (Id. ¶ 4.)


*4.  Summation of Court's Findings that Defendant Has Failed to Satisfy
His Burden of Demonstrating Present and Future Substantial Compliance*

For the foregoing reasons, the court finds that Defendant has not met his burden of

demonstrating "that DHR is in substantial compliance with the requirements of the

Decree and of the Implementation Plan."  (Consent Decree ¶ 93, as amended by 1999

Consent Order.)  Defendant relies on the November 2004 Report of the court monitor.

The court monitor, however, has failed to demonstrate how the data and other information

in his Report coalesce with his recommendation of substantial compliance.  Defendant,

who bears the burden of demonstrating substantial compliance, has not offered any

meaningful analysis to assist the court in connecting the data to the court monitor's

ultimate recommendations.  Indeed, the court's review of the data has been prolonged by

Defendant's failure to establish how the data supports the premise for which it is offered.

In short, the court finds that the record is devoid of sufficient evidence which

---

[33] Defendant's failure to comply with the court's order was noted by the court
monitor in his November 2004 Report.  (Ct. Monitor Nov. 2004 Report at 23 n.5; see also
id. at 56, 61.)  After the status conference in December 2004, at which the court
emphasized Defendant's non-compliance with its order, Defendant worked quickly to
comply with the court's order.  In his report filed February 4, 2005 (Doc. No. 735),
Defendant notified the court that DHR now has implemented a "Report Card Rating
System for Use for All 67 Counties."  (Id. ¶ 4 and Ex. B.)

demonstrates that, for any period of time, converted counties are remaining in substantial compliance with the requirements of the Consent Decree.

Moreover, the court monitor's concerns that counties are regressing after conversion and that DHR is failing to perform to its capacity also weigh against a finding of substantial compliance. Additionally, the fact that the Implementation Plan anticipated a monitoring period after full conversion is another reason suggesting that termination of the Consent Decree is premature.

Turning to the second prong of Defendant's burden, in the court's opinion, the best evidence to support a finding that DHR "will remain in substantial compliance" (Consent Decree ¶ 93, as amended by 1999 Consent Order) is evidence that, after conversion, counties have continued to operate in a manner that substantially complies with the Consent Decree. As indicated, that evidence is lacking.

The court also finds significant the fact that the court monitor never makes an express recommendation that the court find that Defendant "will remain in substantial compliance." (See Ct. Monitor Nov. 2004 Report at 60-61.) To the contrary, his recommendation indicates a hesitancy to make such a recommendation. Specifically, the court monitor recommends continued supervision by the court for a period of one year to permit Defendant to file "two performance reports" which demonstrate that DHR is substantially complying in the "areas of performance" evaluated in the court monitor's

November 2004 Report.[34]  (Id. at 61.)  The court monitor's recommendation is yet another

indicator that the court monitor is not convinced that Defendant has demonstrated that

DHR will remain in substantial compliance.[35]  At best, the court finds that there remains

uncertainty as to whether Defendant will be able to remain in substantial compliance once

the court terminates the injunction in this case.

Accordingly, based on the findings set out herein, the court rejects the court

monitor's recommendation that "the court find that DHR is in substantial compliance

with the Consent Decree."  (Id. at 60.)  The court also rejects the court monitor's

recommendation "that the independent monitoring of the Consent Decree be terminated."

(Id. at 61.)

Having carefully considered how to proceed in this case, so as to permit

Defendant sufficient time to demonstrate substantial compliance, the court shall direct

---

[34] Although the court monitor recommends that the court find that Defendant is in
substantial compliance, he also advises that, as an alternative to termination of the
Consent Decree, the court retain jurisdiction over the Consent Decree for one year.
Previously, the court directed the parties to address whether, once the court finds that
Defendant has satisfied his twofold burden of demonstrating substantial compliance, it
has the authority to retain jurisdiction for one year during which time "either party could
remove to reinstate the case, if appropriate."  (Ct. Order, Oct. 21, 2004 (Doc. No. 711).)
In response, Plaintiffs take the position that the court can and should retain jurisdiction,
while Defendant contends that a finding of "substantial compliance" mandates
termination of the Consent Decree.  The court notes the parties' divergent positions, but at
this time the court need not address this issue given its finding that Defendant has not met
his burden.

[35] The court monitor's recommendation also is consistent with his position at the
October 29, 2002, status conference that, upon completion of the conversion of all sixty-
seven counties, a monitoring period should commence.  (See Doc. No. 645.)

Defendant to file a performance report, as recommended by the court monitor.  (Id.)  The performance report shall be filed on August 4, 2005,[36] and shall include the county report card ratings ordered by the court.  At that time, if appropriate, Defendant may renew his motion to terminate the Consent Decree and Implementation Plan.  The motion must cure the deficiencies recited herein and include careful analysis of the evidence which sustains Defendant's dual burden of demonstrating substantial compliance.

## V.  CONCLUSION

Sixteen and a half years is a long time for a federal court to oversee the operation of the State of Alabama's child welfare system.  As the court previously has observed, "[f]ederalism dictates that a federal court withdraw from the realm of state affairs at the earliest opportunity.  This court is an ardent believer in [federalism] and would like nothing more than to be free from the immense burden of monitoring DHR's operations." R.C., 969 F. Supp. at 703.  Indeed, the court is more anxious than Defendant to return this case to the State; however, the court "must remain true to the wording and intent of [the Consent Decree and of the Implementation Plan], until their goals are met."  Gonzales, 151 F.3d at 531.  As stated herein, Defendant has not satisfied his twofold burden of

---

[36] In its February 2005 report (see Doc. No. 735), Defendant represented that the report cards will be published twice a year, presumably every six months.  (See Doc. No. 735.)  The court assumes that by August 4, 2005, the first report cards will have been published.

59

demonstrating substantial compliance; therefore, the court must deny Defendant's motion for dismissal and termination of the Consent Decree.

## VI.  ORDER

Accordingly, based on the foregoing, it is CONSIDERED and ORDERED that Defendant's motion for dismissal and termination of the Consent Decree (Doc. No. 714) be and the same is hereby DENIED *at this time*.

It is further CONSIDERED and ORDERED that on August 4, 2005, Defendant file a performance report, consistent with directives set out herein.

Done this 13th day of May, 2005.

 /s/ Ira DeMent                                         
SENIOR UNITED STATES DISTRICT JUDGE
