IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

R.C. by his next friend, the ALABAMA )
DISABILITIES ADVOCACY, )
PROGRAM, on behalf of himself and )
those similarly situated, )
       )
       Plaintiffs, )
       )
v. )    CIVIL ACTION 2:88cv1170-ID
       )       [WO]
PAGE WALLEY, as Commissioner )
of the Alabama Department of )
Human Resources, )
       )
       Defendant. )

## MEMORANDUM OPINION AND ORDER

### TABLE OF CONTENTS

I.     **INTRODUCTION**      5

II.    **JURISDICTION**      7

III.   **STANDARD OF REVIEW**      8

     A.  The Standard for Termination of the Consent Decree      8

        1. *Generally*      8

        2. *The Terms of the Consent Decree and its Termination Clause*   9

           a. Implementation of the "System of Care"      10

           b. Termination Clause      11

           c. The Requirements of the Consent Decree      12

        *3.  Substantial Compliance*           14

    B.  Evidentiary Hearing           18

    C.  Findings of Fact and Conclusions of Law           21

IV.    **PROCEDURAL HISTORY AND BACKGROUND**           22

    A.  Brief Summary of R.C. I           22

    B.  Orders and Pleadings Filed after R.C. I           24

    C.  The Court Monitor's 2006 On-Site Sustainability Reviews           28

V.    **DISCUSSION**           31

    A.  Analysis of Substantial Compliance under the First Prong of the Termination Clause of the Consent Decree           32

    B.  Analysis of Substantial Compliance under the Second Prong of the Termination Clause of the Consent Decree           36

        *1.  Preliminary Findings Concerning the 2006 On-Site Sustainability Reviews and the Parties' Positions as to What the Reviews Mean in terms of Substantial Compliance*           38

        *2.  Ratings:  Overall Child Status and Overall Performance*           41

        *3.  Core Purpose One*           44

        *4.  Core Purpose Four*           50

        *5.  Core Purpose Two:  Service Delivery and Competent Staff*           56

            a.  Service Delivery           57

            b.  Competent Staff           59

                *i.  DHR's Demonstrated Compliance with the Court's Order on Developing a Licensed Child Welfare Social Worker Workforce*           59

2

*ii. Stakeholders' Reports*     62

*iii. Training*     63

*6. Core Purpose Two:  Appropriate Caseloads*     65

    a. Staffing Allocations and the Child Welfare Staffing Committee     69

    b. DHR's Compliance with the Monitoring and Reporting Sections of Court's 1998 Order     77

    c. The Court Monitor's Measurements for Ascertaining Substantial Compliance with the Court's 1998 Order and Examination of the Evidence from the 2006 On-Site Sustainability Reviews     79

        *i. Counties' Average R.C. Workloads*     81

        *ii. Counties' Seven-Month Track Record*     83

        *iii. Data Pertaining to Percentages of Staff "Over Standards"*     85

            Findings Regarding Exception Reports     94

            Findings Regarding Staff Turnover     97

            Findings Regarding DHR's Good Faith     98

    d. The Court's Overall Findings of Substantial Compliance Concerning Core Purpose Two's Goal of Compliant Caseloads     101

*7. Core Purpose Three*     104

    a. Positions of the Parties and the Court Monitor     105

    b. Timely Completion of ISPs     106

    c. Serviceable ISPs     108

|   | d.  The 2006 On-Site Sustainability Reviews | 110 |

|   | e.  Findings | 112 |

| 8.  Core Purpose Five | | 116 |

| 9.  The 2006 On-Site Sustainability Reviews:  The Three Counties Which the Court Monitor Deemed Were Not in Substantial Compliance with the Consent Decree | | 131 |

|   | a.  The Arguments of the Parties | 131 |

|   | b.  DHR Has Detected Problems | 132 |

| 10.  Other Noteworthy Evidence | | 137 |

| 11.  The End of Federal Judicial Supervision Does Not Mean the End of Oversight:  DHR's Quality Assurance System and Other Supervision Mechanisms | | 142 |

| **VI.** | **CONCLUSION** | 144 |

| **VII.** | **ORDER** | 147 |

## I.  INTRODUCTION

This cause is before the court on the second motion for order terminating Consent

Decree (Doc. No. 761), filed by the Honorable Page Walley, Ph.D., who by virtue of his

position as the commissioner of the Alabama Department of Human Resources ("DHR")

is the defendant in this long-running litigation involving institutional reform of DHR's

child welfare system.[1]  The first motion for order terminating Consent Decree was denied

by the court in a memorandum opinion and order entered on May 13, 2005.  See R.C. v.

Walley ("R.C. I"), 390 F. Supp.2d 1030 (M.D. Ala. 2005).  In R.C. I, the court found that

"Defendant ha[d] not submitted evidence sufficient to sustain his burden of demonstrating

that DHR 'is' and 'will remain' in substantial compliance with the terms of the Consent

Decree and of the Implementation Plan as required for termination of said Decree."  Id.

at 1033.

As grounds for his second motion, Defendant asserts that he has submitted an

adequate evidentiary record to support termination of the Consent Decree, which has

governed in this case since 1991, and that this evidence addresses and cures the

deficiencies outlined by the court in R.C. I  Conversely, Plaintiffs, who opposed the first

motion and likewise oppose the instant "second" motion, argue that there is no

evidentiary basis for termination of the Consent Decree and that continued judicial

---

[1] Because a lawsuit against a public official in his official capacity is, in effect, a
suit against the underlying public entity, the court refers to "Defendant" and "DHR"
interchangeably.

oversight is necessary to bring Defendant in substantial compliance with the requirements of the Consent Decree.

After careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that DHR successfully has reformed its child welfare system by developing a system of care which substantially complies with the requirements of the Consent Decree and the Implementation Plan and that judicial oversight is no longer necessary to avoid return to the depraved conditions that led to the commencement of this lawsuit in 1988 and to the court's intervention.[2]  The court finds that Defendant has met his burden of demonstrating DHR's substantial compliance under

---

[2]  This class action lawsuit was filed on November 15, 1988, on behalf of a minor who is known by his initials "R.C."  As set out in R.C. I,

> R.C. was an eight-year-old boy who allegedly had been abused by his mother and later neglected by his father.  Ultimately, R.C. was placed in the custody of DHR.  (Compl. at 1-4 (Doc. No. 1).)

> While in the custody of DHR, R.C's welfare allegedly was not much better than it was when he lived with his parents.  R.C. was subjected to a series of short-term placements, including confinement in psychiatric hospitals.  It was alleged that R.C. was heavily medicated with psychotropic drugs and denied visitation with his father.  Eventually, R.C. was placed in a long-term residential treatment facility many miles from home.  (Id. at 5-6.)

> R.C.'s plight was alleged to be symbolic of the fate of numerous other children under the care of DHR.  R.C., on behalf of a class, alleged that the conditions and practices in the child welfare system in Alabama were constitutionally deplorable and in violation of federal statutes.  Through class certification, R.C. sought to alleviate these systemic deprivations within DHR's child welfare system.  (Am. Compl. at 16 (Doc. No. 22).)

390 F. Supp.2d at 1032.

the Consent Decree's two-pronged termination clause and that, accordingly, Defendant's

motion is due to be granted.[3]

## II. JURISDICTION

The Consent Decree bestows upon the court shared authority with the court

monitor to determine compliance with the Consent Decree, but sole authority to terminate

the Consent Decree upon motion of Defendant.  (Consent Decree ¶¶ 86, 91, 93, entered

June 11, 1991 (Doc. No. 235)), as amended by 1999 Consent Order (Doc. No. 511));

R.C. I, 390 F. Supp.2d at 1034.  A court also maintains inherent jurisdiction over its

decrees.  See Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013, 1018 (6th Cir.

1994); Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985) ("Consent decrees are

subject to continuing supervision and enforcement by the court.").  The court, thus, acts

within its jurisdiction in ruling on the present motion to terminate the Consent Decree.

---

[3] The court notes that at least eleven lawyers have represented Defendant during
the course of this litigation.  A few have been absolutely adversarial, but the majority
have been willing to work with Plaintiffs and the court monitor in effecting overall
substantial compliance with the Consent Decree.  The court commends those who have
chosen to be cooperative.

### III.  STANDARD OF REVIEW

A.  <u>The Standard for Termination of the Consent Decree</u>

*1.  Generally*

The court begins with the principles, duly emphasized by Defendant, that Consent

Decrees "are not intended to operate in perpetuity," <u>Board of Education of Oklahoma</u>

<u>City Public Schools v. Dowell</u>, 498 U.S. 237, 248 (1991), and that "[r]eturning

governmental entities to the control of local authorities 'at the earliest practicable date is

essential to restore their true accountability to our governmental system.'" <u>Jordan v.</u>

<u>Wilson</u>, 951 F. Supp. 1571, 1580 (M.D. Ala. 1996) (quoting <u>Freeman v. Pitts</u>, 503 U.S.

467, 490 (1992)); <u>see</u> <u>also</u> <u>Reynolds v. McInnes</u>, 338 F.3d 1201, 1219 (11th Cir. 2003)

("Federal court oversight of an interference in the operations of a state government

department or agency 'should be as narrow and short-lived' as fulfilling the duty to

eradicate [the violation] allows.") (quoting <u>Ensley Branch, NAACP v. Seibels</u>, 31 F.3d

1548, 1574-75 (11th Cir. 1994) (brackets added).  The court concurs wholeheartedly with

the foregoing principles, and, as the court stated in <u>R.C. I</u>, it "is more anxious than

Defendant to return this case to the State[.]"  390 F. Supp.2d at 1059.  At the same time,

however, while the goal of achieving state and local autonomy of non-federal public

institutions is a substantial one, a parallel goal of obvious equal importance is that the

offending party must "remedy the violation" which the consent decree seeks to cure.

<u>Freeman</u>, 503 U.S. at 489; <u>Sims v. Montgomery County Com'n</u>, 9 F. Supp.2d 1281, 1288

(M.D. Ala. 1998).  Stated in slightly different terms, termination of a consent decree is

not appropriate unless the decree's purposes have "'been fully achieved.'" U.S. v. City of Miami, 2 F.3d 1497, 1505 (11th Cir. 1993) (citation omitted).

In R.C. I, the court opined that, notwithstanding that the instant Consent Decree had been in effect at that time for almost fifteen years, termination was not warranted because, in essence, Defendant had failed to meet his evidentiary burden of demonstrating that DHR had remedied the violations which the Consent Decree sought to eliminate.  See 390 F. Supp.2d at 1059.  Defendant's burden is embodied in the two-part termination clause of the Consent Decree, to which the court now turns.

### 2.  The Terms of the Consent Decree and its Termination Clause

"A district court must look to the specific terms of a consent decree in determining whether and when to terminate supervision or jurisdiction over it."  Gonzales v. Galvin, 151 F.3d 526, 531 (6th Cir. 1998).  The Consent Decree is a detailed document, forty pages in length, which sets out a comprehensive agreement for transforming the operations of DHR's child protective services and foster care systems ("child welfare system").[4]  Paragraph 31 of the Consent Decree provides as follows:

> Defendant shall ensure that DHR, pursuant to the timetable in the Implementation Plan:
>
> a.  Establishes a "system of care" for class members and their families;

---

[4] For simplicity, the court refers to DHR's child protective services and foster care systems as the "child welfare system."

9

b.  Operates the "system of care" with the aim of achieving the goals
described in Section VII below and in conformity with the "principles" or
"standards" set forth in Section VIII below.

(Consent Decree at 13, § VII, ¶ 31 (Doc. No. 235).)


a.  Implementation of the "System of Care"

As provided in ¶ 31 of the Consent Decree, above, execution of the "system of

care" is governed by specific standards and deadlines set forth in the Implementation

Plan, a separate document.[5]  (See Order approving Implementation Plan (Doc. No. 265).)

The Implementation Plan ultimately was approved by the court on November 1, 1993.

(Order approving Implementation Plan (Doc. No. 265)); (Order Regarding

Implementation and the Implementation Plan) (Doc. No. 266).)  The Implementation Plan

was developed to effectuate a manageable and cost-effective plan with specified

deadlines to achieve the massive reforms required for DHR to incorporate into its child

welfare system the goals and principles of the Consent Decree.  (Consent Decree

¶¶ 64-68 (Doc. No. 235).)  Therein, the parties agreed to a phased-in "conversion"

process, meaning that each year specified counties were to be "converted" until all

_____

[5] The Implementation Plan is the plan required by paragraphs 64-68 of the Consent
Decree.  (See Consent Decree ¶¶ 20, 64-68.)  By the express terms of the Consent
Decree, the Implementation Plan is incorporated by reference into the Consent Decree.

counties achieved "conversion" status.[6]  See R.C. I, 390 F. Supp.2d at 1034.  As

discussed in the next section, each of Alabama's sixty-seven counties has been evaluated,

and, at the time of evaluation, each county was declared "converted."


### b.  The Termination Clause

The Consent Decree contains a termination clause which provides the ultimate

standard by which the court is to measure whether the required system of care has been

established and whether the Consent Decree's goals and principles have been

accomplished.  As embodied in the Consent Decree and voluntarily agreed to by

Defendant, two questions must be answered in Defendant's favor in order for the court to

terminate the Consent Decree.  Specifically, the termination clause of the Consent Decree

provides as follows:

> On or after October 1, 2002, the defendant may move for termination of
> this Decree upon a showing that DHR is in substantial compliance with the
> requirements of the Decree and of the Implementation Plan and that DHR
> will remain in substantial compliance after termination of the injunction in
> this case.

---

[6] The preface to the "Conversion" chapter of the Implementation Plan provides:
"This chapter describes the conversion (change) process that will be utilized to convert
DHR child welfare operations to compliance with this decree."  (Implementation Plan,
Conversion Chapter, page 1.)  "Converted" means that a county has "change[]d [its]
practice to comply with the consent decree."  (Order Regarding Implementation and
Implementation Plan at 3 (Doc. No. 266).)  The method used by the court monitor to
evaluate whether a county had converted to practice in accordance with the principles of
the Consent Decree is set out on pages five through seven of the court monitor's
November 2005 Report and is summarized herein in a subsequent subsection of this
opinion.  (Doc. No. 783.)

(Consent Decree ¶ 93, entered June 11, 1991 (Doc. No. 235)), as amended by ¶ 10 of

Consent Order Extending Time for Compliance, entered Feb. 11, 1999 ("1999 Consent

Order") (Doc. No. 511)); see also R.C. I, 390 F. Supp.2d at 1041.  In order to ascertain

whether Defendant has attained the twofold goal of substantial compliance, the court

must ascertain the "requirements" of the Consent Decree and of the Implementation Plan.

(Consent Decree ¶ 93, as amended by the 1999 Consent Order.)


c.  The Requirements of the Consent Decree

The Consent Decree's requirements are embodied in the "principles" or

"standards," which are set forth in Sections VII and VIII of the Decree.  In R.C. I, the

court organized these principles into five core purposes.  See 390 F. Supp.2d at 1045-46.

Neither party has objected to the court's categorization.  Those five core purposes are as

follows:

> (1) the prevention of out-of-home placements and the advancement of
> family unification, but only when at-home placement provides an
> environment where the child is safe from imminent and serious harm (core
> purpose one); (2) the delivery of comprehensive services, in a coordinated
> and therapeutic manner, by competent staff with appropriate caseloads, to
> class members and families in home-based and community-based settings,
> devised pursuant to individualized service plans ("ISPs"), for the purposes
> of facilitating home placement, satisfying the unique physical, emotional,
> social, educational and other needs of class members, and promoting
> smooth transitions for class members when they "age out" of the system
> (core purpose two); (3) active participation by the child, parent and foster
> parent in the planning and delivery of services, to include informed
> involvement so that the child, parent and foster parent have full
> understanding of these services and their rights and options (core purpose
> three); (4) child safety, encompassing the prevention of sexual abuse and

12

neglect and the timely intervention and investigation of class members
believed to be victims of sexual abuse and/or neglect (core purpose four);
and (5) stability and permanency in the class members' living situations,
including, if in the children's best interest, that when children are removed
from their homes, siblings are placed together and familial relationships are
maintained through visitations and other means (core purpose five).

Id. at 1046 (internal footnote omitted).

The core purposes of the Consent Decree are not subject to precise definition.  As
recognized by the court monitor, the foregoing "requirements" (or "core purposes," as
phrased by the court) are pliable, and an evaluation of how Defendant is performing in
the areas delineated above, at times, requires a measure of discretion and subjectivity.  In
this regard, the Consent Decree "represent[s] a departure from the more structural
approach to system reform that ha[s] been used in other system reform settlements," (Ct.
Monitor April 2006 Report at 5 (Doc. No. 812)), namely, because its provisions do not
"specify[] the precise means for accomplishing [its] ends."  (Consent Decree at 2 (Doc.
No. 235), as amended by 1999 Consent Order (Doc. No. 511).)  Rather, as set out above,
the Consent Decree "lays out a set of 'operating principles' or 'standards' and directs
defendant to ensure that [DHR's] child protective services and foster care systems
comply with these principles or standards by a date certain.'"  (Id.)

### 3. Substantial Compliance

Although the Consent Decree does not define "substantial compliance," that

determination has not been made in a vacuum.  "An agreed upon measurement process

has been used through[out] the duration of the R.C. Consent Decree to evaluate the

consistency, quality, and effectiveness of performance in each county of Alabama" during

the staggered review process.  (Ct. Monitor Nov. 2005 Report at 5 (Doc. No. 783).)  In

the court monitor's November 2005 Report and in R.C. I, the "basic framework"

employed was summarized.  (See id. at 5-7); R.C. I.  See 390 F. Supp.2d at 1035.  This

framework, with which the parties and the court are very familiar, was used to determine

whether the data and other evidence revealed a level of practice in individual counties

which substantially complied with the principles of the Consent Decree.  Briefly,

> [t]he basic framework for measurement of the conversion to practice in
> accordance with the system of care has been the detailed review of samples
> of children and families served by the system using a process that is now
> known as the Quality Service Review (QSR).  The process determines
> whether the practitioners in the system of care are providing services in
> accordance with the agreed-on standards and with appropriate professional
> due diligence using a sample of children and families as a test of the system
> performance (see Appendix A for the specific domains examined).  The
> QSR examines, for example, whether ISPs [individualized service plans]
> and child teams are operating functionally in the manner intended by the
> practice principles.  In addition to the QSR child reviews, the monitor has

> tracked quantitative indicators that reflect the performance of system
> processes and outcome indicators.[7]

(Ct. Monitor Nov. 2005 Report at 5 (Doc. No. 783) (brackets supplied) (internal footnote

omitted) (footnote 7 added)); see also R.C. I, 390 F. Supp.2d at 1035.  On pages 6 and 7

of his November 2005 Report, the court monitor further outlines "[t]he evidence used to

determine that a county is 'converted' to practicing in accordance with the principles of

the system of care[,]" see supra footnote 6.  (Ct. Monitor Nov. 2005 Report at 6-7 (Doc.

No. 783).)

    As revealed, largely up to this point, the focus of the court, the court monitor and

the parties has been on the achievement of substantial compliance in individual counties.

That focus has been appropriate because achieving the goal of systemwide substantial

compliance in a manageable way necessitated that only a few counties undergo scrutiny

each year.  (See, e.g., Agreement Regarding Implementation ¶ 22 (mandating "phased

implementation by geographic areas, by subgroups of class members or both").)  It,

---

[7] The QSR review is designed to ascertain "the current status of the child and
family" and "the performance of essential system functions for the child."  (Ct. Monitor
Nov. 2005 Report, Appendix A (Doc. No. 783).)  A description of the categories which
are examined as part of the QSR review is contained in Appendix A to the court
monitor's November 2005 Report.  (See id.)  Each category contains a set of "common
sense" questions for reviewers to ask.  The categories examined to determine the status of
child and family include the following: safety of the child; safety of the caregiver; the
child's stability in daily life and learning; the permanence of residence for the child; the
child's physical and emotional well being; and the child's learning and developmental
progress.  (See id., Appendix B.)  The categories rated to determine system performance
include, among others, functional assessment, long-term view, resource availability and
agency responsiveness.

however, is appropriate at this juncture for the court to state that it finds that the Consent

Decree's termination clause employs the phrase "substantial compliance" as a yardstick

for measuring systemwide substantial compliance.  (Consent Decree ¶ 93, entered June

11, 1991 (Doc. No. 235), as amended by ¶ 10 of the 1999 Consent Order (Doc. No.

511).)  In other words, the court finds that now faced with the ultimate question of

termination of the Consent Decree, the assessment of substantial compliance has more of

a systemwide, as opposed to an individual county, focus.  In pragmatic terms, this means

that whether the goal of substantial compliance has been attained systemwide is not

necessarily dependent upon every county demonstrating sustained substantial compliance.

The court monitor recognized as much in his November 2005 Report, when he stated that

substantial compliance with the Consent Decree requires that "most counties" are

performing up to par.  (Ct. Monitor Nov. 2005 Report at 26 (Doc. No. 783).)  DHR also

advocates that the emphasis of "substantial compliance" is on systemwide performance.

It does not appear that Plaintiffs would disagree; in their brief arguing a different point,

Plaintiffs emphasize that the issue for termination of the Consent Decree "was and is

statewide compliance."  (Doc. No. 781 at 17 n.8.)

   "Substantial compliance," the guiding phrase used in the Consent Decree's

termination clause, also has acquired legal meaning from the courts.  In R.C. I, the court

set out the meaning of "substantial compliance," as defined and applied by courts faced

with motions to terminate consent decrees in institutional reform cases.  See 390 F.

Supp.2d at 1043-45.  The parties have not objected to those principles of law, and those

principles again guide the court's consideration in resolving the instant motion. (See, e.g., Doc. No. 781 at 4, wherein Plaintiffs describe the court's legal discussion as the "law of the case"). The court need not repeat those principles here, but reemphasizes that "substantial compliance" is not 100 percent or strict compliance, but, at the same time, "substantial compliance" is not "'susceptible to a mathematically precise definition.'" R.C. I, 390 F. Supp.2d at 1044 (quoting Joseph A. by Wolfe v. N.M. Dep't of Human Servs., 69 F.3d 1081, 1085 (10th Cir. 1995)). Indeed, the court must remain mindful that the standard for termination of consent decrees in governmental institutional reform litigation must be "flexible." City of Miami, 2 F.3d at 1503.

Other factors also bear on the inquiry of whether Defendant has demonstrated substantial compliance with the core purposes of the Consent Decree. Some of these factors were set out in R.C. I, 390 F. Supp.2d at 1043, but bear repeating here. One factor is whether Defendant has complied in good faith with the terms of the Consent Decree since it was entered. See id.; City of Miami, 2 F.3d at 1503. This factor involves consideration of Defendant's record of compliance with the Consent Decree and any other positive undertakings by Defendant toward the goal of compliance. See City of Miami, 2 F.3d at 1508. Another factor is whether the purposes of the litigation have been achieved "to the extent practicable." Id. Relatedly, the court also should consider whether it is necessary or practical for the court to retain judicial control over DHR in order to achieve compliance with any outstanding orders. See Sims, 9 F. Supp.2d at 1287. "[T]he length of time a consent decree has been effect" and the "continuing

17

efficacy of the consent decree's enforcement" are two additional factors of which the court should be informed.  Heath v. DeCourcy, 992 F.2d 630, 633 (6th Cir. 1993) (citing Dowell, 498 U.S. at 237).  To quote City of Miami, "[i]n sum, termination of the consent decree would be appropriate if the district court finds that the decree is clearly no longer necessary either to prevent [the constitutional deficiencies] in the future or to remedy the effect of past [violations]."  2 F.3d at 1508.

## B.  Evidentiary Hearing

In conjunction with his first motion to terminate the Consent Decree, which was the subject of the court's ruling in R.C. I, Defendant complained that he was denied an evidentiary hearing and, thus, was denied the opportunity to present evidence in support of that motion.  (See, e.g., Doc. No. 825 at 2.)  Although Defendant has not expressly requested an evidentiary hearing in connection with the instant "second" motion, given his unrelenting protestations in his present briefs, concerning the court's prior denial of his request for a hearing, the court finds that it is appropriate to address Defendant's statements.

When he filed his original motion to terminate the Consent Decree, Defendant did not cite any authority in support of his accompanying request for an evidentiary hearing. He did not point to the Consent Decree as his authority for the obvious reason that there is no requirement therein that the court hold a hearing prior to terminating the Consent Decree.  Moreover, Defendant neither made any showing of what type of evidence would

18

be adduced at a hearing, if permitted, nor made a proffer of any material disputed factual issues which would have justified presentation through the format of a hearing.  Rather, Defendant generically made a request for a hearing, but otherwise insisted that the court monitor's 61-page November 2004 Report demonstrated that Defendant had satisfied his twofold burden under the Consent Decree's termination clause.[8]  For all of the reasons previously espoused by the court in R.C. I, that Report was woefully inadequate to sustain Defendant's burden.[9]  In short, the court declined to hold a hearing merely for the sake of having a hearing because an undefined request for one was made by Defendant.

Defendant has not specifically requested a hearing in connection with his present motion.  Plaintiffs, on the other hand, essentially advocate that the court can deny the motion on the written record, but cannot grant the motion without holding a hearing. (See Doc. No. 767 at 1, 3.)  The court, however, finds again that a hearing only would prove to be superfluous and would not aid the court in its decisional process.  The court has been immersed in this case for more than a decade and has an in-depth knowledge of

---

[8] The court monitor's November 2004 Report was introduced in evidence at the December 9, 2004 status conference.  (See Doc. No. 723, minute entry.)

[9] As recognized by Defendant in one of his recent filings:  "As this Court observed in [R.C. I] . . ., the Monitor failed to provide the court with a systematic review of the Defendant's compliance with the Decree.  The Monitor's Report entirely overlooked several requirements of the Decree."  (Doc. No. 779 at 7.)

the case.[10]  Throughout the duration of this litigation, the court has received frequent status reports from the court monitor and has reviewed the extensive filings by the parties.

Moreover, the court finds that there is a developed record in this case.  In this regard, the parties have had the opportunity to conduct discovery in connection with Defendant's "second" motion (see Sept. 2, 2005 Order (Doc. No. 768)), to amass evidence in support of their positions for and against termination of the Consent Decree, and to file that evidence with the court.  The record is replete with evidence and arguments from the parties, and the facts and data are extensive.

The court further finds that the material evidence is undisputed.  In this regard, the court finds that, as in the past, the issues turn on an interpretation of the Consent Decree and whether the material evidence is sufficient under the Consent Decree to warrant its termination.[11]  The authority cited by Plaintiffs (see Doc. No. 767 at 17 n.5) does not support their argument that, under the circumstances presented in this case and described above, a hearing is either mandated or warranted.  Cf. Cody v. Hillard, 139 F.3d 1197, 1200 (8th Cir. 1998) (observing the absence of authority that "a hearing is a necessary

---

[10] The undersigned has presided over the implementation of the Consent Decree for more than ten years, with the skilled assistance of the court monitor, having inherited this case in 1996 from another judge of this court, the Honorable Truman M. Hobbs, Senior United States District Judge.

[11] The court observes that the facts and data rarely have been in dispute, as the issues largely have focused on whether those facts and data legally are sufficient to fulfill Defendant's burden under the Consent Decree.

20

prerequisite to terminating supervision over a [consent] decree (as opposed to modifying

a decree)" and stating that "the necessity of a hearing depends on whether there are

disputed factual issues").


## C.  Findings of Fact and Conclusions of Law

_____While the court finds that an evidentiary hearing is not warranted, this finding

does not in any way abdicate the court's responsibility to provide the parties with a

sufficient explanation of the facts and reasons underlying its ruling.  Dowell, 498 U.S.

at 246 (observing that, "[i]f . . . a [consent] decree is to be terminated or dissolved,

respondents . . . are entitled to a [precise] statement from the court").  As stated by the

Sixth Circuit, a district court, which is considering whether to terminate a consent decree,

"should make sufficiently detailed findings of fact and conclusions of law under Rule

52(a), Fed.R.Civ.P., to advise the parties of the factual basis for its decision and permit

informed appellate review."  Bradley v. Milliken, 772 F.2d 266, 272 (6th Cir. 1985); see

also Joseph A. by Wolfe, 69 F.3d at 1089 (vacating and remanding judgment for failure

of lower court "to make the specific and clear findings required" by Rule 52(a) of the

Federal Rules of Civil Procedure).  This opinion constitutes the court's findings of fact

and conclusions of law in accordance with the foregoing dictates.

## IV.  PROCEDURAL HISTORY AND BACKGROUND

The extensive background of this case is very familiar to the parties and the court and is recited in the court's prior opinion in which the court denied Defendant's first motion to terminate the Consent Decree.  See R.C. I, 390 F. Supp.2d at 1034-41.  A detailed updating of that background is not necessary here, and the court refers the reader to its prior opinion.

### A.  Brief Summary of R.C. I

In R.C. I, the court found that Defendant had not met his twofold burden for termination of the Consent Decree because the evidence did not demonstrate that Defendant was and would remain in substantial compliance with the requirements of the Consent Decree and of the Implementation Plan, as required for termination of the injunction in this case.  The court set out in detail its conclusion that, in light of the governing law, there was insufficient evidence to support a finding that those requirements, which the court distilled into five core purposes (as set out in the previous section of this opinion), had been achieved.  Consequently, the court rejected the ultimate recommendation of the court monitor in his November 2004 Report that "the court find that DHR is in substantial compliance with the Consent Decree" and "that the

independent monitoring of the Consent Decree" cease.[12]  R.C. I, 390 F. Supp.2d at 1059.

As detailed in its prior opinion, the court was "unable to reconcile the court monitor's

recommendation of 'substantial compliance' with the data and other information in the

court monitor's November 2004 Report."  Id. at 1048.  The court also deemed telling the

fact that the court monitor did not expressly state that he believed DHR "will remain in

substantial compliance," which is the second prong of Defendant's burden for termination

of the Consent Decree, but instead advocated continued supervision by the court for a

period of a year to monitor the "areas of performance" discussed in his report.  See id.

at 1058-59 (citing Ct. Monitor Nov. 2004 Report at 60-61).

Although in R.C. I the court declined to release the court monitor or to terminate

the Consent Decree, the court concurred with the recommendation of the court monitor

that Defendant file a performance report with the court which "contain[ed] facts

addressing the same areas of performance as the monitor's report" and which "include[d]

the county ratings ordered by the court."  Id. at 1058-59; (Ct. Monitor Nov. 2004 Report

at 61.)  In R.C. I, the court set a deadline of August 4, 2005, for the filing of the

performance report and stated that, at that time, "Defendant may renew his motion to

terminate the Consent Decree and Implementation Plan," if the evidence supports such a

motion.  See 390 F. Supp.2d at 1059.

---

[12] The court monitor, whose has been instrumental to the success of the
implementation of the Consent Decree, has assisted the court for more than a decade.
The court monitor's role and responsibilities are set out by the court in its prior opinion.
See R.C. I, 390 F. Supp.2d at 1034-35.

B.  <u>Orders and Pleadings Filed after R.C. I</u>

The court now picks up where its prior opinion left off.  On August 3, 2005,

Defendant complied with the court's directives issued in <u>R.C. I</u> and, consequently, filed

the instant "second motion for order terminating the Consent Decree," which is

accompanied by a plethora of evidence.  (Doc. No. 761.)  On August 29, 2005, Plaintiffs

submitted an opposition to Defendant's motion, attaching their own evidence and

requesting discovery should the court not be inclined to deny the motion outright.  (Doc.

No. 767 at 1, 7, 17-18.)

After reviewing the parties' submissions, the court entered an order, directing the

court monitor to file by November 18, 2005, a report responding to all assertions in

Defendant's second motion to terminate the Consent Decree and in Plaintiffs' response.

(Sept. 2, 2005 Order at 1 (Doc. No. 768).)  The court's order further provided, "The court

monitor shall provide specific and detailed discussion of whether he believes that

Defendant has met both prongs of the twofold burden for termination of the consent

decree and shall include particularized references to an analysis of the evidence which

justifies his conclusions."  (<u>Id.</u>)  In the same order, the court also authorized Plaintiffs and

Defendant to engage in limited discovery for a period of two months, (<u>id.</u> at 2), and

permitted the parties to file any additional evidence and/or further arguments in support

of their respective positions pertaining to the second motion to terminate the Consent Decree.[13]   (See id.)

In compliance with the court's order of September 2, 2005, Plaintiffs and Defendant filed briefs and evidence in support of their respective positions regarding termination of the Consent Decree, and the court monitor filed a 64-page report.[14]   (Doc. Nos. 779, 781, 783.)  To briefly summarize, in his November 2005 report, the court monitor found that the then "current data," primarily arising from QSR "sustainability reviews" (see supra footnote 7), was insufficient to demonstrate that DHR was complying with the five core purposes of the Consent Decree.  Although the court monitor praised DHR's accomplishments, the court monitor concluded that the data was "not consistent with the achievement of Core Purpose One," that the QSR reviews showed "significant weaknesses in performance" of individualized service plans ("ISPs") (core purpose two), that essentially there was no "quantitative data" to support Core Purpose Three, and that "[t]he [then] current evidence for achievement of Core Purpose Five [was] mixed."  Core Purpose Four received a positive review from the court

_____

[13] The court notes that, after the entry of the court's September 2, 2005, order the parties could not agree on certain discovery matters, thereby prompting Plaintiffs to file a motion to compel Defendant's production of certain records of individual class members. (Doc. No. 777.)  The court heard oral argument on the motion on December 6, 2005. (Doc. Nos. 782, 786.)  The court granted in part and denied in part the motion to compel. (See Doc. No. 785.)

[14] Henceforth, the court refers to the court monitor's submission as the "November 2005 Report."

25

monitor.  (Id. at 56-59.)  In his conclusion, the court monitor stated that "[t]here are

particular weaknesses in the achievement of Core Purposes Two and Three [which] are

an underpinning for achieving the other core purposes."  (Id. at 59-60.)

The court monitor explained that all sixty-seven of Alabama's counties at one

point in time had successfully "converted" their child welfare practices in conformity

with the core purposes of the Consent Decree and that the counties had established the

infrastructure or "building blocks" necessary to support compliance with the second

prong of the Consent Decree's termination clause.  The court monitor, however,

concluded that the then existing data showed a "lack of consistency [by the counties] in

meeting the core purposes."  (Ct. Monitor Nov. 2005 Report at 9, 60-61 (Doc. No. 783).)

The court monitor observed that a more accurate analysis of the second prong of the

Consent Decree

> would require on-site work in a sample of counties to verify current
> caseloads, [to] conduct additional QSR reviews of a significant sample of
> children, and to compare the findings to the quantitative data, qualitative
> data, and stakeholder input provided at the time of the determination of
> conversion to the current performance levels.

(Id. at 64.)  In his November 2005 report, the court monitor emphasized the importance of on-site reviews during the "conversion" process.[15]  After careful study of Defendant's and Plaintiffs' submissions and the court monitor's report, the court entered an order on December 15, 2005 (Doc. No. 787), in which it concurred with the court monitor's recommendation and directed the court monitor

> to perform on-site work in a random and representative sample of counties in order to verify current caseloads, to conduct additional QSR reviews of a random and representative sample of children, and to compare the findings to the quantitative data, qualitative data, and stakeholder input provided at the time of the determination of conversion to present.  The court monitor shall determine the method for generating a random and representative sample of counties and children to accomplish his purposes of evaluating Defendant's level of compliance with the terms of the consent decree, and, if desired, he may seek input from counsel for Plaintiffs and Defendant.

(Doc. No. 787 at 2.)

The court set a deadline of February 28, 2006, for the court monitor to complete his reviews and submit a report of his findings.  (Id.)  In the same order, the court stated

---

[15] The court monitor stated:

> [Q]uantitative indicators are inadequate alone to assess whether practice is occurring with due diligence and in accordance with the principles of the R.C. reform.  For example, the number of children entering care may be increasing or decreasing.  A trend in either direction may or may not be a positive indicator of performance and one must analyze the underlying case practice to determine whether practice is occurring in accordance with the principles and with due diligence.

(Ct. Monitor Nov. 2005 Report at 57 (Doc. No. 783).)

that it would "hold in abeyance" Defendant's second motion to terminate the Consent Decree until the completion of these reviews.  (Id. at 3.)  Subsequently, over objection by Defendant (Doc. Nos. 788, 791, 792), but based upon the court monitor's representation that, logistically, it was not possible to complete the reviews by the February 28 deadline, the court, after holding a telephone conference on the matter (Doc. Nos. 793-94), extended the court monitor's deadline to March 31, 2006, to conduct the court-ordered on-site reviews and to April 21, 2006, to submit his report to the court.  (Doc. No. 803 at 1-2); (Ct. Monitor April 2006 Report at 1 (Doc. No. 812).)

### C.  The Court Monitor's 2006 On-Site Sustainability Reviews

The court monitor sought input from both Defendant and Plaintiffs regarding the process for completing the court-ordered reviews.[16]  (Ct. Monitor April 2006 Report at 2 (Doc. No. 812).)  Ultimately, the court monitor selected the following ten counties to be reviewed:  Chambers, Randolph, Conecuh, Jackson, Lauderdale, Lee, Montgomery, Macon, Marshall and Jefferson.  These counties comprise three small counties, four mid-sized counties and three large counties.  The total number of children included in the reviews was 152, and, for each county, the court monitor "evenly split as much as possible" the number of children in foster care and the number under protective

---

[16] Henceforth, the court refers to the court monitor's reviews conducted in 2006 as the "2006 on-site sustainability reviews."

28

supervision.  (See id. at 3.)  No serious argument has been advanced by either Defendant

or Plaintiffs that these ten counties and the children in those counties whose cases were

scrutinized are not "random" and "representative" of the state as a whole.  (Doc. No. 787

at 2.)

The court monitor completed his reviews by the March 31, 2006 deadline, and

timely filed his report on April 21, 2006.  (Ct. Monitor April 2006 Report (Doc. No.

812).)  In his April 2006 Report, the court monitor explains that he employed the "review

methodology followed during previous compliance reviews," (id. at 2), and that the

"[s]ample sizes of children within the respective counties are comparable to the number

used by the monitor during his previous on-site reviews."  (Id. at 3.)  These sample sizes

also are larger than the number of children included in the QSR reviews, which received

some criticism from the court in R.C. I.[17]  See 390 F. Supp.2d at 1048-49.  "The

methodology included completing QSRs on a randomly selected sample of children in

each county, review[ing] . . . quantitative county data, and conducting a series of focus

---

[17]  The court notes that, although in R.C. I, the court offered some criticism of the
QSR reviews (referred to in R.C. I as the SQA sustainability reviews) as a predictable
indicator of systemwide compliance (primarily based upon the court monitor's own
valuation of the reviews), see, e.g., id. at 1048-49, the court recognizes that these reviews
are one of the strengths of DHR's system of care and, importantly, are but one of many
components which DHR employs to evaluate and monitor the performance of individual
counties.  (See, e.g., Larry Dean Aff. ¶¶ 7-11 (Ex. 17 to Doc. No. 761) (discussing
DHR's multifaceted review mechanisms of counties)); (see also Ct. Monitor Nov. 2005
Report at 25-26 ("In the 2004 monitor's report to the court, it was suggested that the
sample sizes of case reviews be increased in order for more generalizability of the case
review findings.  The monitor recognizes that, as described in Mr. Dean's affidavit, a
variety of sources are used to measure outcomes for counties.") (Doc. No. 783).)

groups with county staff and local children's community stakeholders."[18]  (Ct. Monitor April 2006 Report at 2 (Doc. No. 812).)

These 2006 on-site sustainability reviews required the retention and work of many reviewers.  To decrease expenses and at the urging of Defendant, the court monitor agreed to use 50 percent of reviewers provided by DHR.  (See id. at 3.)  The court monitor chose the other 50 percent of reviewers, whom at the time of his selection he deemed more trained and experienced than the DHR reviewers.  (Id.)  Ultimately, though, the court monitor concluded that the reviews performed by the "independent reviewers and the DHR reviewers were conducted with diligence[,] and the findings were closely comparable and accurate."  (Id.)  The 2006 on-site sustainability reviews also included between fifty and one hundred interviews in each county (with more interviews conducted in Jefferson County) with key stakeholders in the child welfare system.  (Id. at 4.)  The format for stakeholder interviews paralleled the typical format used by the court monitor during the original on-site compliance reviews.  Key stakeholders included DHR employees (both management and front-line workers), "local providers of services, family court judges, foster parents, educators, guardian ad litems, DHR attorney[s,] juvenile probation officers," and law enforcement officials.  (Id.)

---

[18] The court monitor is referring to the QSR reviews, which have been the "basic framework" for measuring a county's progress under the Consent Decree, (see Ct. Monitor Nov. 2005 Report at 5 (Doc. No. 783)), and which were a component of the 2006 on-site sustainability reviews.  These reviews were discussed earlier in this opinion, see, e.g., supra footnote 7.

In his April 2006 report (see Doc. No. 812), discussed in more detail later in this opinion, the court monitor outlines his conclusions that seven of the ten counties are sustaining performance consistent with the principles of the Consent Decree. These counties are Chambers, Randolph, Conecuh, Jackson, Lauderdale, Lee and Montgomery. In the court monitor's opinion, however, three counties are not sustaining, one small-, one medium- and one large-sized county, i.e., Macon, Marshall and Jefferson counties, respectively. (See Ct. Monitor April 2006 Report at 89 (Doc. No. 812).) He stops short of rendering an express finding of substantial compliance as a whole, but states that "[t]he findings of the ten county reviews are consistent with the findings and issues reported in the monitor's September 2005 report to the court," (i.e., Doc. No. 783), a report in which he concluded that Defendant had not demonstrated the second prong of the Consent Decree's termination clause. (Id. at 94.)

## V.  DISCUSSION

The court independently has reviewed the evidence, as it always has done, and for the reasons articulated below, determines that there is evidentiary and legal support for a finding that Defendant has satisfied both prongs of the Consent Decree's termination clause. The court emphasizes that it has considered all of the evidence in reaching its findings. The omission of any reference or discussion to any discrete fact, exhibit or other evidence, therefore, should not be interpreted to mean that the court ignored or did

31

not weigh that evidence.  The court has weighed both the negative and the positive

evidence, and the court is cognizant of Plaintiffs' criticisms.  The court, however, has

discerned that these criticisms are not serious enough to foreclose a finding of substantial

compliance or to call into doubt Defendant's ability to remain in substantial compliance

in the future.

A.  <u>Analysis of Substantial Compliance under the</u>
<u>First Prong of the Termination Clause of the Consent Decree</u>

The first prong of the termination clause of the Consent Decree mandates that

Defendant demonstrate that "DHR is in substantial compliance with the requirements of

the Decree and of the Implementation Plan[.]"  (Consent Decree ¶ 93, entered June 11,

1991 (Doc. No. 235), as amended by ¶ 10 of the 1999 Consent Order (Doc. No. 511).)

For the reasons to follow, the court finds that Defendant has demonstrated substantial

compliance under the first prong.

Pursuant to the Implementation Plan, the parties agreed that the principles of the

Consent Decree would be phased in by geographic areas, namely counties, and that "each

fiscal year an identified group of counties [would] be 'converted.'"  (Order Regarding

Implementation and Implementation Plan at 3 (Doc. No. 266).)  Although DHR was

unable to attain conversion in all counties by the original agreed-upon deadline of

October 1, 1999, (<u>see</u> Consent Decree ¶ 66), that goal finally was reached on March 11,

2005.  See R.C. I, 390 F. Supp.2d at 1035-36, 1046 (describing the extensions of

deadlines and the final attainment of conversion in all sixty-seven counties).  Through the

court monitor's thorough and systematic evaluation of each county in Alabama, each

county has reformed its child welfare practices and has demonstrated that it can provide

care for its children in a manner which conforms to the requirements of the Consent

Decree.  The court monitor has stated that the findings that each county, at the time of

"conversion," was "substantially in compliance" with the Consent Decree constitute the

"primary support for finding compliance with prong one of the Consent Decree."  (Ct.

Monitor Nov. 2005 Report at 7 (Doc. No. 783).)  The court also recognized this great

achievement, stating in R.C. I that "the fact that the court monitor has declared each and

every county 'converted' is monumental, as paragraph 31 of the Consent Decree

anticipated a county-by-county conversion, pursuant to staggered deadlines set out in the

Implementation Plan."  390 F. Supp.2d at 1046-47.

The court monitor also has cited, in general terms, Defendant's abidance with the

mandated obligations in the Implementation Plan and with the court's orders entered

throughout this litigation and, in specific terms, has stated that DHR has implemented the

"infrastructure" required by the Implementation Plan, which is necessary to support

practice in accordance with the Consent Decree.[19]  (See Ct. Monitor Nov. 2005 Report at 9, 25, 60 (Doc. No. 783)); (see, e.g., Order Regarding Implementation and Implementation Plan at 7-9 (Doc. No. 266)); (Implementation Plan, Infrastructure, at 1); (see also Doc. No. 761 at 9.)

Plaintiffs have not presented any detailed challenge to the court monitor's conclusion that prong one of the Consent Decree's termination clause has been satisfied. Rather, Plaintiffs, as well as Defendant, devote the majority of their discussions in their briefs to the second prong of the Consent Decree's termination clause, focusing on "sustainable substantial compliance," to borrow Plaintiffs' phraseology.  (Doc. No. 781 at 3.)  Indeed, in recent years, it appears that an understanding has evolved, if not express then implied, that Defendant would satisfy the first prong of the Consent Decree's termination clause when the last of Alabama's sixty-seven counties attained "conversion" status, which as stated occurred on March 11, 2005.[20]

---

[19] Some aspects of the infrastructure are set out on pages 9 and 10 of the court monitor's November 2005 Report and include:  "employment of senior level staff in the state office to develop the various aspects of the system," such as "quality assurance, policy, licensing standards, resource development, and financing"; "the capacity to work with counties when they are determined to be deficient based on quality assurance reviews or some discrepant data"; the ability to "track[] and adjust[] staffing to address caseload issues"; and "quality assurance processes to examine counties' performance, both qualitatively and quantitatively."  (Ct. Monitor Nov. 2005 Report at 9-10 (Doc. No. 783).)

[20] The court says "at the latest" because in the past Defendant maintained that "substantial compliance" was not contingent upon a declaration by the court monitor that each county had reformed its practices to conform with the requirements of the Consent Decree.  Defendant's latter argument obviously is moot at this point.

Based on the foregoing discussion and the court's independent evaluation of the record, the court concurs with the court monitor's recommendation that Defendant has satisfied the requirements of prong one of the Consent Decree's termination clause. The court bases its decision upon the evidence in the record, as highlighted above, and the remarkable fact that the child welfare practices in every county in Alabama have been scrutinized and have been declared "converted." The court also bases its finding on its concurrence with the court monitor that DHR effectively has overhauled its pre-R.C. practices and has implemented an infrastructure which is sufficient to support a system of care which incorporates all of the core purposes of the Consent Decree. Other of DHR's accomplishments, which the court finds further amplify Defendant's demonstration of substantial compliance under prong one, are set out in the court monitor's November 2004 Report. (See Ct. Monitor Nov. 2004 Report at 2, 58-59); (see also Ct. Monitor Nov. 2005 Report at 9, 60 (Doc. No. 783).)

The court also finds that it is fitting at this point to spotlight the fact that a common theme emanates and predominates in the extensive record and that theme is that the parties and the court monitor have effectuated remarkable and demonstrable improvements in DHR's child welfare system. DHR's child welfare system is, no doubt, far different and far better today than it was at the time that this litigation commenced. The quality of care which children under DHR's supervision receive has improved substantially. (See, e.g., Doc. No. 781 at 2 (although arguing against termination of the

Consent Decree, plaintiffs state that "all would agree" that there has been "notable improvement since the entry of the Consent Decree in 1991").)  With that said, the court recognizes that Plaintiffs take strong issue with DHR's compliance with prong two of the Consent Decree's termination clause, as they aptly state that the material question is not whether "the system now treats children better than it did in 1988."  (Doc. No. 820 at 3.) It is appropriate now for the court to turn to a discussion of the second prong.  As should be evident from the court's discussion below, the court has given very serious consideration to whether the evidence demonstrates that DHR has satisfied prong two of the Consent Decree's termination clause.


B.  Analysis of Substantial Compliance under the
Second Prong of the Termination Clause of the Consent Decree

The second prong of the termination clause of the Consent Decree requires that Defendant demonstrate "that DHR will remain in substantial compliance after termination of the injunction in this case."[21]  (Consent Decree ¶ 93, entered June 11, 1991 (Doc. No.

---

[21] The court notes that, in his original motion to terminate the Consent Decree, which was the subject of the court's opinion in R.C. I, Defendant consistently argued incorrectly that the second prong for termination required that DHR demonstrate that it "*is likely* to remain in substantial compliance."  R.C. I, 390 F. Supp.2d at 1038, 1041-42 (emphasis added).  The amended termination clause, to which Defendant voluntarily agreed in 1999, however, is more stringent.  It requires a demonstration by Defendant that DHR "*will remain* in substantial compliance after termination of the injunction in this case."  (1999 Consent Order ¶ 10 (Doc. No. 511) (emphasis added); R.C. I, 390 F. Supp.2d at 1036 & n.7.

235), as amended by ¶ 10 of the 1999 Consent Order (Doc. No. 511).)  In R.C. I, the

court stated that, "in [its] opinion, the best evidence to support a finding that DHR 'will

remain in substantial compliance' . . . is evidence that, after conversion, counties have

continued to operate in a manner that substantially complies with the Consent Decree."

R.C. I, 390 F. Supp.2d at 1058.  In R.C. I, however, the court found that the "evidence

[was] lacking" in that regard.  Id.  Plaintiffs complain that DHR has not had ample time

in the interim between the court's May 2005 memorandum opinion and order, denying

Defendant's first motion to terminate the Consent Decree, and Defendant's present filing

to bring DHR's child welfare system in compliance with the requirements of prong two

of the termination clause of the Consent Decree.  (Doc. No. 767 at 3.)

     Plaintiffs' argument is slightly off-key.  In its May 2005 memorandum opinion and

order, the court's primary reason for denying Defendant's motion to terminate the

Consent Decree rested on the conclusion that the court monitor's report submitted in

November 2004, upon which Defendant heavily relied, contained insufficient data to

support the court monitor's recommendation of substantial compliance.  In other words, it

was unclear whether evidence of substantial compliance existed or not because there

were large gaps in the evidentiary proof.

     Notwithstanding Plaintiffs' further objection, for the reasons to follow, the court

finds that the missing evidence has been supplied and that Defendant has demonstrated

that DHR "will remain" in substantial compliance with the Consent Decree and the

Implementation Plan after termination of the injunction in this case.[22]  As discussed herein, that evidence is supplied, in part, by the 2006 on-site sustainability reviews which were ordered by the court and conducted by the court monitor.

1.  *Preliminary Findings Concerning the 2006 On-Site Sustainability Reviews and the Parties' Positions as to what the Reviews Mean in Terms of Substantial Compliance*

Initially, regarding the 2006 on-site sustainability reviews, the results of which are elaborated upon in the court monitor's April 2006 Report (Doc. No. 812), the court makes the following findings and observations which hopefully will help clarify what issues are not before the court for exhaustive analysis.

First, the court finds that the results of the 2006 on-site sustainability reviews constitute valuable evidence in evaluating the merits of the present motion for the following reason.  During the "conversion" process of each county, the court monitor's

_____

[22] The court emphasizes that, throughout this litigation, it has greatly valued the court monitor's opinions and has relied extensively on the evidence amassed by and the recommendations received from the court monitor.  This deference and respect, however, is not a mere rubber stamp.  The court, which is the only one with the authority to terminate the Consent Decree (see Consent Decree ¶¶ 86, 91, 93, as amended by 1999 Consent Order), has independently evaluated the evidence pursuant to the governing law. The court respectfully disagrees with the court monitor's implicit, but clear, recommendation of non-substantial compliance concerning the second prong of the Consent Decree's termination clause.  The court emphasizes also that, although the court disagrees with the court monitor as to the propriety of terminating the Consent Decree, the court in no way is questioning the integrity or quality of the court monitor's work in this case.

38

on-site compliance review was the yardstick by which the court monitor determined if a county had implemented the required system of care into its child welfare practices and had achieved a level of practice which conformed to the requirements of the Consent Decree.  The 2006 on-site sustainability reviews conducted by the court monitor replicate these original on-site compliance reviews.  The court monitor has explained that he employed the same "review methodology" that he used when he initially evaluated each of Alabama's sixty-seven counties and that the "[s]ample sizes of children within the respective counties [were] comparable to the number used by the monitor during his previous on-site reviews."  (Ct. Monitor April 2006 Report at 2-3 (Doc. No. 812).)  As recited earlier herein, in R.C. I, the court set out the methodology underlying the review process employed by the court monitor in conducting his initial on-site compliance reviews, see 390 F. Supp.2d at 1035, and the court finds that the methodology is sound.

Second, the court accepts all of the data articulated by the court monitor in his April 2006 Report.  Neither party has lodged an objection as to the accuracy of this data.  Instead, Plaintiffs and Defendant essentially argue that the data supports a finding in their favor on the issue of substantial compliance and that the other party's interpretation of the data is wrong.

Third, the court accepts the conclusions reached by the court monitor as to whether or not each of the ten counties reviewed presently is demonstrating substantial compliance.  To reiterate, the court monitor says that, overall, seven counties are

sustaining substantial compliance and that three are not.  Although the court concurs with the court monitor that three counties are not substantially complying with the Consent Decree, the court parts ways with the court monitor to the extent that the court monitor is recommending that the court find that DHR has not met its burden under the second prong of the Consent Decree's termination clause.

Fourth, the court finds that, when viewed collectively, the ten counties selected for reviews are "representative" of the status of the state as a whole.

Notwithstanding the foregoing findings, the court's task has not been a simple one. Perhaps, if the court monitor had found that all ten counties had failed or that all had passed the "substantial compliance" inquiry, the court's job would have been simplified. As it stands, seven counties passed the court monitor's substantial compliance scrutiny, two of those seven with marginal but, importantly, passing grades, and three did not pass. Given the varied complex facets of the core purposes, many of which are subjective in nature, and the pliancy of the substantial compliance standard, particularly in institutional reform cases such as this one, the court's task has been more complicated.  It would be superficial as well to predicate a finding on a pure percentage basis, i.e., to say that a compliance ratio of seven out of ten counties or 70 percent either does or does not equate substantial compliance, and the court does not understand either party to advance such a position.  (See Doc. No. 820 at 5, 8.)

40

Defendant argues that "the overall results" of the 2006 on-site sustainability reviews "[are] impressive and provide solid evidence that (1) [] Defendant has sustained compliance with the Consent Decree for an extended period of time and (2) practice under the RC principles is improving across the state." (Doc. No. 811 at 3.) Just as emphatically, Plaintiffs contend otherwise. After very careful consideration, the court finds that the evidence in the court monitor's April 2006 Report (Doc. No. 812), when considered against the legal principles governing substantial compliance and other evidence in the record, legalistically tilts in favor of a finding that Defendant has met its burden under prong two of the Consent Decree's termination clause. The court now turns to a discussion of the evidence, which the court finds appropriately begins with a discussion of DHR's ratings from the 2006 on-site sustainability reviews in the categories of "overall child status" and "overall performance." The court, thereafter, will provide a more specific analysis of the evidence as to each of the five core purposes of the Consent Decree; the account of this evidence, however, is not in numerical sequence.

## 2. Ratings:  Overall Child Status and Overall Performance

Defendant maintains that the rating in the category of  "overall child status" is the "single most important measure of the effectiveness of the System of Care, because it is the ranking that measures the outcomes for the children under care." (Doc. No. 811 at 4.) Plaintiffs do not disagree. (See Doc. No. 767 at 11 (stating that the overall child status

and overall performance measures "form[ed] the foundation of the Monitor's determination of compliance" during on-site reviews).)  The "overall child status" rating assesses "how well" as a whole a "child [is] presently doing" based on the thirteen child and family status domains which reviewers probe when evaluating a county's compliance with the requirements of the Consent Decree.[23]  (See Ct. Monitor Nov. 2005 Report, Appendix A (Doc. No. 783).)  The "overall child status" is measured based upon a "special scoring procedure" which uses a "6-point rating scale."  (Id.)

In line with the parties' assessment, the court finds that the composite rating attributed to the counties, which were part of the 2006 on-site sustainability reviews, in the category of "overall child status" is a good indicator that, systemwide, children within DHR's care are safe and are doing well and that DHR is sustaining substantial compliance with the Consent Decree.  Impressively, the aggregate "overall child status" rating for all ten counties subject to the 2006 on-site sustainability reviews was 96 percent.  (Ct. Monitor's April 2006 Report at 90, 92 (Doc. No. 812).)  Even the three counties which the court monitor found not to be sustaining substantial compliance – Macon, Marshall and Jefferson counties – achieved an aggregate "overall child status" rating of 93 percent.  (Id. at 92.)  The impressiveness of these ratings is amplified when

---

[23] Those domains, which were listed supra, in footnote 7, are as follows: safety of the child; safety of the caregiver; stability; maintaining family connections; appropriateness of placement; permanence; health/physical well-being; emotional well-being; education; learning and developmental progress; responsible behavior; caregiver functioning; family progress toward independence; and satisfaction.  (See Ct. Monitor Nov. 2005 Report, Appendix A (Doc. No. 783).)

42

one considers that, throughout the implementation of the Consent Decree, the court

monitor generally has declared a county converted "'when 85% of child status and system

performance ratings [were] acceptable during an on-site compliance [review].'"  R.C. I,

390 F. Supp.2d at 1035; (see also Ct. Monitor April 2006 Report at 4 (Doc. No. 812).)

     Moreover, Defendant asserts that the rating in the category of "overall

performance" constitutes "the next most important measurement."  (Doc. No. 811 at 4 &

n.4.)  This assertion has not been contradicted.  The composite rating from the 2006 on-

site sustainability reviews in the category of "overall performance" shows marked

improvement from the evidence which was before the court when it entered R.C. I.[24]  In

R.C. I, the limited evidence revealed that fifteen counties had been subjected to QSR

reviews and that only three of those counties demonstrated an "overall performance"

rating of 85 percent or better and that, "[d]isturbingly, five of the fifteen counties received

ratings of only 25 percent."  390 F. Supp.2d at 1050 (citing Ct. Monitor Nov. 2004

Report at 35).  In the 2006 on-site sustainability reviews, half of the counties scored 90

_____

     [24] The "overall performance" rating is compiled based upon the fourteen domains
used to measure "current system performance," and, as with the "overall child status"
rating, "[a] special scoring procedure is used to determine Overall System Performance
for a child."  (See Ct. Monitor Nov. 2005 Report, Appendix A (Doc. No. 783).)  The
fourteen domains are: child and family engagement; functional assessment; long-term
view; individualized service plan ("ISP"); resource availability; ISP implementation;
family preservation services; family support network; service coordination; urgent
response capability; agency responsiveness; successful transitions; monitoring and
modification; and effective results.  (Id.)

percent or better, two scored in the eightieth percentile range, and no county scored as low as 25 percent.[25]

### 3.  Core Purpose One

Core purpose one is the prevention of out-of-home placements and the advancement of family unification, but only when at-home placement provides an environment where the child is safe from imminent and serious harm.  In R.C. I, the court found that the evidence in the record at that time revealed that the percentage of children in out-of-home care steadily had been increasing since 1995.  The court found, though, that there was insufficient explanation in the record as to the cause of the increase.  The evidence was mixed and limited as to whether the increase in out-of-home placements was due to regression in DHR's standard of care or due to a rise in methamphetamine abuse in homes, an external factor outside of DHR's control.  See R.C. I, 390 F. Supp.2d

---

[25] The overall performance ratings of the ten counties (i.e., the percentage of acceptable cases in this category) are as follows:  (1) Chambers (100 percent); (2) Randolph (100 percent); (3) Conecuh (100 percent); (4) Jackson (90 percent); (5) Lauderdale (94 percent); (6) Lee (89 percent); (7) Montgomery (83 percent); (8) Macon (50 percent); (9) Marshall (44 percent); and (10) Jefferson (57 percent).  (See Ct. Monitor April 2006 Report at 11, 18, 26, 34, 42, 51, 59, 67, 76, 86 (Doc. No. 812).)

at 1051-52.  This limited evidence did not assist this court in determining the cause of the
increase.[26]

The court finds that there now is unrefuted evidence indicating that the challenge
for counties in the areas of family unification, the prevention of out-of-home placements
(and the related goal of achieving permanence in a child's living situation, a component
of core purpose five) has been sparked largely by an external factor, that is, the rapid
increase in the use and production of crystal methamphetamine affecting families in
Alabama.  Some counties have suffered more than others, but all appear to have suffered.
For example, in discussing the current methamphetamine epidemic which plagues
Jackson County, the court monitor states as follows in his April 2006 Report:

> The major issue affecting practice [in Jackson County] is the rapid increase
> in the presence and use of crystal methamphetamine.  Use and production
> have increased and are seen in homes with multi-generational use.  Half of
> the intakes in Jackson County are attributed to crystal methamphetamine.
> Increase in the number of labs is posing more health risks for children and
> for workers.

(Ct. Monitor April 2006 Report at 29 (Doc. No. 812).)  Notably, of the ten children who
were reviewed in Jackson County, 70 percent of the cases were opened due to substance

---

[26] The cause is important.  The court would be less concerned, for purposes of
evaluating DHR's system of care, if the increase in the number of children receiving out-
of-home care was the result of a factor outside of DHR's control, rather than from
internal deficiencies in DHR's system of care.

abuse.  (Id. at 3.)  In fact, with Conecuh County presenting the only exception, substance

abuse by a parent was the leading reason in all counties that a case was opened.

Defendant also has submitted evidence which reveals that the adverse

consequences of the methamphetamine boom have been felt systemwide, and the court

monitor has "concur[red] with DHR's assessment of the role of methamphetamine[]."

(Ct. Monitor Nov. 2005 Report at 52 (Doc. No. 783).)  The director of Covington

County, for example, attests:  "Work with families in home environment seems to have

evolved from neglect due to the poverty of being in a rural community to explosive

methamphetamine labs."  (Aff., Attach. B to Doc. No. 779-3.)  Defendant also submitted

the affidavit of Freida Baker ("Baker"), who signed her statement as DHR's Deputy

Director of the Family Services Division.  (Baker Aff. – "Children in Care" at 2

(electronically filed as Ex. 36 to Doc. No. 761).)  As noted by Baker, the percentage of

children coming into care as a result of substance abuse increased more than 500 percent

during the three years preceding the signing of her affidavit, and "[t]he complexity of

substance-abusing families presents a national challenge, particularly in the area of

crystal-methamphetamine."  (Id. at 7.)

The methamphetamine epidemic obviously increases dramatically the influx of

new children entering DHR's child welfare system and strains available resources for

achieving the goals of keeping children in their homes, maintaining bonds between

children and their families, and attaining permanence in children's living situations.

46

Children who live in a home which is pervaded by methamphetamine use and/or its
manufacture are not safe, and their removal from the destructive environment is
imperative for their safety.  See R.C. I, 390 F. Supp.2d at 1046 n.18 (reiterating "its
strong position that no child is to be placed in a home from which he or she has been
removed whereupon return he or she stands any chance of a repetition of the abusive
behavior.  If DHR is to err, let it be on the side of the safety of the child, not on the side
of home unification merely for the sake of bolstering the statistics."); (see also
Implementation Plan, system processes and services, page 5 ("DHR may remove a class
member from his home only if it is not possible, through the provision of services
(including intensive home-based services), to protect the class member from imminent,
serious harm while living at home").)

The court finds that the persistent and repeated observations by the court monitor
and the evidence submitted by Defendant concerning the rise in methamphetamine use in
Alabama and its devastating effect on families and children explain, in large measure, the
rise in out-of-home placements.  In other words, the court finds that the increase in the
number of children in out-of-home care is not attributable to any systemic defect, but
rather to an external cause outside of DHR's control.  The record further indicates that
the methamphetamine epidemic is an epidemic which, during the initial conversion
process, was not affecting counties in the same manner as of present.  (See, e.g., Baker
Aff., titled "Children in Care" at 7 (electronically filed as Ex. 36 to Doc. No. 761), in

47

which Baker observes that, in 2001, 3.9 percent of Alabama admissions to foster care were due to substance abuse, but that, in 2004, almost 20 percent of admissions into care were the result of family substance abuse).)

Defendant obviously must be prepared to mold practices and policies to address this relatively new challenge, as well as any other now-unforeseen future challenges, and there is evidence that it is prepared to do so without court supervision. To highlight an example, there is evidence that, in Lee County, the director and the staff have developed a methamphetamine protocol in partnership with law enforcement agencies and the local hospital in the community. (Ct. Monitor April 2006 Report at 53 (Doc. No. 812).)

Relatedly, the evidence reveals that DHR is working hard to maintain family connections. Baker's affidavit provides a synopsis of the services which DHR has implemented as a result of the Consent Decree in an effort to prevent removal of children from their homes where possible (called "front-end" services), including the Family Options Program. (Baker Aff., titled "Children in Care" at 2 (electronically filed as Ex. 36 to Doc. No. 761).) The Family Options Program provides immediate, intensive in-home assessment and support for families. (Id.) In 2004, this program served 3,038 children from 1,247 families. (Id. at 5); (see also Def. Aff. ¶ 16A (electronically filed as exhibit 5 to Doc. No. 761).) Similarly, Baker attests that, while out-of-home placements have increased in Alabama, so have the number of children who are served in their homes. (Baker Aff., titled "Children in Care" at 6.) Indeed, the court monitor

48

complimented Defendant in this area, stating that "the capacity to deliver home-based family preservation services was developed and implemented over the duration of the Consent Decree."  (Ct. Monitor Nov. 2005 Report at 15 (Doc. No. 783).)

The court also finds that the results from the 2006 on-site sustainability reviews reveal notable improvements in the area of family connections.  Prior to these reviews, the available evidence, which was cited in the court monitor's November 2005 Report, revealed that, although counties "worked diligently" to increase the number of visits between families and children in care so as to maintain family connections, the QSR reviews revealed that only 63 percent of the children included in these aggregate reviews had acceptable ratings in the domain of "maintaining family connections."  (Ct. Monitor Nov. 2005 Report at 14-15 (Doc. No. 783).)

Turning to the present record, namely, to the results from the 2006 on-site sustainability reviews, the combined performance for the seven sustaining counties in this category (i.e., maintaining family connections) was 89 percent, and the non-sustaining counties received a combined score of 72 percent.  (Ct. Monitor April 2006 Report at 90, 92 (Doc. No. 812).)  The court monitor finds, to use the words of the court monitor, that DHR is "trend[ing] in the expected direction."  (Ct. Monitor Nov. 2005 Report at 24 (Doc. No. 783).)  Notably, as to the seven sustaining counties, there were no significant problems noted by the court monitor regarding the counties' performance in the areas comprising core purpose one.

49

In sum, the court does not find that the increase in the number of children in out-of-home care is an impediment to a finding of substantial compliance as to core purpose one, and the court finds that DHR has effectively incorporated core purpose one into its child welfare practices.  Stated differently, the court finds that Defendant has demonstrated that it will remain in substantial compliance with core purpose one after termination of the Consent Decree.

### 4.  Core Purpose Four

Child safety is not only a component of core purpose one, but is the essential focus of core purpose four.  Providing a safe haven for children, who are catapulted into DHR's child welfare system, always has been one of the paramount purposes of the Consent Decree and a top priority of the court.  In this regard, the court finds that, although there are varied components of the Consent Decree, an estimable barometer for measuring how DHR's child welfare system is functioning as a whole is to look at whether the children who are served by DHR are safe.  The foregoing was implied by the court monitor in his inverse statement that children will be safe from harm only "when each child and family served is consistently provided with supports and services that are consistently executed with due diligence."  (Ct. Monitor Nov. 2005 Report at 2 (Doc. No. 783).)  As explained herein, the court finds that the evidence indicates that DHR is doing a good job of

protecting children from harm and is doing so in a manner which substantially complies with the Consent Decree.

Overall, the court finds that the evidence regarding child safety is very positive. All of the counties which were part of the 2006 on-site sustainability reviews scored 90 percent or better in the category of "safety of the child."[27]  Previously, the court monitor has observed that "the strongest data" that children are safer now than they were before the commencement of this lawsuit is revealed through this child safety rating on the QSR reviews.  (See Ct. Monitor Nov. 2005 Report at 11 (Doc. No. 783).)

Turning to the 2006 on-site sustainability reviews, in five counties – Chambers, Randolph, Jackson, Lauderdale and Montgomery – 100 percent of the children received an acceptable rating in the category of child safety.  (Ct. Monitor April 2006 Report at 10, 17, 33, 41, 58 (Doc. No. 812).)  In Chambers County, "[t]here were no reported concerns with the safety of youth, and safety plans were present where appropriate."  (Id. at 11, 12.)  The report was equally favorable for Randolph County, where the court monitor observed that children's safety plans are "monitored closely" and that home visits by workers occur at least monthly, but often more frequently.  (Id. at 20.)  Similarly, in

---

[27] Some of the questions probed to evaluate child safety include the following:  "Is the child safe from manageable risks of harm (caused by others or by the child) in his/her daily living, learning, working, and recreational environments?"; "[a]re others in the child's daily environments safe [for] the child?"; and "[i]s the child free from unreasonable intimidations and fears at home and school?"  (See Ct. Monitor Nov. 2005 Report at 30 & Appendix A (Doc. No. 783).)

Conecuh and Lauderdale counties, there were no concerns espoused regarding child safety, and, additionally, in Conecuh County, stakeholders expressed their belief "that workers . . . are keeping children safe."  (Id. at 44, 51.)

Moreover, the remaining five counties – Conecuh, Lee, Macon, Marshall and Jefferson – scored in the ninetieth percentile range for acceptable cases in the category of child safety.  (See id. at 25, 50, 66, 75, 85.)  Even in Macon, Marshall and Jefferson counties, which the court monitor found are not sustaining an overall level of practice which substantially complies with the Consent Decree, the court finds that these counties satisfy the substantial compliance standard in the area of child safety.  Contrary to Plaintiffs' suggestion made in a similar, but slightly different, context (see Doc. No. 820 at 7-8), the court finds that "minimally acceptable," the phrase used by the court monitor to describe Macon, Marshall and Jefferson counties' compliance in the area of child safety, means what it says, i.e., that performance levels in the area of child safety satisfy the threshold of substantial compliance, even if only minimally so.  (Ct. Monitor April 2006 Report at 93 (Doc. No. 812).)

The ability of counties to *timely* investigate allegations of child abuse and neglect is another measurement of safety.  As aptly noted by the court monitor, "[t]he fact that the substantial backlogs of CAN investigations that existed in some counties, and particularly Jefferson county and Mobile county, at the outset of the system reform essentially have been eliminated is strong evidence that children are more likely to be

52

kept safe."[28]  (Ct. Monitor Nov. 2005 Report at 11 (Doc. No. 783).)  In R.C. I, the court

found that there existed "[p]ositive data as to core purpose four pertaining to the

prevention and timely interventions and investigations of class members believed to be

victims of sexual abuse and/or neglect," 390 F. Supp.2d at 1054, and the court's finding

remains the same.  In R.C. I, the court explained:

> [S]ome "quantitative indicators" as to whether or not DHR is ensuring child
> safety are revealed through data compiled by DHR regarding the number of
> child abuse and neglect ("CAN") reports received, the timeliness of contact
> to these reports, and the timeliness of the resolution of the CAN report.
> (Ct. Monitor Nov. 2004 Report at 39.)  According to the court monitor, the
> data demonstrates a steady and notable increase in the percentage of cases
> having initial CAN contacts within the required five days.  (Id.)  To
> Defendant's credit, there is data that, in 91.4 percent of cases, DHR
> caseworkers are making contact with children who are the subject of CAN
> reports within five days, and percentages of initial CAN contacts have
> averaged approximately 90 percent during the previous three years.  (Id.
> at 41.)  The court monitor observes that these figures represent a
> "considerable increase since 1997" when only 49 percent of children were
> contacted by a social worker within five days.  (Id.)

390 F. Supp.2d at 1054.

Furthermore, the statements provided by community stakeholders reveal that

county staff members have developed strong, positive working relationships with law

enforcement.  (See, e.g., Ct. Monitor April 2006 Report at 12, 20, 36, 44, 53, 78 (Doc.

No. 812).)  In Marshall County, for example, "[l]aw enforcement spoke very highly of

DHR and reported that [it was] responsive and cooperative."  (Id. at 78.)  Also, in

---

[28] "CAN" denotes child abuse and neglect reports.  See R.C. I, 390 F. Supp.2d
at 1054.

Jackson County, which as discussed earlier in this opinion has been hard hit by the ill

effects of methamphetamine abuse, stakeholders described strong collaboration between

DHR staff and law enforcement, judges and guardian ad litems.  (See id. at 36.)  The

court monitor observed that, in Jackson County, law enforcement and DHR staff "work

well together when methamphetamine[] [is] involved" and that "[l]aw enforcement has

been diligent with training DHR staff regarding home visit safety."[29]  (Id.)  The court

again commends Defendant for DHR's continued "ability and willingness to respond

immediately to any complaint concerning child safety, as well as to cooperate with

municipal, county and state law enforcement [and federal law enforcement, where

indicated] in all matters pertaining to child endangerment and the prevention of the

same."  R.C. I, 390 F. Supp.2d at 1033 (brackets added).

      In finding that DHR has demonstrated substantial compliance with core purpose

four, the court is not insensitive to the recently-reported death in Jefferson County of a

child, who had been returned to his mother's care, but who nonetheless was under DHR's

watch, and another case where it was alleged that DHR failed to investigate a report of

child abuse.  (See Doc. No. 767 at 12); (Doc. No. 820 at 21.)  The court also is cognizant

of DHR's representation to the court of the measures employed to address the reported

---

[29] In this regard, it is recommended that DHR implement policy or law which gives
employees of DHR the authority of a deputy sheriff and allows them to carry firearms in
and about the performance of their duties, provided the employees are certified to do so
by the Commissioner and have qualified, with an appropriate weapon, on an approved
firing range as either marksman, sharpshooter or expert.

incident of abuse, which DHR states included an investigation and the imposition of disciplinary actions against employees and the county director.  (See Doc. No. 779 at 12.) After careful consideration, the court finds that the record does not support the conclusion that these tragedies exemplify systemwide failures, as opposed to "isolated" occurrences. Wyatt v. Rogers, 985 F. Supp. 1356, 1388 (M.D. Ala. 1997).  Although Plaintiffs take a contrary position than that of the court, Plaintiffs have admitted that a failure in an individual case, even a tragic one, does not, "in and of itself, demonstrate[] noncompliance."  (Doc. No. 767 at 12.)  Although the court, and certainly DHR, desires every child in every county to achieve optimal success under DHR's system of care, the court realizes that such a goal is neither realistic nor possible, and this is the reason the Consent Decree embodies a standard of substantial, rather than complete, compliance.[30]

As a final observation, the court commends DHR for its success in the outcome of child safety on a national study.  In a United States government study conducted by the Children's Bureau and the Administration for Children and Families, located within the U.S. Department of Health and Human Services ("DHHS"), the State of Alabama achieved substantial conformity within the safety outcome titled "Children are, first and foremost, protected from abuse and neglect."  R.C. I, 390 F. Supp.2d at 1054 n.31 (citing

---

[30] To illustrate further, when the individual counties were going through the "conversion" process, there unfortunately were instances where individual children were not being served satisfactorily under the county's system of care; however, pursuant to the court monitor's 85 percent measuring stick, those failures were not a bar to a finding of substantial compliance.

Ct. Monitor Nov. 2004 Report at 53); (see also Betty Ziri Aff. (Ex. 34 to Doc. No. 761)

(discussing generally the review process)); (Exs. 35 & 36 to Doc. No. 761).)  Although

the court recognizes that the DHHS standards do not supplant the terms of the Consent

Decree, as Plaintiffs readily have pointed out (see Doc. No. 835 at 1; Doc. No. 767 at 9),

the court observes that the DHHS reviews incorporate a methodology similar to that

employed by the court monitor; the DHHS reviews integrate data analysis and individual

case reviews, with ratings assessed based upon "the federal review instrument and

interviews of key stakeholders of [DHR's] system."  (Paul Butler Aff. (Doc. No. 836 &

Attachment 3 to Doc. No. 811)); (see also Dean Aff. ¶¶ 4, 7 (Ex. 17 to Doc. No. 761).)

Based on the foregoing, the court finds that overall DHR is keeping children safe.

The court finds Defendant has demonstrated that DHR will remain in substantial

compliance with core purpose four of the Consent Decree after court supervision ends.


5.  *Core Purpose Two*:  *Service Delivery and Competent Staff*

Core purpose two embodies a multitude of important aims of the Consent Decree.

Core purpose two provides:  The delivery of comprehensive services, in a coordinated

and therapeutic manner, by competent staff with appropriate caseloads, to class members

and families in home-based and community-based settings, devised pursuant to ISPs, for

the purposes of facilitating home placement, satisfying the unique physical, emotional,

social, educational and other needs of class members, and promoting smooth transitions

for class members when they "age out" of the system.  The court turns now to an

examination of core purpose two.


a.  Service Delivery

One of the important principles of the Consent Decree, i.e., a component of a well-

functioning system of care, is that "children and families should have access to an array

of services that . . . address individual, physical, emotional, social, and education needs."

(See Ct. Monitor Nov. 2004 Report at 3.)  The court monitor found, and the court

concurs, that "DHR has developed an array of services necessary to implement the

system of care."  (Ct. Monitor Nov. 2005 Report at 9 (Doc. No. 783).)  These services are

extensive.  Some are discussed in Baker's and Defendant's affidavits.  (See Baker Aff.,

titled "Children in Care" at 2-6 (electronically filed as Ex. 36 to Doc. No. 761)); (Def.

Aff. ¶¶ 12, 15 (electronically filed as Ex. 5 to Doc. No. 761).)[31]  Therapeutic foster family

care is one such "service" for which DHR deserves praise.  Therapeutic family foster care

did not exist as a resource at the inception of this lawsuit, and the court concurs with the

court monitor that "its creation has been a strength of the system."  (Ct. Monitor Nov.

2005 Report at 13 (Doc. No. 783)); (see also Implementation Plan "Conversion" section

_____

[31] Defendant's affidavit is attached to Defendant's exhibit 5 (titled "County
Conversion Schedule") and is electronically docketed by the clerk as exhibit 5 to
document number 761.

at 4 (describing as one of the fifteen indicators of conversion that "the provision of . . .

therapeutic family foster care is increased").)

DHR's success in the area of services can be attributed, in part, to its financial

commitment to obtaining and spending the funds necessary for the creation and

implementation of these services.  (See Ct. Monitor Nov. 2005 Report at 10 (Doc. No.

783).)  The evidence reveals that annually DHR is spending $100 million more for child

welfare services than required by the Consent Order (i.e., the Order which extended the

time for compliance with the Consent Decree).  (Id.); (see Feb. 11, 1999 Consent Order

(Doc. No. 511)); (Def. Aff. ¶ 16B (electronically filed as Ex. 5 to Doc. No. 761).)  Also,

every county uses flexible funds to provide appropriate services for children and their

families.  (Lapsley Aff. ¶ 8 (electronically filed as exhibit 6 to Doc. No. 761)); (Ct.

Monitor Nov. 2005 Report at 10 (Doc. No. 783) ("The monitor concurs that flexible

funding has been utilized.").)  The use of flexible funds is essential to a county's ability

to practice consistently with the Consent Decree.  (See Implementation Plan, cited

recently in Ct. Monitor Nov. 2005 Report at 2-3 (Doc. No. 783)); (see also Ct. Monitor

Nov. 2005 Report at 4-5 (observing that "[s]izable increases in funding through revenue

maximization efforts were accomplished and had a direct impact on the availability of

flexible funds that could be accessed by ISP [individualized service plan] teams to craft

individualized services for children and families").)

b.  Competent Staff

Paragraph 53 of the Consent Decree states:  "Services shall be provided by competent staff who are adequately trained and supervised and who have appropriate caseloads.  The competence of staff, staff's training and supervision, and staff's caseloads shall be deemed adequate when the 'system of care' is able to comply with the standards set forth in this decree."  (Consent Decree ¶ 53.)  In the area of competency of staff, the court discusses below DHR's compliance with the court's order on licensing standards for social workers, the perception of stakeholders concerning their interactions with staff in various counties (as revealed in the 2006 on-site sustainability reviews), and staff training programs developed as a result of the Consent Decree.

*i.  DHR's Demonstrated Compliance with the Court's Order on Developing a Licensed Child Welfare Social Worker Workforce*

The Consent Decree's goal of having competent staff is advanced, in part, through the court's Order on licensing standards ("Licensing Order"), and the evidence reveals that DHR is complying with these court-mandated requirements.  By way of brief background, in December 1999, DHR finalized a policy on licensing requirements, which has been approved by the court and embodied in the court's Licensing Order entered on January 18, 2000.  (Licensing Order (Doc. No. 538).)  The policy, in sum and substance, created a new entry-level classification for social workers and provided that DHR would

only hire applicants for this classification who had earned a bachelor's degree in social work.  (Id.)  The policy also implemented incentives for existing staff to obtain professional social work degrees, such as providing staff with paid educational leave. (Id.)

Regarding the Licensing Order, the court monitor has observed that, "[t]hrough direct intervention of the court, the workforce has become more professionally credentialed through the preferential hiring of workers having [bachelor's and master's degrees] who subsequently obtain licensure when working for DHR."  (Ct. Monitor Nov. 2005 Report at 5 (Doc. No. 783).)  Indeed, the court ordered Defendant to implement licensing requirements for social workers as a measure to help ensure that DHR recruits the caliber of workers needed to implement the Consent Decree.  (Licensing Order (Doc. No. 538).)

Defendant has submitted evidence, through the deposition testimony of Reba Cantrell ("Cantrell"), of DHR's sustained progress in adhering to and, in some instances, exceeding the requirements set out in the court's Licensing Order.[32]  (Cantrell Dep. at 38-50 (Attach. K to Doc. No. 779)); (Doc. No. 779 at 20.)  Cantrell attests that DHR hires only social workers who meet the court-mandated licensing requirements.[33]

------

[32] At the time she gave her deposition testimony, Cantrell was the program administrator in DHR's Family Services Division.

[33] Neither Plaintiffs nor the court monitor has contended otherwise.  (See, e.g., Ct. Monitor Nov. 2005 Report (Doc. No. 783) ("The monitor concurs that . . . a licensing program as mandated by court's order[] [has] been established.").)

(Cantrell Dep. at 39.)  Cantrell attests that, consistent with the court's Licensing Order, DHR continues to reimburse licensing fees for those employees who have attained bachelor's degrees and master's degrees in social work and provides supervision and continuing education for social workers, thereby enabling them to maintain their licensing requirements.  (Id.)  DHR's other accomplishments in the areas of recruitment and retention are set out further in Cantrell's deposition testimony.  (See id. at 40-50.)

Moreover, DHR employs full-time employees whose jobs are devoted to recruiting and retaining social workers.  (See id. at 39.)  Namely, in 2001, DHR established a Staff Development Office for the specific purpose of ensuring DHR's compliance with the court's Licensing Order and furthering the recruitment and retention of licensed and qualified social workers.  See 390 F. Supp.2d at 1039.

The court monitor has commended DHR for the creation and work of the Staff Development Office.  (Ct. Monitor Nov. 2004 Report at 55).)  Notably, discussing the accomplishments of the Staff Development Office, the court monitor has stated, "As a result of targeting recruiting efforts and supporting workers obtaining licensure, the percentage of license-eligible social work frontline staff has increased from 19.3% of staff in 2000 to 40% of staff as of October 2004."  (Id.)  As set out by the court monitor in his November 2004 Report, DHR also has made a long-term commitment to adhere to the court's Licensing Order after termination of the Consent Decree.  (Id.)  In sum, the court finds that the evidence establishes that DHR is committed to sustaining the

improvements it has made in recruiting and retaining licensed child welfare social workers and that it is complying with the court's Licensing Order.

### ii. Stakeholders' Reports

In the area of worker competence, another consideration deemed important by the court monitor, and one which weighs in Defendant's favor on the substantial compliance inquiry, is the perception of relevant stakeholders. (See, e.g., Ct. Monitor April 2006 Report at 4 (requiring for a county's conversion that "stakeholder input and collaborative working relationships were predominantly reported as positive")); (see also Larry Dean Aff. ¶ 8 (Ex. 17 to Doc. No. 761) (stating that "stakeholder interviews comprise a key component of the onsite review process").) Overall, with the exception of Jefferson County, the court monitor recited positive comments from stakeholders regarding the competence of staff. Comments from stakeholders are set out in more detail below, but the court briefly recites a few of those comments here. In Chambers County, "all stakeholders and staff cited strong leadership as the primary strength in the county," and, in particular, "[t]he director was described as having a high standard for practice and as being supportive of her staff." (Ct. Monitor April 2006 Report at 12 (Doc. No. 812).) In Conecuh County, the court monitor noted that the staff was "stable" and that "[t]here was a high regard for the staff from all stakeholder groups and an overall belief that workers are doing a good job and are keeping children safe." (Id. at 28.) In Jackson County,

stakeholders, in particular, noted "the strength of the supervisory staff as an asset to

[DHR] and key to positive practice outcomes."  (Id. at 29.)  In Randolph County,

"[s]takeholder input was uniformly positive."  (Id. at 20.)  Finally, a "strength" of

Montgomery County, as noted by stakeholders, was the "stable" leadership.  (Id. at 61.)


### iii.  Training

A multitude of training programs have been implemented as a result of the Consent

Decree in this case, as elaborated upon in the Child Welfare Strategic Plan which sets out

various training programs which DHR offers for its social workers, many through

national resource centers.  See R.C. I, 390 F. Supp.2d at 1039; (Ct. Monitor Nov. 2004

Report at 55-57); (Ex. to Doc. No. 714.)  Alabama Certification Training is one example

of the training that now is provided to staff.  (Ct. Monitor Nov. 2005 Report at 8-9

(recognizing that "Alabama Certification Training and other training ha[ve] been

provided on an ongoing basis to staff")); (see also id. at 4 (noting that the development of

Alabama Certification Training resulted from this litigation).)  The court monitor found,

and the court concurs, that "training curricula . . . have been established."  (Ct. Monitor

Nov. 2005 Report at 10 (Doc. No. 783).)

Turning to the 2006 on-site sustainability reviews, training specifically was noted

as a strength in two counties, i.e., Chambers and Jackson.  As to the remaining compliant

counties, the court monitor made no observations, positive or negative, on the issue of

training; there, however, is no indication that his positive position espoused in his November 2005 report, *supra*, has changed.

With that said, the court recognizes that in those counties which the court monitor deemed were not in substantial compliance, workers reported that training needed to be improved.  (Ct. Monitor April 2006 Report at 6, 29, 44, 69, 79 (Doc. No. 812).)  Commendably, in one of those counties, namely, Jefferson County, at the time the court monitor conducted his 2006 on-site sustainability review, there was specific evidence that this county already was in the process of improving its training curricula.  (See Tanveer Aff. ¶ 11 (Ex. to Doc. No. 811).)  "Staff trainers were added to the Jefferson County DHR training unit in 2005 to address both new and ongoing training needs," and an expanded three-month training program for newly-hired workers was slated to commence in August 2005.  (Id.)

In short, the evidence is favorable as to the establishment of exemplar training programs in DHR's counties.  The evidence, though, is somewhat mixed as to whether some counties are implementing the training curricula in a satisfactory manner.  In reaching its findings of systemwide substantial compliance, the court has weighed both the positive and negative evidence in the area of training.

### 6.  Core Purpose Two:  Appropriate Caseloads

As discussed above, compliance with the court's Licensing Order is one important step DHR took to implement core purpose two into its child welfare practices.  A more difficult task for DHR has been discerning how to retain an adequate number of competent staff to serve the children in its care.  One way to retain staff is to minimize burnout which can be attributable to high caseloads.  High caseloads also reduce the quality of care each child receives from his or her social worker.  To this end, the Consent Decree recognizes that child welfare professionals must have appropriate caseloads in order to carry out the principles of the Consent Decree.  (See Ct. Monitor Nov. 2005 Report at 36 (citing ¶ 53 of the Consent Decree) (Doc. No. 783)); (see also Agreement Regarding Implementation, § IV, ¶ 12, which provides: "The Implementation Plan shall identify maximum caseloads for various types of staff, including DHR caseworkers, and specify the steps that will be taken to bring caseloads down to at least those levels.").)

Consequently, the Implementation Plan set a June 1994 deadline for DHR to develop and to adopt provisional caseload standards, mutually acceptable to the parties, for conversion of counties.  (Doc. Nos. 452, 538.)  The 1994 deadline proved unattainable, however, and, ultimately, the court stepped in.  As a result, the parties reached an agreement which is embodied in the court's order setting caseload and staffing

levels.[34]  The court's 1998 Order expressly recognizes that "[t]he Consent Decree

contemplates staffing to be one of the core responsibilities of [DHR]."  (Ct. 1998 Order

at 2); (Consent Decree ¶ 53.)  This section of the court's opinion focuses on DHR's

compliance with the court's 1998 Order.

In R.C. I, the court explained that the overall objective of the court's 1998 Order is

to restrict the number of cases assigned to social workers so that caseloads remain

manageable.[35]  As recognized by the court monitor, the court's 1998 Order also

"anticipated that there will be some variability in the day-to-day management of caseload

levels at the local county level and that some allowance is necessary for periodic, but not

sustained, county caseload levels going above the court-specified standards."  (Ct.

Monitor Nov. 2005 Report at 38 (Doc. No. 783).)  Therefore, the "Implementation"

sections of the court's 1998 Order, embodied in Appendix B, ¶ 1, set out the steps a

county must take to correct caseload overages and, at the outer fringe, mandate that DHR

---

[34] The Order, entered on January 12, 1998, is titled, "Order on Caseload Standards, Staff Allocation and Tracking Compliance."  The court refers to this Order in abbreviated form as "the court's 1998 Order."  The Order also is attached as exhibit 2 to Defendant's "second motion for order terminating Consent Decree."  (See Doc. No. 761.)

[35] These standards are set out in an appendix to the court's 1998 Order, as well as on pages 37 and 38 of the court monitor's November 2005 Report.  (Doc. No. 783.)  For example, the Order provides that there shall be "1 worker for every 13.5 child abuse and neglect reports received on a monthly average the preceding year," "1 worker for every open family services case[]," "1 worker for every 18 children in foster care," and a minimum of one supervisor per county, with "an additional supervisor for each increment of six workers."  (Ct. 1998 Order, Appendix A.)  There also are additional requirements for large counties, such as Jefferson and Montgomery counties.  (Id.)

implement corrective action to cure caseload problems within seven months.[36]  (See id.);

(see also Ct. Monitor Nov. 2005 Report at 40 (Doc. No. 783)); (Salter Aff. ¶ 4

(electronically filed as Ex. 12 to Doc. No. 761).)

Defendant argues that DHR is complying with the court's 1998 Order.[37]  The

primary evidentiary support for his argument comes via two affidavits from Mike Salter

("Salter"), a 32-year veteran of DHR who at the time he signed his affidavits worked as

the director of DHR's office of management and fiscal analysis.  (Salter Affs.

---

[36] Appendix B to the court's 1998 Order, in the section titled "Implementation Rule," provides that "[t]he average worker-to-case ratio for each component standard will not exceed the standard for three consecutive months without corrective action being taken to bring the average to the standard within 30 days."  (Ct. 1998 Order, Appendix B); (Ct. Monitor Nov. 2005 Report at 37 (Doc. No. 783).)  Similarly, in the section of Appendix B, titled "Monitoring and Correcting Implementation," "[c]ounties that have more than 10% of workers who exceed the standard caseload, or who have a quarterly average that exceeds the standard for a component," are required to "file an exception report identifying the reasons for the assignment of caseloads over standard and the actions that will be taken to correct the situation during the next 30 days."  (Ct. 1998 Order, Appendix B.)  Moreover, where "a county reports in excess of the standard for two consecutive quarters, the state and county shall analyze the problem to determine what factors are creating the overload."  (Id.)  The Order provides further that "[c]orrective action shall be taken on the analysis within 30 days, including increasing the county staff allocation, if it is determined that the caseloads in excess of the standard are a result of increasing incidence and demand."  (Id.); (see also Ct. Monitor Nov. 2005 Report at 48 (Doc. No. 783).)

[37] The court emphasizes, at the outset, that it disagrees with Defendant's statement in his affidavit that the court monitor "lack[s]" an "understanding" of the court's 1998 Order, and none of the court's findings herein should be interpreted as a concurrence with Defendant's latter statement.  (Def. Aff. at 7 (electronically filed as Ex. 5 to Doc. No. 761)); (see also Ct. Monitor Nov. 2005 Report at 48 (Doc. No. 783).)  Indeed, the court's 1998 Order is the product of the court monitor's recommendations and diligent efforts.  (See 1998 Order at 4-5.)

(electronically filed as Ex. 12 to Doc. No. 761 & Ex. 5 to Doc. No. 779-5).)[38]  Briefly,

among the points Salter makes in his affidavits are as follows.  He says that systemwide

staffing allocations actually are greater than that required by the court's 1998 Order.

(Salter Aff. ¶ 11 (electronically filed as Ex. 12 to Doc. No. 761).)  He offers explanations

for why variations and overages in caseloads occur.[39]  Salter also addresses some of the

court's concerns, which the court outlined in R.C. I, including a concern that staffing

allocations in certain converted counties were reduced after the counties were "declared"

in substantial compliance with the Consent Decree.  (Id. ¶ 16.)  Below, the court will

include discussion of Salter's affidavits where appropriate.

In contrast to DHR's position, the theme echoed by the court monitor is that DHR

exhibits weaknesses in its ability to comply with the court's 1998 Order.  (See, e.g., Ct.

Monitor April 2006 Report at 89, 93-94 (Doc. No. 812).)  Plaintiffs concur with the court

monitor's opinion and argue that the statistics, collected from the 2006 on-site

_____

[38] Where Defendant has not labeled the exhibits, the court refers to the electronic
exhibit numbers assigned by the clerk.

[39] Salter says that there are two primary justifications for workload percentages
exceeding the standards set out in the court's 1998 Order.  The first is that in any given
month caseloads may increase, which requires a temporary spike in workloads, but that,
as stated, the Staffing Committee allocates additional staff when caseloads increase.
(Salter Aff. at 8 (electronically filed as Ex. 5 to Doc. No. 779-5).)  Second, Salter says
that another "reason for an increased workload number is often the result of a staff
member leaving DHR," but that the procedures in place permit a county to "automatically
request a register and start the hiring process for a new worker" when there is a vacancy.
(Id.)  The court monitor offers additional reasons.  (See Ct. Monitor Nov. 2005 Report
at 46-47 (Doc. No. 783).)

sustainability reviews and as a whole, demonstrate that DHR is not substantially complying with any component of core purpose two.  (See, e.g., Doc. No. 820-18 at 9-12.)

### a.  Staffing Allocations and the Child Welfare Staffing Committee

A discussion of staffing allocations is incomplete without first recognizing DHR's Child Welfare Staffing Committee, which is the product of the Consent Decree.  (See Ct. Monitor Nov. 2005 Report at 40 (Doc. No. 783).)  The Staffing Committee is responsible for allocating for each county the number of staff the county needs in order to comply with the court's 1998 Order.  As observed in R.C. I, the Staffing Committee "meets 'regularly' for the primary purpose of monitoring staff-to-caseload ratios.  The Staffing Committee reviews county directors' requests for additional personnel and incorporates county consultant updates regarding county staffing needs."  390 F. Supp.2d at 1039 (internal citations omitted).  These meetings occur on a monthly basis.  (See Salter Aff. ¶ 15 (electronically filed as Ex. 12 to Doc. No. 761) (observing that DHR's "staffing committee meets every month to review the caseloads and take corrective action as quickly as necessary").)  In his affidavits, Salter describes in more detail the procedures used by the Staffing Committee, including the analyses generated by the county caseload management reports and the biweekly staffing reports, to review county staffing levels and to monitor a county's compliance with the court's 1998 Order.  (Salter Aff. ¶¶ 5-8

(electronically filed as Ex. 12 to Doc. No. 761)); (Salter Aff. at 2-3 (electronically filed as Ex. 5 to Doc. No. 779-5).)  The Staffing Committee is an asset of DHR.

The court monitor recently observed a specific example of the effective workings of the DHR Staffing Committee.  Namely, in Lauderdale County, the court monitor stated that "[s]taff turnover and caseload issues have been stabilized in the past two years" as a result of the collaborative efforts of the county and the DHR Staffing Committee which resulted in the committee's allocation of additional personnel for Lauderdale County. (Ct. Monitor April 2006 Report at 37 (Doc. No. 813).)

Salter also cites Jackson County as one example of the positive contributions made by the Staffing Committee.  He says that, due to the Staffing Committee's vigilance in monitoring the increase of child welfare cases in Jackson County, the Staffing Committee has increased staffing allocations five times between November 2003 and September 2004, from fourteen to eighteen workers. (Salter Aff. ¶ 15 (electronically filed as Ex. 12 to Doc. No. 761)); (see also Wayne Sellers' Aff. (Attach. 6 to Doc. No. 811) (stating in his capacity as the director of the Marshall County DHR office that the "DHR Staffing Committee has quickly responded to our ever-increasing caseloads and increased our allocation many times over the past two years").)  Other examples of the work of the Staffing Committee are noted in the next section.

The court finds that, through the efforts of the Staffing Committee, DHR actually is allocating the number of positions needed in counties to comply with the caseload

standards established by the court's 1998 Order.  The Child Welfare Staff Data charts

support the court's findings.  A discussion of that data follows.

The court looks first to the Child Welfare Staff Data chart, which is submitted as

attachment 4 to Salter's Affidavit.[40]  (See Doc. No. 779-5).  The Child Welfare Staff Data

chart contains five categories of information for each county pertaining to staffing and

workload data.  As explained by Salter, the first row, titled in abbreviated form "co.

mthly caseload report," reflects the number of staff needed in the county to comply with

the court's 1998 Order, as calculated by the caseload management system and reported in

the county management reports.  The second row, titled "system data," shows the number

of staff needed to comply with the court's 1998 Order based on DHR's automated system

---

[40] Salter's Affidavit, in turn, is submitted as attachment D to document number
779.

"count of cases."[41]  (Salter Aff. at 2, 6 (Doc. No. 779-5).)  The third row, labeled

"allocation," sets forth the staffing allocation determined for the county by the Staffing

Committee.  (Id.)  The fourth row, labeled "CFP last pay period of mth.," represents the

number of workers actually employed during the month in question, and the fifth and

final row denotes the average R.C. workload percentage in the county for the month.

(See id.)

 The Child Welfare Staff Data chart compiles monthly data of seventeen counties

from November 2004 to September 2005.  Of the 187 total months measured, there are

171 months where staffing allocations in counties either met or exceeded one or both of

the figures in the first and second rows (i.e., the figures quantified through the caseload

management system and DHR's automated system).  Translated into percentages, this

_____

 [41] As explained by Salter, these charts reflect two data collection methods used by
DHR.  (Salter Aff. ¶ 8 (electronically filed as Ex. 12 to Doc. No. 761)); (Salter Aff.
at 2-3 (electronically filed as Ex. 5 to Doc. No. 779-5).)  The data reflected in the
caseload management reports is input by the county office, and the "system count of
cases" is generated by DHR's automated system.  (Salter Aff. at 2-3 (electronically filed
as Ex. 5 to Doc. No. 779-5).)  Salter explains that sometimes there are discrepancies
between the number of cases generated by the caseload management system and DHR's
automated system.  (Id. at 3); (Salter Aff. ¶ 8 (electronically filed as Ex. 12 to Doc. No.
761).)  One reason is because the caseload management system does not have the
capacity to count prevention cases, which are counted as family services cases in the
monthly management report (but correctly classified as prevention cases in DHR's
automated system).  (Id.)  The two reports also may reflect different numbers if the
numbers are counted at different points in time during the month.  Salter says that
generally the automated "system" count of cases "tend[s] to be more accurate."  (Salter
Aff. at 3 (electronically filed as Ex. 5 to Doc. No. 779-5).)  No disagreement has been
advanced by Plaintiffs or the court monitor concerning Salter's latter contention.  The
court notes that where there is a variance in the two statistics, in all but a few cases, the
automated "system" count of cases reflects the lower number.

data reflects that DHR met the staffing allocation requirements in 91 percent of the months examined.  The court finds that this data is favorable.

The sixteen remaining months (out of 187 months) denote staff allocation shortages in five counties, namely, Elmore, Jackson, Marshall, Pike and Shelby.  Jackson County's staff allocation was short by one for five months, and Marshall County's staff allocation suffered by one for seven consecutive months.  Elmore County also was short one allocation during one month, as was Pike County.  Shelby County was deficient by one worker for two months.

Similarly, the court finds that favorable results are revealed in a separate Child Welfare Staff Data chart, submitted as Appendix D to the court monitor's April 2006 Report.  This chart examines staffing data on twenty-seven counties for a period of thirteen months beginning in December 2004 and continuing through December 2005.[42] As reflected in this chart, for 321 months (out of a total of 351 months), staffing allocations either met or exceeded one or both of the figures quantified by the caseload management system and DHR's automated system (which are used to determine compliance with the court's 1998 Order).

_____

[42] Some of the counties set out in Salter's exhibit, discussed above, and Appendix D are the same, and, for those intersecting counties, the charts overlap for the months of December 2004 through September 2005.  Appendix D, however, contains data for the additional months of October 2005, November 2005, and December 2005.

73

The data and percentages discussed herein are even more positive when one considers that the staffing allocations, which are generated by the caseload management system (designated as "co. report" on the Total Child Welfare Staff Need report) and DHR's automated system (designated as "system" on the Total Child Welfare Staff Need report), are based upon the caseload ratios which DHR has implemented which, for some types of cases are lower than that required by the court's 1998 Order.  (See Attach. 3 to Salter Aff. (electronically filed as Ex. 5 to Doc. No. 779-5)); (see also Salter Aff. at 4 (electronically filed as Ex. 5 to Doc. No. 779-5)); (Salter Aff. ¶ 8 (electronically filed as Ex. 12 to Doc. No. 761).)  For instance, Salter attests, that as of September 2005, systemwide, there were thirty-one additional CAN (child abuse and neglect) social workers allocated to various county offices due to DHR's implementation of a ratio lower than the court's standard.  (Salter Aff. at 5 (electronically filed as Ex. 5 to Doc. No. 779-5).)

Salter further attests that DHR "has consistently provided more staff for county offices than required by the staffing order," and he has discussed the statistics which the court finds supports his assertion.  (See, e.g., Salter Aff. ¶ 12 (electronically filed as Ex. 12 to Doc. No. 761).)  For example, he says that, in May 2005, "[t]he combined total of the workers on board and the ones being hired was 1,609, which [was] the staffing allocation for May 2005."  (Id. ¶ 10.)

74

Based on the foregoing evidence, the court issues the following findings.  First, overall, having considered in its totality the evidence assimilated in the Child Welfare Staff Data charts, the court finds that the data equates to evidence of substantially compliant staffing allocations.  Similarly, the court concurs with Salter that these charts "show[] that DHR is working hard to keep staff levels high enough to enable [] counties to meet the caseload standards."  (Salter Aff. at 6 (electronically filed as Ex. 5 to Doc. No. 779-5).)  Furthermore, the court finds that the shortfalls are minimal and are inconsequential to a finding of substantial compliance.  Second, the court finds that the Staffing Committee ensures, through monitoring and analysis, that counties are allocated a sufficient number of workers to comply with and, in some instances, to exceed the requirements in the court's 1998 Order.  (See id.)

Additionally, Salter adequately has addressed the court's concern, as also voiced by the court monitor, that DHR reduced staffing allocations in counties after the counties were found to be in substantial compliance with the Consent Decree.  See R.C. I, 390 F. Supp.2d at 1051; (see Salter Aff. ¶ 16 (electronically filed as Ex. 12 to Doc. No. 761).) Salter attests, "While it is true that some counties were reduced in staff after conversion, they were never reduced below the number required by the caseload standards."  (see Salter Aff. ¶ 16.)  He explains that, during the conversion process, many counties were provided extra staff "above that needed by the court[-]ordered standards, so that workers would have time to learn the R.C. principles."  (Id.)  He cites Calhoun County as an

example.  He says that in December 2003, when Calhoun County had its assertion

presentation, Calhoun County employed eleven more workers than required by the

court's 1998 Order (i.e., the court's 1998 Order required fifty-six workers and Calhoun

County employed sixty-seven workers).  (Id.)  By April 2005, due to a decrease in the

number of cases, the court's 1998 Order required Calhoun County to employ fifty-four

workers.  (Id.)  The court, thus, finds that Calhoun County's reduction of staff between

December 2003 and April 2005 from sixty-seven to sixty did not violate the court's 1998

Order.  (Id.)  Salter also states that "[s]ome" counties have increased their staff since the

time of assertion presentations and cites Etowah County as one example.  (Id. ¶ 17.)

At this juncture, the court observes that, although Salter suggests to the contrary,

the court does not view the court monitor to dispute the foregoing evidence.  Indeed, the

court monitor has noted a positive trend in recent staffing patterns.  The court monitor has

stated that, subsequent to his November 2004 Report, statewide, "both the actual number

of child welfare professionals and the number of allocated positions have increased."

(Ct. Monitor Nov. 2005 at 39 (Doc. No. 783).)  Namely, the court monitor stated that, in

August 2004, there were 1,558 allocated positions and, in October 2005, that number

increased to 1,622.  (Id.)  Corresponding to the increased allocations, in August 2004,

there were 1,546 actual workers, and in October 2005, there were 1,564 actual workers.

(Id.)  Allocating a sufficient number of staffing slots to each county to comply with the

court's 1998 Order and actual filling all of those available slots are two different issues.

The court monitor primarily criticizes the latter, as discussed below; Salter focuses on the former.

b.   DHR's Compliance with the Monitoring
and Reporting Sections of the Court's 1998 Order

The court finds that the evidence demonstrates that DHR is monitoring caseloads standards, in accordance with the dictates set out in Section II of the court's 1998 Order. (See Ct. 1998 Order, Appendix B, § II.)  Based on the foregoing evidence, the court finds that DHR has in place a well-functioning framework for allocating staff and tracking and reporting caseloads, by number and by type, on the county level, as required by Section II.  (See id. ("Each county shall determine monthly the average caseload for each standard component (i.e., foster cases, family services, etc.) and document the average caseload during the months for each worker[].").  The court monitor concurs that "information is collected that can be used to manage and evaluate the system of care."  (Ct. Monitor Nov. 2005 Report at 10 (Doc. No. 783).)  The effectiveness of DHR's framework is demonstrated by the Staffing Committee's proven ability to allocate staff for each county, adjusting the numbers up or down when necessary, so that each county has the number of staff required to comply with the court's 1998 Order.  In other words, the court finds that DHR is "increasing the county staff allocation, if it is determined that the caseloads in

excess of the standard are a result of increasing incidence and demand." (Ct. 1998 Order, Appendix B, § II E.)

Furthermore, the evidence establishes that, as dictated by the court's 1998 Order, counties are "report[ing] three months of caseload data by worker and a quarterly average on the quality assurance reports." (See id. § II B.) Finally, the court's 1998 Order requires that a county having more than 10 percent of workers exceeding the standard caseloads must file an exception report, explaining therein the reasons for the overages and the corrective action which it is implementing to correct the deficiencies. As recognized by the court monitor, "DHR has consistently filed these exception reports as addendums to the monthly caseload management report."[43] (Ct. Monitor Nov. 2005 Report at 43 (Doc. No. 783).)

---

[43] The court monitor provides an excerpt of an exception report on page 44 of his November 2005 Report, which explains that for the month in question variances occurred for various reasons, including one worker's military deployment, the hiring of two new employees, several workers' involvement in required training, two workers' absence due to maternity and medical leaves, and the transfer of another worker. (Ct. Monitor Nov. 2005 Report at 44 (Doc. No. 783)); (Def. Aff. ¶ 16B (electronically filed as Ex. 5 to Doc. No. 761).) These exception reports are discussed further below.

c.  The Court Monitor's Measurements for Ascertaining Substantial Compliance
with the Court's 1998 Order and Examination of the
Evidence from the 2006 On-Site Sustainability Reviews

The court monitor traditionally has taken into account three factors when analyzing caseload data to assess compliance with the court's 1998 Order.  (See Ct. Monitor Nov. 2005 Report at 47 (Doc. No. 783).)  These three "important" factors, explained in more detail below, are as follows:  (1) the county's "average R.C. workload"; (2) the number of counties which are "over standards" for periods of time exceeding the seven-month outer goal of corrective action set out in the court's 1998 Order, see *supra* footnote 36; and (3) the percentage of workers "over standards" within a county.[44]  (See id. at 47-48.)  As to the third factor, the court monitor has stated:  "Having 20% or less of [the] staff over court-specified standards falls within the range of caseload variability typically accepted by the monitor."  (Ct. Monitor Dec. 2003 Report at 29.)  Concerning the first factor, at times, the court monitor also has given some leeway (10 percent) to counties concerning overages in R.C. workloads.  (See, e.g., Ct. Monitor Nov. 2005 at 48 (Doc. No. 783)); (cf. Ct. Monitor April 2006 Report at 37 (Doc. No. 812) (observing that a case worker whose monthly caseload average was 109 percent was over standards "by a small percentage").)

---

[44] "Over standards," as that term is used by the court monitor, means that the worker had a caseload average for the month in question exceeding the workload deemed acceptable under the court's 1998 Order.  For consistency, the court uses the same phraseology.

79

The court further finds that other factors also are relevant to the analysis of compliant caseloads. Some of these factors were discussed in the preceding subsections and include whether DHR is allocating positions to allow counties to hire the requisite number of workers needed to comply with the court's 1998 Order and whether DHR is complying with other of the technical requirements of the court's 1998 Order, such as the implementation of measures to monitor and to track caseload data (i.e., Section II of Appendix B). As discussed above, the court finds that DHR is compliant in the foregoing matters. Any evidence of good faith on the part of DHR also should not be ignored and has been considered by the court.

Below, the court examines the 2006 on-site sustainability reviews to assess how the ten representative counties are performing in the three areas traditionally examined by the court monitor (as set out above). As explained herein, the court finds that the 2006 on-site sustainability reviews yield results which support a finding of systemwide substantial compliance concerning core purpose two. The court further finds that the evidence reveals a demonstration of good faith by DHR and establishes that federal oversight is not necessary in order to ensure future compliance with the court's 1998 Order.

*i. Counties' Average R.C. Workloads*

In his December 2003 Report, the court monitor stated that a county's average

R.C. workload level is an "indicator that describes the ability of the staffing capacity of

each individual county to meet the court's current caseload demands." (Ct. Monitor Dec.

2003 Report at 11.)  He explains that a county's average R.C. workload level "is

determined by a formula that examines the total number of children and families

receiving services (CAN investigations, Foster Care and/or Protective Services,

Adoptions, Resource Development and Supervisors) and compar[es] these figures to

allocated staff for each of the above-listed service-type categories."  (Id.)  According to

the caseload management reports, attached as Appendix C to the court monitor's April

2006 Report, eight of the ten counties did not exceed an average R.C. workload of 100

percent for the month reviewed.  (See Ct. Monitor April 2006 Report, Appendix C.)

Those counties and their average R.C. workloads, in percentages, are as follows:

(1) Chambers (74 percent); (2) Randolph (67 percent); (3) Conecuh, (89 percent);

(4) Jackson, (98 percent); (5) Lauderdale (84 percent); (6) Lee (82 percent);

(7) Montgomery (97 percent); and (8) Jefferson (93 percent).  (See id.)  Another county,

Marshall County, had an average R.C. workload of 107 percent, meaning that only one

county, Macon County, scored above 110 percent, with an average R.C. workload of 114

percent.  (See id.)  The court finds that the foregoing data is very favorable.

The foregoing evidence collected as part of the 2006 on-site sustainability reviews also reveals other positive facts on caseload standards. The court finds that the data set out in the Child Welfare Staff Data chart, attached as Appendix D to the court monitor's April 2006 Report, and the data in Appendix C reflect the ability of counties to correct caseload overages. For example, between December 2004 and December 2005, Jackson County experienced average R.C. workloads ranging between 101 percent and 126 percent; however, Jackson County attained an improved 98 percent average R.C. workload in February 2006 during the court monitor's on-site sustainability review. (See Ct. Monitor April 2006 Report at 30 & Appendixes C & D.) Conecuh County also demonstrated improvements, reducing average R.C. workloads for four consecutive months, from 139 percent in September 2005, to 119 percent in October 2005, to 92 percent in November 2005 and, finally, to 89 percent in December 2005. (Id., Appendixes C & D.) Additionally, for five consecutive months, from September 2005 to January 2006, Montgomery County maintained its average R.C. workloads in the ninetieth percentile range. (Id.)

Appendix D also reflects that the average R.C. workloads in Lee and Randolph counties remained below 100 percent for thirteen consecutive months; thus, these two counties exhibited perfect compliance for the time period in question. Jefferson and Lauderdale counties maintained average R.C. workloads at or below 105 percent during the same thirteen months. (See id., Appendix D.)

*ii.  Counties' Seven-Month Track Record*

In his November 2005 Report to the court, the court monitor stated:

> Managing active caseloads on a day-to-day basis is a dynamic process as
> caseload levels for individual workers will fluctuate as cases close, and new
> cases for children and families are opened.  It is not uncommon in the
> management of active cases for workers to occasionally go above caseload
> standards.  This occasional allowance was contemplated in the timeframes
> for corrective action discussed in the 1998 Order[.]

(Ct. Monitor Nov. 2005 Report at 47 (Doc. No. 783).)  The court's 1998 Order

recognizes the inevitable ebb and flow in caseloads for individual workers and, thus,

permits DHR a period of time to correct noncompliant caseloads, with seven months

constituting the maximum time period for correction, see *supra* footnote 36.  (See also Ct.

Monitor Nov. 2005 Report at 48 (Doc. No. 783).)  For the reasons to follow, the court

finds that the ten representative counties, which were subjected to the 2006 on-site

sustainability reviews, demonstrate that DHR is tracking caseloads, identifying caseload

problems, and implementing corrective action to correct caseload overages within the

court-ordered maximum time frames.

In his April 2006 Report, the court monitor did not elaborate upon certain data

which the court finds demonstrates that counties effectively are ensuring that average

R.C. workloads do not exceed the 100 percent ceiling for seven continuous months.

Appendix D to the court monitor's April 2006 Report charts the monthly average

workload levels of the ten representative counties and others from December 2004

83

through December 2005 and is worthy of the court's discussion.  (Ct. Monitor April 2006

Report, Appendix D (Doc. No. 812).)  As outlined in Appendix D, eight of the ten

counties subjected to the 2006 on-site sustainability reviews (which includes two non-

sustaining counties) were not over standards for any uninterrupted seven-month period.

(See id.)  Of these ten counties, therefore, only Jackson and Marshall counties suffered

average R.C. workload levels greater than 100 percent for seven consecutive months.[45]

Regarding Jackson County, however, the data is not all bad.  The data reveals that

Jackson County gradually made improvements; namely, between October 2005 and

December 2005, Jackson County reduced its average R.C. workload from 122 percent to

101 percent.  Moreover, neither Jackson County nor Marshall County had average R.C.

workload levels greater than 110 percent for any continuous seven-month period, 110

percent being a margin of tolerance recognized recently by the court monitor.  (See Ct.

Monitor Nov. 2005 at 48 (Doc. No. 783)); (cf. Ct. Monitor April 2006 Report at 37

(observing that a case worker whose monthly caseload average was 109 percent was over

standards "by a small percentage").)

        Prior to the 2006 on-site sustainability reviews, the court monitor stated "that

counties having [average] R.C. workloads over standards, with some counties having

workloads over standards for durations as long as seven months, remains a persistent

problem for DHR."  (Ct. Monitor Nov. 2005 Report at 47 (Doc. No. 783).)  The court

─────────────────────

        [45] Again, the court notes that a worker with an average R.C. workload of 100
percent or less is deemed in compliance with the court's 1998 Order.

finds that the 2006 on-site sustainability reviews of the ten representative counties reveal

that DHR has halted and, indeed, has corrected this "persistent problem."  The court finds

that this data reveals marked improvements and that the data easily extends into the

parameters of substantial compliance.

### iii.  Data Pertaining to Percentages of Staff "Over Standards"

The court turns to an examination of the data from the 2006 on-site sustainability

reviews to ascertain how many workers were "over standards" within a county, the third

factor which the court monitor deemed important when analyzing caseload data to assess

a county's compliance with the court's 1998 Order.  (Ct. Monitor Nov. 2005 Report at 47

(Doc. No. 783).)  This factor denotes "the percentage of staff for each county [who] have

current caseloads that are in excess of court-specified limits, commonly referred to as

being 'over standards.'"  (Ct. Monitor Dec. 2003 Report at 10.)  Again, a worker with an

average R.C. workload of 100 percent or less is deemed in compliance with the court's

1998 Order.  Below is the data, discussed county by county, concerning workers who, for

the month in question, carried caseloads in violation of the standards set out in the court's

1998 Order, as reported in the monthly management reports generated by DHR's

caseload management system.  This data is found in Appendix C to the court monitor's

April 2006 Report.  (See Ct. Monitor April 2006 Report, Appendix C (Doc. No. 812).)

The court observes also that the court monitor's discussions, presently and in the past, reveal that other considerations, in addition to the raw data, also factored into the court monitor's evaluation of whether a county is performing satisfactorily in this third area of examination.  (See, e.g., Ct. Monitor Nov. 2005 Report at 53-54 (Doc. No. 783).) The court, thus, includes discussion of these other relevant considerations, which include among other things the perceptions of stakeholders.  Below, the court first sets out the evidence garnered from each county as a result of the 2006 on-site sustainability reviews, followed by the court's findings regarding said evidence.

In Chambers County, one of the six workers, or 17 percent, was over standards.[46] This worker's workload for the month was 108.6 percent.  The intake worker was over standards (155.6 percent), and one of the three supervisors, or 33 percent, was over standards (111 percent).[47]  As the court monitor explained, in Chambers County, there was significant turnover in front-line practice, but he found that the turnover was "warranted" and did not "reflect[] adversely in current practice."  (Ct. Monitor April 2006

_____

[46] The court notes that the court monitor cautions that sometimes the percentages can be somewhat misleading in that "some counties have a small number of workers due to the size of the county.  Thus, a large percentage of staff having caseloads over standards may be reflective of a small number of workers being over standards."  (Ct. Monitor Nov. 2005 Report at 46 (Doc. No. 783).)

[47] Again, "over standards" is the terminology used by the court monitor.  The case management reports also employ the phraseology "over compliance."  "Over compliance" means the same thing as "over standards"; both usages denote non-compliance.

Report at 6-7 (Doc. No. 812).)  The court monitor says also that the caseloads of the intake and caseworker will even out as new workers assume caseloads.  (Id.)

In Randolph County, no worker was "over standards," meaning that eight case workers, the intake worker and three supervisors had workload averages for the month in question at or below 100 percent.  Accordingly, the court monitor reports that the staff in Randolph County has been very stable with no turnover in the twelve months preceding his report.  (Id. at 14.)

In Conecuh County, "25% of workers [were] over standard[s]."  (Id. at 21.)  The court monitor, however, indicates that this percentage, although seemingly high, "should be interpreted with some caution."  (Id.)  He observes that "[t]here [was] one CAN investigator . . . who also ha[d] 11 ongoing cases and one foster care child."  (Id.)  This worker was "over standards" by a small percentage (102.4 percent).  See id.  The court monitor also states that there were "two foster care workers[,] with [one] worker at 114% of workload standard, [who was] shown as having 15 foster care cases, three ongoing, and one CAN."  (Id.)  The court observes also that the sole supervisor was in compliance with the workload figures.  (See id., Appendix C.)

Conecuh County, however, experienced no staff turnover in the twelve months preceding the court monitor's April 2006 Report.  (See id. at 21.)  The court monitor recites that stakeholders felt that "workers are dedicated and are providing equal or better service than at the time of assertion."  (Id. at 28.)  The 2006 on-site sustainability review

similarly revealed that "[t]here was a high regard for the staff from all stakeholder groups and an overall belief that workers are doing a good job and are keeping children safe." (Id.)

In Jackson County, the monthly management report reveals that 43 percent of the workers had caseloads which exceeded the maximum caseload requirements, with caseloads ranging from 111.1 percent to 153.3 percent.  (Id., Appendix C.)  One of the three supervisors also exceeded standards, carrying a workload which was 5.6 percent "over standards."  (Id.)  Pertaining to Jackson County, the court monitor observes that, at the time of his report, the Jackson County director had been in the position for only nine months.  (Id. at 29.)  He also says that, "[a]lthough the new staff is young and inexperienced in the child welfare field," these new professionals have "strong social work skills" and "strong training and support from supervisory staff."  (Id.)  The three supervisors "have longevity," and stakeholders, in particular, "repeatedly noted the strength of the supervisory staff as an asset to the department."  (Id.)  Noting the statistics from the monthly management report under review, however, the court monitor states that "[s]taffing continues to be a major challenge for Jackson DHR."  (Id. at 30); (see also id. at 36.)  Also, during the twelve months preceding the court monitor's April 2006 Report, turnover was high:  "Jackson County has experienced 68.2% turnover in the senior social worker position and 54.1% in the social worker position."  (Id.)  Nonetheless,

stakeholders "consistently described good working relations between the department staff and community partners."  (Id.)

In Lauderdale County, only three workers out of twenty-one were over standards (or 14 percent).  The three with overages were case workers, with one exceeding standards by a mere .6 percent (100.6%).  (See id., Appendix C.)  The other two case workers had average workloads for the month of 109 percent and 125 percent.  (Id.); (see also id. at 37 (observing that two of three case workers were over caseload standards "by a small percentage").)  The court monitor reports that staffing in this county has been "very stable" since fiscal year 2004.  (Ct. Monitor April 2006 Report at 37 (Doc. No. 812).)  Although Lauderdale County experienced high staff turnover and some caseworkers were over standards, "staff turnover and caseload issues have been stabilized" as a result of the collaborative efforts of the county and the DHR Staffing Committee which resulted in the committee's allocation of additional personnel for Lauderdale County.  (Id.)  Management and case workers have positive relationships, with case workers reporting that they feel well supported by their superiors through "frequent supervision sessions," "mentoring," and "shadowing of staff to court hearings, home visits, etc."  (Id.)

In Lee County, the monthly management report reveals that, as in Lauderdale County, 14 percent of the workers were over standards.  (Ct. Monitor April 2006 Report, Appendix C (Doc. No. 812).)  Three of the twenty-one "case-carrying positions" were

over standards.  (Id. at 45.)  These three workers had average caseloads of 111.1 percent, 112.5 percent and 133.3 percent.  No supervisor was "over standards."  (Id.) Notwithstanding these positive figures, the court monitor observed that staff turnover rates have been high and that "[a]ll stakeholder groups identified worker burnout and staff retention as areas of concern."  (Id. at 53, 54.)  On the other hand, the court monitor stated that, prior to the 2006 on-site sustainability reviews, DHR was aware of the problems in Lee County and that DHR already was "taking steps" to correct the problems.  (Id. at 54.)  Additionally, stakeholders found that staff within Lee County DHR was "accessible," and stakeholders "expressed a high regard for leadership and staff."  (Id.)  In the latter regard, the court monitor stated, "A major strength in Lee County has been the DHR Director and the management staff."  (Id.)

In Montgomery County, 35 percent of the workers exceeded caseload standards, as reported in the monthly management report.  (Ct. Monitor April 2006 report, Appendix D (Doc. No. 812).)  Twenty-four case workers exceeded the standard caseload requirements, with monthly workload percentages ranging from 100.7 percent to 212.5 percent.  (Id.)  Four supervisors were carrying caseloads in excess of standards, with workload percentages for the month ranging from 110 percent to 211.1 percent.  (Id.) The court monitor reported high turnover rates in this county.  In the twelve months preceding his report, the court monitor says that "65% of senior social workers, 40% of social service caseworkers, and 34% of social workers have separated from service."  (Ct.

Monitor April 2006 Report at 54.)  The court monitor observes that, although Appendix

D "does not show that staffing is a problem in Montgomery County," he says that "the

turnover of staff and the resulting high caseloads are a major problem to sustaining

performance."  (Id.)

In Montgomery County, stakeholders also have "expressed concern regarding

caseworker burnout and caseload size and felt these issues contributed to staff turnover."

(Id. at 61.)  On the other hand, stakeholders reported "strong, collaborative relationships

with Montgomery County DHR," "perceive[d] that the department is working diligently

to provide good quality services despite staff turnover and challenges," and cited

"excellent examples of good work."  (Id.)  The court monitor also observed that a

"strength of Montgomery County DHR is that the leadership and management team have

been very stable over the past ten years" and that this managerial team "understand[s] the

critical role that quality practice has on achieving successful outcomes for children and

families."  (Id.)  At the same time, "[t]he major challenge is achieving a stable caseload-

carrying staff and creating an environment that will support retention and training of

workers."  (Id.)

The court observes that the evidence demonstrates that DHR is aware of the high

turnover rates in Montgomery County.  It already has taken a concrete step aimed to

correct the problem.  Namely, DHR has requested and received approval to increase the

in-hire rates for social workers, senior social workers and social service caseworkers in

Montgomery County and other large counties.  (See id., Appendix H (State Personnel Department's letter approving Defendant's request to increase in-hire rates for counties with high turnover rates, including Montgomery County).)

Turning to Macon County, the caseload management report provides that there are five caseload-carrying positions, that 1.4 workers out of five exceeded caseload standards, and that the sole supervisor was over standards.  (See Ct. Monitor April 2006 Report, Appendix C (Doc. No. 812).)  The court monitor observes that staff turnover is high in Macon County, peaking at 82 percent overall in 2004, and that stakeholders identified "staffing" as one of the "biggest challenges for this county."  (See id. at 62, 69.) The court monitor states, though, that, prior to his 2006 on-site sustainability review, DHR had identified performance issues in Macon County and had begun "taking steps to address them."  (Id. at 62); (see also Slaughter Aff. at 1-3 (Ex. 7 to Doc. No. 811) (discussing corrective action taken in Macon County, including drastic changes in management).)[48]

Marshall County, a non-sustaining county, exhibited substantial problems in the area of excessive caseload ratios during the 2006 on-site sustainability review.  (See, e.g., Ct. Monitor April 2006 Report at 79 (Doc. No. 812) (finding that Marshall County is not sustaining substantial performance, "particularly regarding the core purpose[] of adequate

---

[48] James Slaughter ("Slaughter") signed his affidavit in his capacity as deputy commissioner of DHR's field administration.

and competent staff").)  Twenty-five of thirty-seven workers were over standards, and three, or 30 percent, of the supervisors were over standards.  (Ct. Monitor April 2006 Report, Appendix C.)  The court monitor observed that Marshall County had a QSR review in 2001 and that specific areas needing improvements included "staffing and caseloads," as there was not an adequate number of staff to meet caseload standards.  (Id. at 70.)  Stakeholders, however, "were generally positive about Marshall County's efforts," but they "recognized the problems with high caseloads and staff youth and turnover."  (Id. at 78.)

Turning finally to Jefferson County, the court monitor observed that "[t]he turnover rates and the caseloads are [] significant impediment[s] to the county sustaining appropriate performance."  (Id. at 80.)  The statistics, cited by the court monitor, support his conclusion.  (Id.)  Thirty-one percent of the workers allocated to the child welfare program were over standards, with 88.5 of 211 workers (or 42 percent) being over standards.  (See id. at 80 & Appendix C.)  Only one supervisor of the forty-nine supervisors/administrators (or 2 percent), however, was over standards, as revealed on the monthly management report.  (See id., Appendix C.)  Given this data, Jefferson County, as the largest urban county in Alabama, also should benefit from the increased in-hire rates as a result of DHR's targeted efforts to help combat the high turnover rates in this county.  (See id., Appendix H.)

As demonstrated from above, the court carefully has studied the caseload and staffing data contained in the court monitor's April 2006 Report.  The court is aware of both the positive and negative statistics, as outlined above.  After the court's careful study, the court renders the following findings.

Findings Regarding Exception Reports

The court has studied the comments attached to each county report, called "exception reports."   These exception reports provide explanations for the assignment of caseloads to a worker who is over standards and explain the corrective action that the county plans to implement to bring the caseworker's caseload into compliance with the court's 1998 Order.  These exception reports reveal that the data, as recognized by the court monitor, cannot be viewed based upon percentages alone.  (See, e.g., Ct. Monitor April 2006 Report at 21 (observing that in Conecuh County although the caseload management report reveals that 25 percent of workers were over court-ordered standards, that data "should be interpreted with some caution," given other available information which deflects the seeming severity of the percentages).)  A predominating concern from DHR's perspective, which the court finds is illuminated in these exception reports, is the delicate balancing of the competing interests pertaining to DHR's compliance with the caseload standards imposed by the court's 1998 Order and the reassignment of a case where a child has formed a meaningful relationship with a caseworker.  In his affidavit,

94

Salter states, "The only way a county director could insure that workers never exceeded the standards would be to constantly move the cases from worker to worker every month, so that the caseloads were always equal." (Salter Aff. ¶ 13 (electronically filed as Ex. 12 to Doc. No. 761).) Salter says, however, that "good outcomes for children would not be achieved by assigning them a new worker every few months just to meet a caseload standard." (Id.) The court concurs generally with Salter's statements.

In the exception report for Jackson County, for example, five caseworkers who oversee foster care children were over standards; however, the management team weighed the competing interests and decided not to "sever" these workers' relationships for the expedience of improving the workload percentage statistics. For each worker, it was noted that several children were "reaching permanency" and that each case worker would be within standards within six weeks. Similar decisions were noted and suggested in Conecuh, Macon and Lauderdale counties. In Lauderdale County, for example, the program supervisor expressly made the following observation:

> Having specialized units rather than generic caseloads prohibits cases from being assigned equally across lines and can give the appearance of work being unevenly distributed. Caseloads are assessed monthly and a determination is made as to reassignments (as a foster care worker going to Assessment Unit mid November). We also take into account the need for continuity for our families and assess the impact change has on them. The supervisor also looks at the level of intensity needed in the case while making assignments. A worker's numbers may be lower than [another's] . . ., but the time needed in the cases is as great.

(Ct. Monitor April 2006 Report, Appendix C, Lauderdale County.)

95

In the circumstances identified in the record, the court is satisfied that preservation of established bonds between caseworkers and children overrides strict compliance with the court's 1998 Order. In other words, the court is loathe to find that DHR is not adhering to court-ordered caseload standards where the alleged infractions are the result of considered deliberations by DHR that continuity of care, rather than technical compliance with caseload statistics, promotes the best interest of the child. In these cases, the court finds that compliant percentages can and should be sacrificed and that the goals of the Consent Decree are fulfilled, rather than violated.

The exception reports reveal the many challenges facing counties in maintaining compliant caseloads for workers. Workers are called to active military duty. Workers take maternity leave or are absent due to other medical reasons.[49] Workers quit, resign and retire mid-month. Newly-hired workers have reduced caseloads because a portion of their work day is spent in training. From month to month, incoming cases fluctuate and the types of cases vary. Overall, the court is satisfied with the explanations in the exception reports for the overages.

In the court's considered opinion, DHR does everything possible to remedy these shortcomings. Through the Staffing Committee, DHR monitors these ever-changing complexities on a biweekly basis. Based on the evidence discussed previously in this

_____

[49] (See also Def. Aff. at 6 (electronically filed as Ex. 5 to Doc. No. 761) (DHR has "a young and fertile workforce in which a significant percentage of workers take maternity leave[] each year.").)

opinion, the court finds that the Staffing Committee effectively rectifies worker shortages by increasing a county's allocation when caseloads increase.  Similarly, the court finds that the evidence establishes that DHR has in place procedures which permit a county, without delays, to request a register and commence the hiring process when there is a vacancy.  (See, e.g., Salter Aff. at 8 (electronically filed as Ex. 5 to Doc. No. 779-5)); (Ct. Monitor Nov. 2005 Report at 47 (Doc. No. 783) (recognizing DHR's "good faith efforts . . . to attempt to keep counties within caseload standards by providing registers to fill vacant positions in a timely manner and allocating additional positions when ongoing workload/caseload demands merit an increase in a county's allocation").)

### Findings Regarding Staff Turnover

As revealed above, high turnover rates among staff are a challenge which DHR faces on a daily basis.  The court, however, finds that DHR has not turned a blind eye to this obstacle.  Defendant's attestations reveal DHR's cognizance.  Defendant states, "The reality of child welfare work in Alabama and everywhere in this country is that the workforce is marked by high turnover levels."  (Def. Aff. at 6 (electronically filed as Ex. 5 to Doc. No. 761).)  The high turnover rates cannot totally be blamed on internal failings within DHR.  As observed by Defendant, high turnover is caused, in part, by the fact that "working with troubled families is often difficult and debilitating, especially where the

families have been ravaged by poverty, drugs and the absence of one or both parents."

(Id.)  The court finds this reason to be valid.

The evidence also demonstrates that DHR is committed to combating high turnover rates which have plagued its child welfare workforce and is taking steps in the right direction.  Ensuring that counties are allocated sufficient staff constitutes one area in which DHR is succeeding.  DHR also recently has requested and received permission to increase in-hire rates in larger counties; better pay obviously furthers the goal of retaining social workers and reducing turnover.  (See Ct. Monitor April 2006 Report at 94 & Appendix H.)  Additionally, as explained by Defendant in his affidavit, DHR has created recruitment and retention programs in the state office, in part, to help minimize staff turnover.  (See Def. Aff. at 6 (electronically filed as Ex. 5 to Doc. No. 761).)

### Findings Regarding DHR's Good Faith

As stated, whether there is evidence of good faith on the part of DHR to comply with the court's orders is another important consideration in the analysis of compliance with consent decrees.  See Johnson, 348 F.3d at 1343 ("In determining whether the [consent] decree's purpose has been fulfilled, the district court should consider whether the City has complied in good faith with the decree.").  DHR's good faith and diligent efforts to comply with the court's 1998 Order on caseload standards is not in question.

Beginning from the effective date of that Order, DHR has strived to attain and to maintain compliance with the caseload requirements therein.

DHR's good faith commitment to the court's 1998 Order is demonstrated in a multitude of ways. As discussed herein, DHR has complied with the tracking and monitoring portions of the court's 1998 Order. DHR consistently files exception reports in counties which have more than 10 percent of workers exceeding the standard caseloads, as also required by the court's 1998 Order. (See Ct. Monitor Nov. 2005 Report at 43 (Doc. No. 783).)

The court monitor continually has observed DHR's acts of good faith. The court monitor, for example, has noted that DHR has engaged in "[s]ignificant effort[s]" to increase the total number of DHR child welfare workers subsequent to the effective date of the court's 1998 Order. (Ct. Monitor Nov. 2004 Report at 12.) Reciting the statistics, the court monitor has stated, "In October 1997, there were . . . 997 child welfare professionals; in September 2004, there [were] . . . [] 1,552 child welfare professionals, reflecting an approximately 60 percent increase in the number of child welfare professionals[.]" (Id.); (see also id. at 5 (stating that, as a result of the Consent Decree, "total child welfare workforce staffing levels have increased by [more than] 30%, due in large part to court-specified caseload standards implemented to set caseload levels for frontline workers")); (see also Salter Aff. ¶ 10 (electronically filed as Ex. 12 to Doc. No. 761) (reciting data reflecting increases in the overall number of DHR child welfare

workers).)  Also, DHR's "good faith efforts" in establishing registers to fill vacancies and in allocating additional staff in counties where needed also have been specifically noted by the court monitor.  (Ct. Monitor Nov. 2005 Report at 47 (Doc. No. 783).)  Plaintiffs also have not overlooked Defendant's demonstrated good faith.  (See, e.g., Mem. of Understanding, filed Dec. 5, 2002 (Doc. No. 650) ("The plaintiffs and the Court Monitor agree that the defendant . . . has in the past two years demonstrated good faith in his diligent efforts to comply with the Orders of this Court in this action")); see also R.C. I, 390 F. Supp.2d at 1036-37

DHR's good faith also is amplified by the fact that, on its own initiative, DHR has exceeded the requirements of the court's 1998 Order by further reducing the number of certain types of cases a social worker may carry.  As a result, Salter says that systemwide the staffing allocation actually is greater than that required by the court's 1998 Order.  (Salter Aff. ¶ 11 (electronically filed as Ex. 12 to Doc. No. 761).)  Finally, the court finds that DHR demonstrated its good faith commitment to abide by the court's 1998 Order when, in 2004, DHR codified the 1998 court-ordered caseload standards in a permanent administrative rule.  (See Certification of Administrative Rules Filed with the Legislative Reference Service (Ex. 1 to Doc. No. 761)); R.C. I, 390 F. Supp.2d at 1040-41; (Ct. Monitor Nov. 2005 Report at 39 & n.11 (Doc. No. 783).)

### d.  The Court's Overall Findings of Substantial Compliance Concerning
### Core Purpose Two's Goal of Compliant Caseloads

The court is not oblivious to the struggles counties face in adhering to the court's 1998 Order.  The court monitor has noted his concerns on numerous occasions.  (See, e.g., Ct. Monitor Nov. 2004 at 12.)  Even in his November 2004 Report, in which the court monitor recommended that the court find Defendant in substantial compliance with the Consent Decree, he nonetheless recognized that "[m]aintaining county staff to comply with the caseloads standards is an ongoing task[.]"  (Id. at 13.)

The court likewise is cognizant of the crucial importance of DHR's system of care maintaining adequate staffing and appropriate caseloads, as repeatedly emphasized by the court monitor.  (See id. at 11, 12, 13); (Ct. Monitor Nov. 2005 Report at 47 (Doc. No. 783).)  Similarly, the court recognizes, as Plaintiffs and the court monitor duly emphasize, that "it is more critical than ever that caseloads [are] kept well within standards."  (Ct. Monitor April 2006 Report at 94 (Doc. No. 812)); (see also Def. Aff. ¶ 6 (Doc. No. 761).) It is clear that maintaining appropriate caseloads is and, quite frankly, always will be a tremendous challenge for DHR.  If DHR had an infinite supply of money and resources, it could double or triple its workforce, increasing twofold or threefold its labor pool of licensed social workers in each county, to ensure that at all times each of Alabama's sixty-seven counties had at its immediate disposal a qualified, back-up stockpile of workers to cover the multitude of human circumstances and frailties, some of which are expected but

101

others of which are unanticipated, which cause not only absences and vacancies in DHR's child welfare staff, but also cause the continual, and often erratic, rise and fall in the number of children needing DHR's care at any given time.  The ideal scenario, for obvious reasons, is not possible, even if it were court ordered.

On the other hand, the evidence demonstrates that, as of last count, DHR had exceeded the court's spending requirements by more than $100 million.  Even taking into account the court monitor's caution that the court's spending requirement was a floor, rather than a ceiling (see Ct. Monitor Nov. 2005 Report at 9 (Doc. No. 783)), DHR's commitment to secure these funds, as required by the Consent Decree, for the safety and well being of the children in its care is remarkable.  (See Def. Aff. at 6 (electronically filed as Ex. 5 to Doc. No. 761)); (see also Consent Decree at 3, 4, 34.)  In short, given all of the evidence in the record, the court finds that Defendant is in substantial compliance with the court's 1998 Order on caseloads.  Cf. Kendrick v. Bland, 659 F. Supp. 1188, 1196 (W.D. Ky. 1987) (in prison litigation where the inmates were asserting noncompliance with a consent decree, the court stated: "[g]iven the state budget and considering the realities of life, the court finds that defendants do provide inmates with adequate and suitable clothing in compliance with the consent decree"), aff'd, 843 F.2d 1392 (6th Cir.) and 856 F.2d 196 (6th Cir. 1988).

In the court's considered opinion, which is based upon the court's entrenched involvement in this case for the past ten years, DHR is doing everything possible to

provide children with well-qualified social workers who have manageable caseloads to ensure that each child receives the quality of care to which he or she is entitled.  To reiterate briefly, DHR has established a Staffing Committee and comprehensive data collection procedures, which effectively and accurately track caseloads on the county level and pinpoint problems.  (See Ct. Monitor Nov. 2004 Report at 13 (stating that "DHR has implemented the fundamental underlying steps to ensure adequate staffing levels")); (see also Ct. Monitor Nov. 2005 Report at 53) (Doc. No. 783) (stating that "DHR definitely has improved its collection of data both quantitatively and of the qualitative components of the quality assurance processes over the time of the R.C. reform").)  The court further finds that DHR is maintaining staffing allocations which comply with the court's 1998 Order and that, on a monthly basis, the Staffing Committee continually is adjusting staffing allocations in individual counties to account for increases and decreases in caseloads.

Although the data reveals that, despite sufficient allocations, in some instances staff vacancies remain open, there is no evidence that DHR is acting dilatory or in bad faith in filling open allocations.  As discussed in the previous subsection, the court monitor has "recognize[d] the good faith efforts of DHR to attempt to keep counties within caseload standards by providing registers to fill vacant positions in a timely manner and allocating additional positions when ongoing workload/caseload demands merit an increase in a county's allocation."  (Ct. Monitor Nov. 2005 Report at 47 (Doc. No. 783)); (see also

Salter Aff. at 8 (electronically filed as Ex. 5 to Doc. No. 779-5) (DHR has procedures in place which permit a county to "automatically request a register and start the hiring process for a new worker" when there is a vacancy.).)

Under these facts, the court can envision no legitimate or beneficial reason for the court to continue its oversight in this case for the purpose of ensuring compliance with its 1998 Order.  The court finds that judicial control is no longer necessary or practicable to ensure compliance with said Order.  See Heath, 992 F.2d at 633 (providing that one factor for consideration in deciding whether to terminate a consent decree is "the continuing efficacy of the consent decree's enforcement") (citing Dowell, 498 U.S. at 237).

### 7.  Core Purpose Three

Core purpose two embodies the formulation of ISPs, as does core purpose three. Core purpose three contemplates "active participation by the child, parent, and foster parent in the planning and delivery of services, to include informed involvement so that the child, parent, and foster parent have a full understanding of these services and their rights and options."  (Ct. Monitor Nov. 2005 Report at 58 (Doc. No. 783).)  The court discusses ISPs in this section.

The ISP, which is to be completed for each class member for whom a case is opened, "is the primary tool for identifying strengths and needs, identifying services to address needs, ensuring that needed services are authorized and obtained, and measuring

progress.  It also serves as an organizer of activity and a tool for communication with those involved with the family and class member." (Implementation Plan, System Processes and Services, at 9-14.)  The Implementation Plan states further that, "[i]n order for the counties to practice consistently with the decree, it is necessary for them, among other things, to . . . develop individualized, needs-based service plans, based on comprehensive assessments of strengths and needs[,]" for each child.  (Implementation Plan, conversion chapter (elaborating upon the purposes and requirements of the ISP)); (see also Ct. Monitor Nov. 2005 Report at 3 (Doc. No. 783).)


a.  Positions of the Parties and the Court Monitor

In his November 2004 Report, in which the court monitor recommended a finding of substantial compliance, the court monitor stated that ISPs are "being met with exceedingly high consistency."  (Ct. Monitor Nov. 2004 Report at 59.)  The court, however, in R.C. I found that the court monitor's report was "incomplete as to what facts form[ed] the basis of the court monitor's conclusion."  390 F. Supp.2d at 1053.  In his subsequent report to the court, submitted in November 2005, the court monitor revisited the evidence and, as a result, disagreed with Defendant's then current assertion that "every child in care has case decisions now driven by the ISP" and that "children and families attend ISPs and help develop their case plans."  (Ct. Monitor Nov. 2005 Report at 9 (Doc. No. 783).)  Plaintiffs also have expressed their concern about the number of counties in

105

which ISPs have been rated as an area needing improvement.  (Doc. No. 767 at 10); (Doc.

No. 781 at 9.)

b.  Timely Completion of ISPs

DHR sets certain time lines for the completion of the initial ISP and for the

completion of updates to the ISP in foster care and protective services cases.  DHR also

collects and tracks data to measure whether counties are complying with these guidelines.

Whether a child's ISP is being completed within the time lines designated by DHR's

policy has been one of the "quantitative" indicators the court monitor has examined to

assess how DHR's system of care is performing.  (See Ct. Monitor Nov. 2005 Report

(Doc. No. 783).)

The court finds that the 2006 on-site sustainability reviews reveal positive data in

the area of timely completion of ISPs for children.  In the court monitor's April 2006

Report, a chart is displayed for each county reflecting data comparisons in several

performance categories at the time of the county's assertion and in 2006.[50]  Four of the

categories reflect the percentage of ISPs completed within policy guidelines for (1) initial

foster care ISPs, (2) updated foster care ISPs, (3) initial protective services ISPs, and

_____

[50] "Assertion," as that word has been used throughout this litigation, refers to a
county's pronouncement that the county believes that it has reformed its practices in a
manner consistent with the Consent Decree.  Throughout this litigation, after a county
made this assertion, the court monitor commenced an on-site review to determine
independently whether the county was substantially complying with the Consent Decree.

(4) updated protective services ISPs.[51]  (See Ct. Monitor April 2006 Report at 13, 20, 28,

36, 44, 53, 61, 69, 78, 88) (Doc. No. 812).)  In Chambers, Conecuh, Jackson, Lauderdale,

Montgomery and Randolph counties, this data reflects overwhelmingly that ISPs are being

completed within policy time lines in each of the four ISP categories.  (See, e.g., id. at 13

(in Chambers County "ISPs were current at the time of assertion and are mostly current

now")); (see id. at 20 (in two ISP categories, Randolph County scored 100 percent; it

scored 98 percent in the other two ISP categories)); (see id. at 28 (in Conecuh County,

ISPs are being completed within policy guidelines in 100 percent of cases)); (see id. at 35,

36 (in Jackson County, "ISPs are currently within policy time lines")); (see id. at 44 (in

Lauderdale County, 100 percent of the ISPs in three categories were completed within

policy time lines, and 97 percent of the ISPs were timely completed in the fourth

category); (see id. at 60, 61 (in Montgomery County, "ISPs are being completed and

updated between policy time lines").)

In Jefferson County, the percentages in the four ISP categories ranged from 89.6

percent to 97.6 percent.  (See id. at 88.)  Marshall County had percentages of 81, 90, 95

and 98 in the four ISP categories.  (See id. at 78.)  Lee County revealed percentages of 94,

99, 99 and 100 percent, and the court monitor noted that, in Lee County, "ISPs are

generally being completed and updated within policy time lines, with the exception of

---

[51] Relatedly, the court notes that these four categories of data were recently added
as a result of upgrades to DHR's data collection capabilities; thus, in these four categories
there is no comparative data.  (See Doc. No. 811 ¶ 9.)

updates to ongoing protective supervision ISPs." (Id. at 52); (see also id. at 69 (in Macon County, the court monitor found that ISPs were being completed satisfactorily in three of the four categories).)  The lowest rating occurred in Marshall County, in which 81 percent of cases had ISPs completed within time lines in the category of updated protective services ISPs.

Overall, the court finds that the data regarding the timely completion of ISPs is positive.  The court monitor has expressed the same:  "The monitor concurs that individualized service plans are being completed for most children and families receiving services in a timely manner, as evidenced by the 'percentages of ISPs completed' data included as an attachment to Mr. Dean's affidavit."  (Ct. Monitor Nov. 2005 at 10 (Doc. No. 783)); (Larry Dean Aff. (Ex. 17 to Doc. No. 761).)  The court finds that DHR is performing in a substantially compliant manner concerning the timely completion of ISPs.

c.  Serviceable ISPs

The court monitor, however, has noted that timely completion of ISPs does not guaranty that the ISP is functioning effectively for the child.  The QSR reviews include an examination of whether ISPs "are operating functionally in the manner intended by the practice principles" of the Consent Decree.  (Ct. Monitor Nov. 2005 Report at 5 (Doc. No. 783).)  In his November 2005 Report, the court monitor observed that "quantitative data" from the QSR reviews "regarding the timeliness of completing ISP team meetings

provided by . . . DHR show that a number of counties report having ISPs conducted on a regular basis according to policy expectations[.]"  (Id. at 36.)  However, the court monitor stated that the evidence at the time "show[ed] that the function and quality of the ISP process [are] not being maintained."  (Id.); (see also id. at 54 (raising a question "about whether the documentation of ISPs being completed in accordance with policy time lines is a meaningful measure of practice as required by the principles" of the Consent Decree).)

Some of the questions which QSR reviewers probe in order to assess how ISPs are functioning for a child are set out in the footnote below.[52]  It is in these areas of inquiry, the ratings of which were compiled as part of the 2006 on-site sustainability reviews and which are reflected in the categories of "individual service plan" and "service coordination," that the court monitor concluded that performance was lacking.  The court likewise recognizes, as discussed below, that ISPs are not driving practice, as they should be, in all counties.

---

[52]  "Is the ISP relevant to the child and family's needs and goals?"  "Is the ISP consistent with the long-term view?"  "Does the ISP address focal concerns, underlying causes of behavior, known health or safety risks, and stress positive outcomes?"  "Does the selection of ISP strategies, supports, services, and time lines make sense?"  "Does the ISP reflect the preferences and choices of those who are expected to participate in and benefit from the services offered?"  "Does the ISP provide concurrent and safety components, as necessary?"  "Are the services/activities specified in the ISP being implemented in a timely manner?"  "Is there effective coordination and continuity in the organization and provision of services for this child and family?"  "Is there accountability for assuring that the ISP is implemented, monitoring activities are conducted, and information is shared with the service team so that smart and timely changes are made in strategies, supports, and services across settings and providers?"  (See Ct. Monitor Nov. 2005 Report at 30 & Appendix A (Doc. No. 783).)

109

d.  The 2006 On-Site Sustainability Reviews

Turning to the evidence garnered as a result of the 2006 on-site sustainability reviews, the court begins with the favorable evidence regarding the performance of the smaller counties.  In two of the small counties, i.e., Chambers and Conecuh, it was specifically noted that "ISPs are working documents and are driving practice."  (Ct. Monitor April 2006 Report at 12, 27 (Doc. No. 812).)  In Chambers County, where "[r]eviewers found a consistency between ISPs and services provided," 100 percent of the cases were acceptable in the categories of "ISP" and "service coordination."  (See id. at 11.)  In Conecuh County, where "[r]eviewers observed a consistency between [individual] service plans and implementation of supports," 80 percent of the cases were acceptable in the ISP category, and 100 percent of the cases were acceptable in the area of service coordination.  (See id. at 26, 27.)

Lauderdale County, a mid-sized county, also fared well, with acceptable ratings given in 94 percent of the cases in the categories of "ISP" and "service coordination."  (Id. at 42.)  In Randolph County, a sustaining county and also a small county, the court monitor stated that this county "needs to make improvement in . . . functional assessment and the resulting ISP required by core purpose two."  (See id. at 21.)  Randolph County had acceptable ISPs and service coordination ratings in 80 percent of the cases.  (Id. at 18.)

110

The evidence surrounding the quality of ISPs was less favorable in other counties. In Jackson County, where the lowest domain rating was in the category of "ISP" at 60 percent, "[r]eviewers found ISPs to be not driving practice, not containing measurable goals and objectives, and lacking long-term view and direction." (See id. at 31.) The category of service coordination, however, received a favorable rating with 100 percent of cases deemed acceptable. (See id. at 34.)

Lee County had acceptable ISP ratings in 67 percent of the cases reviewed and acceptable service coordination ratings in 83 percent of the cases reviewed. (Id. at 46, 51.) The court monitor indicated that, "while children are getting services, there are some weaknesses in how well the ISP is addressing the underlying conditions that will result in successful resolution or safe case closure." (Id. at 46.) The court monitor expressed a similar concern about Montgomery County, where the percentage of acceptable cases in the category of ISPs was 56 percent and the percentage of acceptable cases in service coordination was 83 percent. (Id. at 55, 59.)

Macon and Marshall counties also scored low with only 30 percent and 33 percent, respectively, of cases receiving an acceptable rating in the category of ISPs. (Id. at 63, 67, 71, 76.) The percentage of acceptable cases in the category of service coordination was somewhat better:  71 percent in Macon County and 73 percent in Marshall County. (Id. at 67, 76.) The court monitor observed in Macon County that the low ISP rating indicated "significant weaknesses in practice." (Id. at 63.) In Marshall County, "[s]ome providers

111

and educators reported that ISPs aren't perceived as collaborative and that they are not always included in the process"; however, "[f]oster parents generally reported that they were included in ISP meetings, but they reported [that] there were not enough caseworkers or foster parents to meet the needs."  (Id. at 78.)  Jefferson County also received unfavorable ratings, with 47 percent of cases in the category of ISPs receiving acceptable ratings and 60 percent of cases in the category of service coordination obtaining acceptable ratings.  (Id. at 88.)


e.  Findings

The court finds that a procedural barrier to effective and well-functioning ISPs is the complexity surrounding the ISP process.  A reverberating theme emanating from the court monitor's April 2006 Report is that the ISP requirements are overly burdensome and too complex.  Complaints included the following:  "ISPs [are] hard for families to understand" (Ct. Monitor April 2006 Report at 12 (Doc. No. 812)); "the paperwork expectations and documentation redundancy combined with mandatory requirements made doing the necessary practice and hands-on work with children and families very difficult" (id. at 12, 48); "ISPs are too long and overwhelming for families" (id. at 19); "[t]he ISP was reported to be too cumbersome, and it had become hard for families to understand (this was reported in virtually all counties by staff)."  (Id. at 78.)

112

The court monitor also has observed that the "ISP process could benefit from [a] continued focus on developing plans that are easy for families to understand and useful to achieving resolution of problems."  (Id. at 19.)  Having studied the criticisms of the present ISP process, the court concurs with the court monitor's assessment.  The court concludes that, although there is evidence that ISPs are being completed in a timely manner, ISPs are not performing in the manner intended by the Consent Decree; the standard of substantial compliance has not been met.  At the same time, the court also recognizes, as Defendant aptly states, that "ISP development is, and always will be, an ongoing process for [DHR's] county staff."  (Butler Aff. ¶ 7 (Ex. to Doc. No. 825).)

The court, however, does not find that the present deficiency forecloses a finding of systemwide substantial compliance.  An underlying common denominator in this lawsuit, one echoed by the court monitor and not disputed by the parties, is that DHR's child welfare system is an evolving system of care, one which must remain under vigilant watch.  The parties have recognized that changes in practice and performance are expected and indeed are inevitable.  (Cf. Implementation Plan, Introduction, at 5 ("The process of change is dynamic.  As information is learned about the effectiveness of intervention and reform strategies, plans may need to be revised, services modified, steps reordered, mistakes corrected and systems changed.").)

Change has occurred, and the court expects, with emphasis, that DHR will work diligently and as quickly as possible to simplify and to improve the entire ISP process so

that ISPs can return to the forefront as the mechanism which drives practice in all counties.  The court, though, does not deem it necessary to retain jurisdiction until such time that DHR remedies and revitalizes the ISP process for this reason.  Throughout the long duration of this case, as set out in other parts of this opinion, DHR has demonstrated its good faith commitment to achieving performance within its child welfare system which complies with the dictates of the Consent Decree, and Defendant has complied with other directives issued by this court.  See Sims, 9 F. Supp.2d at 1287 (discussing factors which the court should consider in deciding whether termination of a consent decree is appropriate, including "whether retention of judicial control is necessary or practical to achieve compliance with any outstanding orders").

The court's finding is based also on evidence which reveals that DHR is not stagnant, but continually is implementing refinements in order to improve its child welfare system.  The evidence reveals that Defendant is aware of the problems infecting the ISP process and already has initiated some corrective measures.  For example, in his Affidavit, Butler states, "To improve ISP quality, DHR is continuing to provide consultation and training to all our county and state staff."  (Butler Aff. ¶ 7 (Ex. to Doc. No. 825).)  "The DHR child welfare consultant staff has recently begun new training for counties across the state to address ISP development and assessment of family dynamics."  (Id.)

Additionally, Angela Tanveer ("Tanveer"), who signed her affidavit on April 28, 2006, in her capacity as DHR's assistant director for child welfare for Jefferson County,

has explained the mechanisms recently implemented in Jefferson County to address problems in the area of ISPs.  Tanveer says that all regions of Jefferson County

> received training that consisted of a two-day interactive workshop on assessments and ISPs.  State DHR Child Welfare consultants met with units in each region to train individual workers on how to improve their ISP and assessment practice.  I am meeting with small groups of regional supervisors each month to help them learn how to assist their workers in improving ISP practice and how to focus on outcomes.

(See Tanveer Aff. ¶ 9 (Ex. to Doc. No. 811).)

There also is other evidence that DHR is making strides in the right direction in the arena of ISPs.  In one of his briefs (Doc. No. 811), Defendant sets out a chart which compares the system performance data for counties discussed in the court monitor's November 2004 Report with the current data from the 2006 on-site sustainability reviews. (Doc. No. 811 at 7); (see also Oliver Wayne Scott Aff. (Attach. 1 to Doc. No. 811).)  This data reflects a positive trend.  Overall, the percentage of acceptable cases in the category of ISP improved by 21 percentage points (41 percent to 62 percent), and, in the category of service coordination, the percentage of acceptable cases improved by 25 percentage points, from 57 percent to 82 percent.  (Doc. No. 811 at 7.)

In sum, the court expects that DHR will follow through posthaste with completion of the necessary reforms to the ISP process; however, based upon DHR's record of compliance in this litigation and the improvements demonstrated thus far, the court finds

that continued judicial oversight is not necessary to bring Defendant in substantial compliance with the requirements of the Consent Decree concerning serviceable ISPs.

### 8. Core Purpose Five

Core purpose five embodies the operating principles of the Consent Decree pertaining to stability and permanency in the class members' living situations, including, if in the children's best interest, that when children are removed from their homes, siblings are placed together and familial relationships are maintained through visitations and other means.  See R.C. I, 390 F. Supp.2d at 1046.  The court has reviewed all of the evidence relating to core purpose five and finds that Defendant has demonstrated that DHR will remain in substantial compliance with core purpose five of the Consent Decree.  The court explains its reasoning.

Regarding permanency, the court monitor has written, "[T]he primary mission of child welfare is to ensure that children live in safe and permanent homes."  (Ct. Monitor April 2003 Report at 24.)  "Permanency is defined as ensuring that children live in permanent, stable, and family settings and is achieved through either the successful reunification with family members, or when reunification with family (or placement with other relatives) is not possible, through adoption."  (Id.)

In some instances as indicated, permanency can be achieved through adoption or a custody transfer of the child to permanent placement with a relative.  In other instances,

116

the permanency goal is to keep the child in the home or, where the child has been

removed, to return the child to that home, or in some cases, to place the child in long-term

care with a foster parent.  An additional permanency goal is APPLA or "another planned

permanent living arrangement," previously referred to as long-term foster care, which is

primarily geared toward those children who will reach the age of majority while receiving

foster care services.  (Ct. Monitor Nov. 2004 Report at 49); (see also Consent Decree

at 9-10 (¶ 17)); (see, e.g., Ct. Monitor April 2006 Report at 9, 16, 32, 39, 48, 57, 65, 73,

83 (Doc. No. 812) (delineating permanency goals of the children whose cases were

reviewed).)  Commendably, in nine of the ten counties, which were part of the 2006 on-

site sustainability reviews, every child who was subject to review had in place a

permanency goal.[53]  (Ct. Monitor April 2006 Report at 9, 16, 24, 32, 39, 48, 57, 64, 73

(Doc. No. 812).)

Establishing a permanency goal for each child is one factor in the equation for

measuring DHR's attainment with the permanency component of the Consent Decree.

Another way to gauge compliance as to permanency is to assess the length of time it takes

for a child to achieve permanency in his or her living situation.  As the court and the court

monitor previously have recognized, timely achieving permanency in a child's living

---

[53] The exception is Jefferson County.  Of the thirty children reviewed in Jefferson
County, two of the children did not have in place a defined permanency goal.  (See Ct.
Monitor April 2006 Report at 83 (Doc. No. 812).)

situation is a critical component of core purpose five.[54]  See R.C. I, 390 F. Supp.2d

at 1053-54.  DHR compiles data on a county-by-county basis of the percentage of children

who remain in foster care for more than thirteen months.  Similarly, recent federal

legislation, namely, the Adoption and Safe Families Act of 1997, P.L. 105-89 (Nov. 19,

1997 ("ASFA"), sets twelve months as the time in which permanency is to be achieved[55];

however, for purposes of the Consent Decree in this case, the court monitor is of the

opinion that "setting a standard that every child must achieve permanency within 12

months will likely not be achieved."[56]  (See Ct. Monitor Nov. 2004 Report at 48); (see also

Ct. Monitor Nov. 2005 Report at 60 (Doc. No. 783) ("[T]here are significant challenges in

meeting the 13-month time-line requirements for the achievement of permanency.").)

The court monitor previously has written as follows:

Many issues are going to determine what actual time lines can be achieved
for each child.  These include the age of children, the per capita entries into
care (fewer entries mean those who enter are more likely to have more
complex issues to resolve to achieve permanency), the range of emotional

---

[54] Some questions used by QSR reviewers to examine permanence are as follows:
(1) Is the child living in a home that the child, caregivers, and other stakeholders believe
will endure until the child becomes independent?  (2) If not, is a permanency plan
presently being implemented on a timely basis [consistent with ASFA time lines] that will
ensure that the child will live in a safe, appropriate, and permanent home?"  (Ct. Monitor
Nov. 2004 Report, Appendix G.)

[55] Not only is permanency an important component of the Consent Decree, but of
federal legislation as well.  (See Ct. Monitor Nov. 2004 Report at 48.)

[56] Indeed, as noted by the court monitor, under the ASFA, no state received an
acceptable rating in the performance of permanency achievement.  (Ct. Monitor Nov.
2004 Report at 50 (Doc. No. 783).)

and behavioral conditions of the children, and the amount of effort and commitment to keep children with their families.

(Ct. Monitor Nov. 2004 Report at 50.)  For the foregoing reason, the court monitor has not placed undue emphasis on compliance with a rigid time guideline in measuring substantial compliance in individual counties.  Although the ASFA twelve-month time line has been incorporated into the QSR review questions in the area of permanency (see Ct. Monitor Nov. 2004 Report, Appendix B), the court monitor consistently has deemed individual counties in substantial compliance even where the data revealed that the majority of the children were achieving permanency in excess of twelve and even thirteen months.  For instance, in the 2006 on-site sustainability reviews, the court monitor found that counties were in substantial compliance with the Consent Decree, even though the percentages of children in the majority of these counties who had been in care for more than thirteen months were substantial, extending into the seventieth percentile range in Randolph County (74 percent) and Conecuh County (71 percent).[57]  (See, e.g., Ct. Monitor April 2006 Report at 20, 28 (Doc. No. 812).)

-------

[57] In Chambers and Lauderdale counties, 69 percent and 64 percent, respectively, of the children in care remained in care for periods of time exceeding thirteen months, and the percentage of children in care for more than thirteen months in Jackson County was 44 percent.  (Ct. Monitor April 2006 Report at 13, 36, 44.)  Indeed, Lee and Montgomery counties were the only two counties making headway in reducing the time periods during which children were in DHR care.  The percentage of children in care more than thirteen months decreased in Lee County from 58 percent in 2002 to 36 percent as revealed in the 2006 on-site sustainability reviews, and similar improvements were seen in Montgomery County which effectively reduced the number of children in care from 62 percent to 28 percent over a period of nine years.  (Id. at 52-53, 60-61.)

119

As indicated, there now is additional data in the record on the issue of permanency as a result of the 2006 on-site sustainability reviews which was not before the court when the court evaluated Defendant's first motion to terminate the consent decree.[58]  The following indicates the percentage of children reviewed in each county who received an "acceptable" rating in the area of permanence:  (1) Chambers (90 percent); (2) Randolph (60 percent); (3) Conecuh (80 percent); (4) Jackson (90 percent); (5) Lauderdale (83 percent); (6) Lee (94 percent); (7) Montgomery (83 percent); (8) Macon (60 percent); (9) Marshall (67 percent); and (10) Jefferson (63 percent).  (Ct. Monitor April 2006 Report at 10, 17, 25, 33, 41, 50, 58, 66, 75, 85) (Doc. No. 812).)  Viewing the data on permanency in the aggregate for the seven sustaining counties, the percentage of acceptable cases is 83 percent, which the court finds to be satisfactory under the Consent

---

[58] Previously, the court monitor determined that there was insufficient data from which he could form a reasoned opinion as to whether DHR was substantially complying with the goal of timely achieving permanency in a child's living situation.  See R.C. I, 390 F. Supp.2d at 1053-54 (citing Ct. Monitor Nov. 2004 Report at 50.)  At the time, he stated, "The achievement of permanency . . . is a complex issue that needs more data analysis and more detailed study."  (Ct. Monitor Nov. 2004 Report at 50.)  The court monitor based his opinion on the limited data provided to him on permanency for fiscal years 2000 through 2003.  See R.C. I, 390 F. Supp.2d at 1053.

Decree's standards.[59]  (Id. at 90.)  The percentage in the aggregate for the three non-

sustaining counties is 63 percent.  (Id. at 92.)

Although four of the counties scored in the sixtieth percentile in the domain of

permanency (i.e., Randolph, Macon, Marshall and Jefferson), the court finds that these

percentages cannot be viewed in isolation.  (See, e.g., id. at 21 ("appropriate assessment of

underlying conditions and the whole family situation are necessary to achieve

permanence").  Rather, the issues surrounding permanency must be examined in

conjunction with other factors, such as the appropriateness of placement,[60] a category in

which all of the counties scored exceptionally high marks as follows:  (1) Chambers (100

percent); (2) Randolph (100 percent); (3) Conecuh (90 percent); (4) Jackson (99 percent);

(5) Lauderdale (100 percent); (6) Lee (100 percent); (7) Montgomery (100 percent);

_____

[59] The court notes that Paul Butler ("Butler"), who at the time of the submission of
his affidavit was the interim director of DHR's family services division, points out that
the data examined by the court monitor "is point-in-time data and includes data on some
children who have been in care since before the implementation of the R.C. principles in
all of the counties."  (Butler Aff. ¶ 8 (Ex. to Doc. No. 825).)  Butler states that "[a] much
better approach for reviewing the trends for Alabama's foster children comes in looking
at cohort groupings of children who enter care over the years.  Cohort data is data on
children who enter care for the first time in any given year."  (Id.)  He concludes, "In
looking at this [cohort] data, improvements in practice can be seen."  (Id.)  While the
court has considered Butler's opinion in reaching its findings herein, the court has given
only limited weight to Butler's conclusion, given that the conclusion is, in large part just
that, a conclusion.

[60] The question used by QSR reviewers to assess appropriateness of placement is:
Is the child in the most appropriate placement consistent with the child's needs, age,
ability, and peer group and consistent with the child's language and culture?  (See Ct.
Monitor Nov. 2004 Report, Appendix B.)

(8) Macon (90 percent); (9) Marshall (94 percent); and (10) Jefferson (97 percent).

Additionally, it cannot be ignored that, as discussed in other parts of this opinion, the

evidence indicates that at least part of the challenge in achieving permanence has been

sparked by a factor outside of DHR's control, that is, the adverse consequences on

Alabama families due to the rapid increase in the use and production of crystal

methamphetamine.

The court recognizes, as pointed out by Plaintiffs (see Doc. No. 820 at 23, 28), that

the court monitor observed in his April 2006 Report that permanence is a challenge even

for some of the counties which are sustaining substantial compliance.[61]   (See, e.g., Ct.

Monitor April 2006 Report at 14, 19, 21 (Randolph County); id. at 29 (Conecuh County);

id. at 36 (Jackson County).)  The court observes that these weaknesses in permanence,

however, were not a barrier to the court monitor's finding that seven counties were

substantially complying with the Consent Decree.  Given that the time frame for achieving

permanency involves consideration of the individual and unique circumstances of each

child and his or her environment, the court finds that it is not always workable to evaluate

substantial compliance under the Consent Decree solely based upon an unbendable

twelve-month, or even thirteen-month, guideline for achieving permanency.

---

[61] For other counties, achieving permanence was not a challenge.  In Lee and
Montgomery counties, for instance, the court monitor noted no weaknesses regarding the
goal of permanence.  (Id. Ct. Monitor April 2006 Report at 54, 62.)

Importantly, there is evidence that DHR closely is monitoring permanency issues. (See, e.g., Def. Aff. at 8 (electronically filed as Ex. 5 to Doc. No. 761) ("Attaining timely permanency for children remains one of the greatest challenges of the system, and it is a subject on which we have worked diligently to produce better results.").)  For example, although Randolph County scored lower than other counties at 60 percent in the category of "permanence," the court monitor observed Randolph County's "diligent effort in seeking permanence for each child and that teenagers presented significant challenges to achieving permanence."  (Ct. Monitor April 2006 Report at 19 (Doc. No. 812).) Additional evidence that DHR is focusing on permanency in Randolph County in an effort to improve performance lies in statements from stakeholders who have "consistently report[ed] that DHR is looking at permanency issues for children when they first come into care."  (Id. at 20); (see also id. (in Randolph County, "[f]oster parents feel that DHR makes good decisions about returning children home or placing them with relatives")).) Randolph County also is making positive strides in the area of permanency, as the court monitor observed that "[p]ermanency plans are being developed timely and are moving toward adoptions sooner."  (Id. at 20.)

Moreover, on the subject of permanence, Defendant has submitted other favorable evidence, demonstrating that the percentage of children in foster care continues to decrease.  (See Butler Aff. ¶ 9 (Ex. to Doc. No. 825).)  As stated by Butler, "[t]he children who entered care in 2001 had a median time in care of 387 days.  For 2002, the median

123

number of days in care was 389, and in 2003 it was 346.  For the children who entered

care in 2004, the median time in care was 293 days."  (Id. (internal footnote added).)

Relatedly, Butler points out that DHR has "decreased the number of re-admissions to

care."  (Id.)  He says that, "[o]f the children who entered care in FY [fiscal year] 2001,

approximately 12 have returned to care.  However, of those children who entered care in

FY 2004, less than 8% have reentered care.  No child who entered care since 2002 has had

more than three admissions into care."  (Id.)  Finally, Butler recites that, of the children

who entered care in fiscal year 2004, 74.3 percent have returned to their home or achieved

permanency through other means, such as relative placement.  (Id.)

Defendant also has submitted evidence of methods which DHR has implemented to

assess performance in the area of permanence and to target needed interventions.  One

such method is the "Quarterly County Permanency Profile."  (See Doc. No. 779 at 27.)

As explained by Cantrell, the program administrator in DHR's Family Services Division,

this report provides a data profile of the permanency goals, length of stay and compliance

with the ASFA.  (Cantrell Dep. at 96 (Attach. K to Doc. No. 779)); (Doc. No. 779 at 27.)

The report encompasses information regarding in-home and out-of-home care.  (Cantrell

Dep. at 96); (Doc. No. 779 at 27.)  Defendant also has provided evidence and discussion

of certain data threshold measurements which have been established by DHR for the

purpose of measuring whether a county is achieving permanency goals, as well as safety

goals.  (Doc. No. 779 at 28); (Cantrell Dep. at 51-52, 73.)  In instances where the data

reveals substandard performance as to the permanency goal, DHR has implemented a multi-step protocol to correct the deficiency.  (Doc. No. 779 at 28 (citing Margaret Bonham Dep. at 51-52, 73, attach. L).)

DHR's proven ability to improve deficient areas of performance, including the area of permanence, is evidenced in Jackson County.  In the review preceding the 2006 on-site sustainability review, Jackson County exhibited "significant practice issues" in most areas of performance, including permanency.  (Ct. Monitor April 2006 Report at 29 (Doc. No. 812).)  Impressively, in the 2006 on-site sustainability review, 90 percent of the children reviewed in Jackson County received an acceptable rating in the area of permanency. Problems in Jackson County have been identified and corrected which is precisely what the Consent Decree seeks to achieve.

Relatedly, as stated, adoption is an avenue by which permanency can be achieved. (Ct. Monitor Nov. 2005 Report at 13 (Doc. No. 783).)  The evidence in the area of adoptions is favorable, with the court monitor confirming that "[t]he number of completed adoptions and the number of children with adoptions as a permanency goal has increased." (Id.); (Lapsley Aff.)  Indeed, it is noteworthy that DHR's average time to adoption exceeds

the goals of the ASFA.[62]  (See Doc. No. at n.14.)  DHR also monitors adoption placements

through reports and data compilation, which are reviewed on a regular basis.  (See Doc.

No. 779 at 29); (Cantrall Dep. at 36-38, 41.)

Core purpose five also requires consideration of whether familial relationships are

being maintained through visitations and placement with siblings when children are

removed from their homes.  In his November 2005 report, the court monitor noted that

only 63 percent of the children included in the QSR reviews received an acceptable rating

in the category for "maintaining family connections."  He concluded that this data

indicated that there was "significant variability in how this basic practice principle is

implemented in frontline practice since conversion was achieved in some counties."  (Ct.

Monitor Nov. 2005 Report at 15 (Doc. No. 783).)  Significantly, in DHR's favor, the

subsequent data gathered as a result of the 2006 on-site sustainability reviews reveals

substantial improvement in DHR's practice of maintaining family connections.  On pages

---

[62] The court notes that Defendant has pointed out that the Consent Decree's emphasis on family reunification in many cases has resulted in delays in the time to adoption and, thus, runs counter to the goals of the ASFA.  Defendant makes this point as support for his proposition that "[t]he friction between the principles of the 1991 Consent Decree and Congress' enactment of differing objectives in the Act demonstrates another reason that [the] ancient Consent Decree[] should be terminated."  (Doc. No. 825 at 11 n.13.)  The court simply observes that Defendant complains that the Consent Decree should be terminated as archaic, but at the same time ignores the fact that DHR never sought the arguably more reasonable remedy of modification on the basis of ASFA's enactment.  See Philadelphia Welfare Rights Organization v. Shapp, 602 F.2d 1114, 1120-21 (3d Cir. 1979) (court has power to modify "complex ongoing remedial [consent] decree"); Wyatt, By and Through Rawlins v. King, 803 F. Supp. 377, 384-85 (M.D. Ala. 1992) (discussing the standard for seeking modification of consent decrees in institutional reform cases as set out in Rufo v. Inmates of Suffolk County, 502 U.S. 367 (1992)).

90 and 91 of his April 2006 Report, the court monitor compiled charts showing the combined performance ratings for the seven counties which he determined were sustaining substantial performance (i.e., Chambers, Conecuh, Jackson, Lauderdale, Lee, Montgomery and Randolph).  In the domain of "maintaining family connections," these seven counties received an aggregate favorable rating of 89 percent.  (See Ct. Monitor April 2006 Report at 90 (Doc. No. 812).)  Although the three non-sustaining counties received a lower rating of 72 percent in this domain, the trends overall are moving in the right direction.  (See id. at 92); (see also Baker Aff., titled "Children in Care" at 10-11 (electronically filed as Ex. 36 to Doc. No. 761)), in which Baker attests that those "siblings who are not together have been deemed as having particular needs that may not be met unless they are served in different settings.  These issues are seriously considered within the context of the Individualized Service Plan for that child and family, and placement decisions are made as a result.").)

        Providing a child who is in out-of-home care with a stable home environment, with minimal risk of placement disruption, is another component of core purpose five.  In his November 2004 Report, the court monitor examined the available data from January 2000 to September 2003, but deemed the data insufficient in some respects.  (See Ct. Monitor Nov. 2004 Report at 50); R.C. I, 390 F. Supp.2d at 1054 (observing absence of data). However, in his November 2005 Report, the court monitor examined more recent data and made several positive comments based upon this data.  (Ct. Monitor Nov. 2005 Report

127

at 15 (Doc. No. 783).)  In that report, he set out a chart, titled "Foster Care Data 2005," which displays, on a county-by-county basis, the average number of placements for children in out-of-home care and the average length of continuous time children are in out-of-home care.  (Id. at 15-16.)  Based upon a comparison of this data to earlier data, he observed that, in 2001, "63% of children were discharged with not more than two placements," and that, "[i]n 2004, 85.4% of children were discharged with less than two placements, with 59.1% discharged after one placement."  (Id. at 17.)  From the same data, the court monitor also observes that "there has been a reduction of almost one placement change on average for children in care since the inception of R.C." and that, "[o]verall, there has been significant improvement in reducing the number of placements."  (Id. at 17, 59.)

Also part of the record are the results from the 2006 on-site sustainability reviews which show that counties are maintaining success in keeping at bay the number of placements for children in out-of-home care.  (See Ct. Monitor April 2006 Report, Appendix G (Doc. No. 812).)  Examining the data in Appendix G, which charts the number of placements for children in DHR care in the ten counties subject to the 2006 on-site sustainability reviews, the court monitor reports favorably as follows:

> When data from that chart are compared with the number of moves that children were experiencing when the initial R.C. needs assessment was done, significant progress has been made in reducing the number of moves children experience.  At that time, only 42% of children in care had two moves or less.  In the current data, 60% to 70% of children experience two moves or less.

(Id. at 89-90.)  Even Macon, Marshall and Jefferson counties – the counties which the court monitor found are not sustaining substantial compliance –  are performing at these levels.  The percentage of children in care who have experienced two placements or less in Jefferson, Macon and Marshall counties is 66 percent, 66 percent and 72 percent, respectively.  (See id., Appendix G.)

As a final observation regarding placements, Defendant has emphasized DHR's national success in the area of reducing the number of placements of children in state care. (See Doc. No. 825 at 12); (Butler Aff. ¶ 10 (Ex. to Doc. No. 825.)  The federal government measures a state's success in stability by comparing the percentage of children who have less than three placements in a given year.  (Butler Aff. ¶ 10.)  Under the ASFA, a state receives a "passing" grade when the state meets the threshold of 86.7 percent.  (Id.) In 2005, approximately 93 percent of the children in Alabama's care had less than three placements, which placed DHR in the top three leading states in the nation.[63]  (Id.)

Finally, the court observes that, in the areas comprising core purpose five, there were no notable negative comments from stakeholders, but there were some notable positive comments, which as stated constitute an important component of the methodology used by the court monitor during on-site sustainability reviews.  (See, e.g., Ct. Monitor

---

[63] The court notes that Butler has pointed out that Glenda Peters, one of DHR's program managers, has been asked by the Agency for Children and Families, which is part of the U.S. Department of Health and Human Services, to speak at a national conference on how Alabama DHR is achieving such excellent results in reducing multiple placements for children in foster care.  (Butler Aff. ¶ 10.)

April 2006 Report at 2 (Doc. No. 812).)  In Chambers County, "[f]oster parents and other stakeholders report[ed] feeling supported by DHR and describe[d] workers as taking the extra steps to facilitate engagement, maintain family connections, provide needed services and supports despite limited resources, and set families up for success."  (Id. at 12.)  In Randolph County, "[s]takeholder input was uniformly positive."  (Id. at 20.)  As stated above, "[s]takeholders consistently report that DHR is looking at permanency issues for children when they first come into care."  (Id.)  "Stakeholders reported that caseworkers are doing a better job of engaging families and are asking the right questions when assessing families."  (Id.)  In Conecuh County, "[i]ssues with permanency, stability, and visitation by staff were reported to be satisfactory."  (Id.)  Stakeholders also "described workers as taking extra steps to engage families, [as] . . . maintaining family relationships, and [as] providing support and services that facilitate success for families." (Id. at 28.)  Also, "[s]takeholders were generally positive about Marshall County's efforts."  (Id. at 78.)  In the remaining counties, the court monitor did not recite any positive or negative comments from stakeholders.

*9. The 2006 On-Site Sustainability Reviews:  The Three Counties*
*Which the Court Monitor Deemed Were Not*
*in Substantial Compliance with the Consent Decree*

a.  The Arguments of the Parties

Defendant argues that the fact that three counties – Macon, Marshall and Jefferson

– did not pass substantial compliance muster as a result of the 2006 on-site sustainability

reviews does not mean that overall Defendant is not sustaining substantial compliance.  He

argues that "[t]here is nothing in the Consent Decree or the governing legal standards to

support a conclusion that the inability of one or more non-party counties to maintain the

standards of the Decree for some period of time precludes the Commissioner from

demonstrating his own sustained compliance with his requirements under the Decree."

(Doc. No. 811 at 9.)  Furthermore, Defendant states that, even in these three lagging

counties, the data reveals that children are in safe, stable and appropriate placements.  (Id.

at 10.)  Defendant also stresses as relevant to the substantial compliance inquiry the fact

that DHR has in place procedures to identify and correct problems in individual counties.

In fact, he says that, prior to the court monitor's 2006 on-site sustainability reviews, DHR

already had pinpointed the weaknesses noted by the court monitor in the non-compliant

counties and had initiated corrective action.  Defendant proffers that the court monitor

would concur with the latter statement, given the court monitor's recent statement that

"DHR has demonstrated the ability to work with and correct problems when they are identified in some counties, and this is particularly true in the small counties.'"  (Id. (citing Ct. Monitor April 2006 Report at 92 (Doc. No. 812).)

Plaintiffs, on the other hand, contend that the deficiencies in Macon, Marshall and Jefferson counties are many and great.  Further, Plaintiffs interpret the evidence as to the seven sustaining counties to include other substantial shortcomings which Plaintiffs contend further magnify DHR's alleged failure to demonstrate sustained substantial compliance.  (Doc. No. 820 at 6-8.)

### b.  DHR Has Detected Problems

The 2006 on-site sustainability reviews provide the basis for the court's finding that the Consent Decree effectively has caused DHR to implement mechanisms and procedures which have given it the ability to detect and redress problems within individual counties. This desired result is another factor which underlies the court's finding that DHR has demonstrated that it will continue to comply with the Consent Decree's principles in the absence of court supervision.  In other words, the court finds that the Consent Decree is no longer necessary to ensure the effective functioning of DHR in the arena of child welfare. See Dowell, 498 U.S. at 247; Kindred v. Duckworth, 9 F.3d 638, 644 (7th Cir. 1993) ("[D]ecrees imposing obligations upon state institutions normally should be enforceable

no longer than the need for them.").  DHR's success in the area of self-monitoring and self-correction also has not gone unnoticed by the court monitor.

The evidence establishes that DHR successfully is identifying weaknesses in child welfare practices which affect a county's ability to sustain substantial compliance with the Consent Decree.  (See Doc. No. 811 at 10-11.)  For example, in his April 2006 Report, the court monitor reported that the major impediments to Macon County's success are retention of staff (reflected by the turnover rates which exceeded 60 percent for each of the three years preceding his review), limited in-county resources, and weak collaboration with foster parents.  (Ct. Monitor April 2006 Report at 69 (Doc. No. 812).)  The court monitor, however, was quick to point out that he was not the first to discover these weaknesses.  He says, "It should be noted that DHR was already working on these performance issues and that further action has been taken since the review."  (Id. at 70.)  Indeed, in 2004, DHR identified management problems in Macon County.  After close monitoring, in 2006, the county director was replaced with a management "team" comprising a district administrative specialist and child welfare consultants.  (Slaughter Aff. at 2 (Attach. 7 to Doc. No. 811).)  As a result, "[i]mprovements are already being seen," and it is "anticipated that the county will make steady progress over the coming year."  (Id.)

Turning to Jefferson County, the court initially observes that it does not agree in whole with Plaintiffs' statement that Jefferson County "is the best single proxy for the

functioning of the state foster care system as a whole."  (Doc. No. 820 at 18.)  Jefferson County does not necessarily typify the state, or for that matter, any other county.  The court recognizes that Jefferson County comprises the county with the largest percentage of children in DHR's care, as Plaintiffs point out, but that fact also is one which contributes to the uniqueness of the county.  Jefferson County always has been uniquely situated. (See, e.g. Dec. 13, 2004 Order (Doc. No. 725) (describing Jefferson county as having "unique needs").)  The court simply does not find that the deficiencies in Jefferson County are impediments to a finding of systemwide substantial compliance.  The court, however, also makes abundantly clear that it would not so find if the evidence did not show in a very concrete manner that DHR presently is taking great strides and directing a multitude of resources for the long-term betterment of Jefferson County.  The affidavits of Paul Butler, Angela Tanveer and Susan Ward provide details of the recent work in progress in Jefferson County.[64]  (See attachments 4-6 to Doc. No. 811.)  Below are some examples of the steps being taken by DHR to improve leadership, services, the performance of ISPs, and the attainment of permanency for children in Jefferson County.

---

[64] The court notes that Butler, at the time he signed his affidavit, served as the interim director of DHR's Children and Family Services.  In this capacity, he supervised the director of Jefferson County DHR and worked with the county in all program areas, especially child welfare.  (Butler Aff. at 2.)  Tanveer, as stated earlier in this opinion, submitted her affidavit in her capacity as the assistant director for child welfare in Jefferson County DHR (Tanveer Aff. ¶ 2), and Ward signed her affidavit in her capacity as the director of the State DHR Office of Resource Management which "deals with contracting services for DHR, Statewide Licensing of Child Placing Agencies and Child Care Institutions, and statewide Resource Development and Utilization Review of resources used by DHR."  (Ward Aff. ¶ 2.)

In an effort to improve child welfare practice, the State office has replaced the leadership of Jefferson County, bringing in a new child welfare administrator and an interim county director.  (Doc. No. 811 at 11.)  The interim director immediately implemented an across-the-board review of child welfare practice in the county.  (See Butler Aff. at 3.)

Contracts recently have been negotiated to increase the array of services specifically targeted to prevent removal of children from their homes, to increase family reunification, to treat children who exhibit self-injurious behavior, and to promote ISP-driven services.  (Ward Aff. at 1-3 (Attach. 5 to Doc. No. 811 at 1-3).)  A recruitment and retention specialist has been hired to research issues pertaining to staff retention.  (Tanveer Aff. at 2.)  Monthly meetings are being held between the child welfare administrator and supervisor to discuss, among other matters, practice issues, retention issues and supervisory growth, and monthly professional development training sessions for the management team have been put into place.  (Id.)

A State DHR consultant presently is reviewing all pending cases in Jefferson County, primarily to issue recommendations to workers and supervisors on safety issues. (Id. at 4.)  DHR's quality assurance office is conducting a study on "non-indicated" CANS to ascertain patterns and trends for purposes of improving performance, and management has placed an emphasis on the timely reporting of CAN investigations.  (Id.); (see supra, footnote 28.)

135

Management has identified the need to improve the quality of ISPs and assessments of families; thus, all five regions of Jefferson County received a two-day interactive workshop focused on improving the ISP and assessment practice.  The improvement of ISP practice also has been the focus of monthly meetings held with regional supervisors. (Id. at 4.)  Furthermore, the Jefferson County management team has identified the need to improve the county's work in the timely achievement of permanency for children in foster care and is taking steps for improvement in this area, as set out in Tanveer's affidavit. (Id.)  As a final example, in August 2005, DHR identified serious performance issues in Bessemer, one of the five regions of the Jefferson County DHR, and immediately an investigation commenced.  Ultimately, the regional manager of that division was removed. (Butler Aff. at 2.)

The court finds that the evidence reveals that DHR continually is monitoring the status of child welfare in Jefferson County and earnestly is attempting to rectify the practice problems in this county.  The foregoing measures, which are representative and not inclusive, demonstrate Defendant's "good faith commitment to the whole of the court's orders and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance."  Sims, 9 F. Supp.2d at 1287.

### 10.  Other Noteworthy Evidence

When measuring substantial compliance in individual counties, the court monitor has considered and placed an emphasis on any notable positive trends occurring within counties.  (See, e.g., Ct. Monitor April 2006 Report at 4 (Doc. No. 812).)  The court finds that, in the record, there is substantial evidence of positive trends of DHR's performance, and the court has considered this evidence in reaching its finding that Defendant has demonstrated that DHR will remain in substantial compliance.  The court finds that it is appropriate to set out some of these positive trends which also further amplify DHR's good faith commitment to providing child welfare care which complies with the core purposes of the Consent Decree.  For efficiency, the court addresses this evidence point-by-point, without elaborate transition.

First, as discussed earlier in this opinion, but worth reiterating here, the court finds that the ratings for the ten counties, which were included in the court monitor's 2006 on-site sustainability reviews, in the category of  "overall child status" is a strong indicator that, systemwide, children within DHR's care are safe and doing well.  The "overall child status" rating for the children reviewed in these ten counties was 96 percent.  (Ct. Monitor's April 2006 Report at 90, 92 (Doc. No. 812).)

Second, as also discussed earlier in this opinion, the rating in the category of "overall performance" shows marked improvement from the evidence which was before the court when the court entered R.C. I.  (Compare the aggregate "overall performance"

ratings from the QSR reviews which were before the court in R.C. I, see 390 F. Supp.2d at 1050, with the results from the 2006 on-site sustainability reviews, see Ct. Monitor April 2006 Report at 11, 18, 26, 34, 42, 51, 59, 67, 76, 86 (Doc. No. 812).)

Third, and relatedly, DHR has provided two charts which compare the aggregate results of the 2006 on-site sustainability reviews with the aggregate results from the fifteen QSR reviews set out in the court monitor's November 2004 Report and discussed in R.C. I.  (Doc. No. 811 at 5-8); (Ct. Monitor Nov. 2004 Report at 31, 33); R.C. I, 390 F. Supp.2d at 1050-51.  One chart compares the percentage of children who received an "acceptable" rating in the categories used to determine the status of the child and family (see Doc. No. 811 at 8), while the other chart compares the percentage of children who received an "acceptable" rating in the categories used to rate the performance of essential system functions for the child, see supra footnote 7.  (Doc. No. 811 at 7.)  The court agrees with DHR that the comparative charts reveal that the trends "are moving strongly in a positive direction."  (Doc. No. 811 at 5.)  The charts impart that, in the categories used to evaluate system performance, the percentage of "acceptable" cases is higher, in some categories markedly higher, than the percentages in the same categories set out in the court monitor's November 2004 Report.  (See id. at 7.)  Moreover, with the exception of one county, the percentage of "acceptable" cases is either equal to (within one percentage point) or in excess of the percentages uncovered during the QSR reviews set out in the court monitor's November 2004 Report.  (Id.)

138

Fourth, in keeping with the discussion of the QSR reviews presented in the court monitor's November 2004 Report, see R.C. I, 390 F. Supp.2d at 1048-51, the court finds that DHR's ability to detect and to restore compliance in backsliding counties is demonstrated through Jackson County.  In 2004, Jackson County was one of the counties with a 25 percent performance rating.  The court monitor noted that Jackson County, in particular, exhibited "significant problems with practice performance" and had an average R.C. workload of 127 percent.  (Ct. Monitor Nov. 2004 Report at 16); R.C. I, 390 F. Supp.2d at 1050 n.23; (see also Ct. Monitor April 2006 Report at 29 (Doc. No. 812).)  The results of the 2006 on-site sustainability review, however, demonstrated substantial compliance.  In his April 2006 Report, the court monitor declared that, although previously Jackson County was "not sustaining practice in accordance with the R.C. principles," it now is in substantial compliance with the Consent Decree.  (Ct. Monitor April 2006 Report at 29, 36 (Doc. No. 812).)  The Jackson County DHR staff is deserving of praise for its ability to detect and correct the problems which prevented adequate performance.

Fifth, the absence of discussion in this opinion with regard to DHR's Child Welfare Strategic Plan should not be misinterpreted as a lack of consideration of the Plan in the court's decision to terminate the Consent Decree.  (Doc. No. 714.)  In R.C. I, the court discussed this Plan, which DHR also refers to as its "sustainability plan," see 390 F. Supp.2d at 1038-39, and the court concurs with the court monitor that this Plan is a "strength" of DHR.  (Ct. Monitor Nov. 2005 Report at 27 (Doc. No. 783).)  Although the

139

court finds it unnecessary to repeat its discussion from R.C. I, it emphasizes that it finds that the Plan is a concrete exemplification of DHR's good-faith commitment to the whole of the Consent Decree.[65]

Sixth, further demonstration that DHR has no plans to abandon any of the principles of the Consent Decree, after the Decree's termination, is evidenced by the fact that DHR is "updat[ing]" its existing policy manual to "institutionalize [the] stand-alone RC policies within [DHR's] policy manuals."  (Cantrell Dep. at 50-51 (Attach. K to Doc. No. 779)); (Doc. No. 779 at 25.)  The updates include, among others, chapters addressing family focus practice, DHR's work with families through the ISP Process, child and family safety and well being, service of children in out-of-home placements, adoption, in-home services, and child abuse and neglect investigation.  (Cantrell Dep. at 50, 52-54); (Doc. No. 779 at 25.)

Seventh, Defendant willingly has collaborated with the Governor of the State of Alabama and the court monitor on an executive order which will come into effect when the Consent Decree is terminated.  (See Def. Aff. ¶ 6 (electronically filed as Ex. 5 to Doc. No. 761).)  As stated in R.C. I, pursuant to this executive order, the Governor will appoint

---

[65] The Strategic Plan describes its intentions as follows:  "The Department has made outstanding improvements to practice, however, we do not wish to rest upon our laurels, but choose instead to constantly strive for better performance.  We know that it is necessary to be ever vigilant regarding progress made.  To that end, DHR presents an organizational plan for post RC that will be called the Child Welfare Strategic Plan." (Cantrell Dep. at 98, attached as Ex. 1 to Doc. No. 779); (see also Doc. No. 779 at 19 n.8.)

a child welfare commission to operate for a period of time for the purpose of overseeing DHR's child welfare system.  See 390 F. Supp.2d at 1039 n.10.  The court again commends the Governor of Alabama, Bob Riley, for his dedication to the State of Alabama's child welfare system and his steadfast commitment to ensuring that DHR maintains a level of practice which equates substantial compliance when the Consent Decree is terminated.[66]

Eighth, it is worth reiterating that DHR has developed sophisticated automated systems for purposes of assimilating information necessary to monitor and advance DHR's system of care.  (See Dean Aff. ¶¶ 5-6 (Ex. 17 to Doc. No. 761)); (Bratcher Aff. at 4-5); (Johnson Aff. at 4); (Bonham Aff. at 2-4 (Ex. 11 to Doc. No. 761).)  The court monitor's April 2006 report reveals that DHR continually is improving its capability to collect and analyze data for purposes of monitoring its child welfare system.  (See, e.g., supra, footnote 41.)

Ninth, in his affidavit, Butler has submitted a compilation of the yearly ratings given for the fifty-one indicators of quality practice, as assessed during the state quality assurance reviews.[67]  (Butler Aff. at 5 (¶ 12) (Ex. 2 to Doc. No. 825)); (Dean Aff. ¶ 9 (Ex.

---

[66] (See also Transcript from Oct. 31, 2000 status conference at 22, which was filed Nov. 14, 2000, in which the Governor's then legal counsel highlighted that Governor Riley stated "in his inaugural address that the children of Alabama were going to be his number one priority" and that the Governor's "commitment ha[s] not changed").)

[67] The fifty-one indicators are based upon the principles outlined in the Consent Decree.  Each indicator is rated either as a county's strength, an area needing improvement or both.  Dean's affidavit provides a description of how the fifty-one

2 to Doc. No. 761).)  The court finds that this data reveals that the average number of indicators rated as a "strength" has been increasing over the past three years.  (See Butler Aff. at 5.)  The collection of this data, which is amassed from every county each month on the fifty-one indicators of practice, is one method which DHR has employed to measure substantial compliance with the Consent Decree.  (Doc. No. 761 at 14, 20, 23, 29); (see also Dean Aff. (Ex. 17 to Doc. No. 761)); (see also Ex. 7 to Doc. No. 761, titled "Sustainability Reviews–51 Indicator Summary").)

Tenth, DHR is continuing to conduct QSR reviews to ascertain whether counties are complying with the Consent Decree.  As of August 2005, twenty-seven such reviews have been conducted by DHR.  (See Doc. No. 761 at 2.)  In sum, the court finds that the foregoing factors indicate both positive trends and exemplify what the court finds to be DHR's proven demonstration of good faith.

11.  *The End of Federal Judicial Supervision Does Not Mean the End of Oversight: DHR's Quality Assurance System and Other Supervision Mechanisms*

Many of the measures discussed in the previous section demonstrate that the end of court oversight does not mean the end of oversight.  It was expected that DHR would establish mechanisms which would allow it to monitor and promote compliance with the Consent Decree and, similarly, pinpoint and correct problems, which undoubtedly will

_____

indicators are used to measure a number of practice-specific and systemic performance issues for a county.  (Dean Aff. ¶ 9 (Ex. 17 to Doc. No. 761).)

occur in a department the size of DHR.  The court monitor has praised DHR for its

development of effective mechanisms for monitoring its progress with respect to

compliance with the core purposes of the Consent Decree, and the court concurs with the

court monitor's assessment.  As stated by the court monitor,

> DHR deserves recognition for developing and implementing a QA [quality
> assurance] system that fulfills the expectations of the Consent Decree and
> Implementation Plan regarding quality assurance.  The QA system provides
> a permanent structure for evaluating the level of practice and outcomes for
> children and families at both the state and county level.  The quality
> assurance system is one of the strengths of the agency, and an effective QA
> system is a critical component of an effective system of care.

(Ct. Monitor Nov. 2005 Report at 27 (Doc. No. 783)); (see also Implementation Plan,

Quality Assurance Plan (attached as exhibit to Doc. No. 275)); (Dean Aff. ¶¶ 7-11 (Ex.

17 to Doc. No. 761) (discussing DHR's multifaceted review mechanisms).)

Not only is a quality assurance ("QA") system in place, but the Child Welfare

Strategic Plan also "incorporates ongoing QA mechanisms as one strategy to continue to

monitor and provide feedback to county child welfare operations."  (Id.)  For example,

the Child Welfare Strategic Plan ensures that counties receive formal review at least

every three years after termination of the Consent Decree.  (Doc. No. 761 at 23); (Def.

Aff. ¶ 20 (electronically filed as Ex. 5 to Doc. No. 761).)  DHR's "report cards," which

describe the status of each county's performance with respect to the Consent Decree, also

will continue to be published on DHR's website for the public's observance and scrutiny.

See R.C. I, 390 F. Supp.2d at 1041; (Doc. No. 761 at 24); (see also Dean Aff. ¶ 13 (Ex.

17 to Doc. No. 761).)  Finally, externally, the Governor's child welfare commission will

be in place and the U.S. Department of Health and Human Services ("DHHS") will

continue its oversight.[68]

## VI.  CONCLUSION

The Supreme Court of the United States' decision in Lewis v. Casey provides the

*ratio decedendi* for the court's decision in this case today.  See 518 U.S. 343 (1996).  In

Lewis, the Supreme Court rejected a class action brought by state prisoners who alleged

that the state prisons' law library facilities were constitutionally substandard and thereby

deprived them of their right of access to courts.  See id.  Holding that the inmates failed

to demonstrate actual injury, a prerequisite for establishing standing, the Supreme Court

explained that the doctrine of standing essentially is "a constitutional principle that

prevents courts of law from undertaking tasks assigned to the political branches."  Id.

at 349 (citations omitted).  The Court reasoned:

---

[68] Again, the court recognizes that the reviews conducted by DHHS, which
monitors the child welfare programs of each state in the nation, are not a substitute for
substantial compliance.  The court, however, concurs with Defendant that these reviews
are "one of several levels of protection against a repeat of the conditions that existed
when this suit was filed" in 1988.  (Doc. No. 779 at 11-12); (see Doc. No. 767 at 11-12.)
Continuing in the same vein, the court also notes that it read the recent authority cited by
Plaintiffs.  See Frazar v. Ladd, 457 F.3d 432 (11th Cir. 2006); (Doc. No. 839.)  Although
the general legal principles concerning termination of consent decrees in institutional
reform cases are applicable, the court finds that Frazar's holding is not.  In Frazer, the
defendant argued, in part, that termination of consent decree was warranted because the
entity had complied with the federal law.  Here, Defendant has never argued, as the
defendant did in Frazar, that compliance with federal law is a replacement for substantial
compliance with the provisions of the Consent Decree.

> It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.  In the context of the present case:  It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur.  Of course, the two roles briefly and partially coincide when a court, in granting relief against actual harm that has been suffered, or that will imminently be suffered, by a particular individual or class of individuals, orders the alteration of an institutional organization or procedure that causes the harm.

Id. at 349-50.

The court finds, that, although it took much longer than originally contemplated by the Consent Decree, the *ratio decidendi* of the holding in Lewis now is directly applicable to this case.  The class of children in DHR's care whom the Consent Decree in this case protects is no longer in imminent danger of harm due to the widespread constitutional deficiencies which once plagued DHR's child welfare system.[69]  The court finds that the Consent Decree has served its useful and critical purpose in successfully effectuating the overhaul and reform of DHR's child welfare system.  The deficiencies which caused the harm have been remedied, and the time has come for this court to

---

[69] The court notes that, although the Consent Decree contains a "disclaimer of liability" (i.e., that Defendant "does not acknowledge or admit that DHR is in any way in violation of the U.S. Constitution or any federal statute") (Consent Decree at 4), Defendant has conceded that litigation would have resulted in "a clear victory for the plaintiffs" and exposed "devastating" facts.  See R.C. v. Nachman, 969 F. Supp. 682, 686 (M.D. Ala. 1997), aff'd, 145 F.3d 363 (11th Cir. 1998).

release DHR's child welfare system from federal judicial oversight and return it to the complete autonomy of the state.

Based on the totality of the evidence presented and DHR's demonstrated good faith compliance with regard to the operation of its child welfare system and the implementation of the court's orders, the court finds that Defendant is operating and will continue to operate DHR's child welfare system in a manner which complies with the laws, the Consent Decree and the Implementation Plan.  The court further finds that it has not been presented with any material reason to believe that DHR will revert to its pre-R.C. ways if court oversight ends.  In light of the evidence which the court finds equates systemwide substantial compliance, the court finds that retention of judicial control is not necessary or practical and that to accept Plaintiffs' invitation to further delay termination of this Consent Decree would be tantamount to inviting the proverbial elephant into the parlor.  Cf. Reynolds v. McInnes, 338 F.3d 1201, 1217 (11th Cir. 2003) (Carnes, J.) (comparing the obstacles to cessation of a long-running consent decree to an elephant in the parlor).

There admittedly are weaknesses in the system, as articulated herein.  The court, however, finds that the present shortcomings are shortcomings which are inherent in any organization of this type and size.  As recognized by another judge of this court, in reference to the Alabama Mental Health and Mental Retardation System, which at the time was operating under a consent decree, "[w]ithout question, close scrutiny of any

state institution of the magnitude presented here will inevitably reveal numerous deficiencies."  Wyatt, 985 F. Supp. at 1388.  "It would be impractical, and thus unreasonable, to expect 100% compliance 100% of the time."  Id.

In sum, as required for termination of the Consent Decree, the court finds that Defendant has demonstrated that "DHR is in substantial compliance with the requirements of the Decree and of the Implementation Plan and that DHR will remain in substantial compliance after termination of the injunction in this case."  (Consent Decree ¶ 93 (Doc. No. 235), as amended by ¶ 10 of the 1999 Consent Order (Doc. No. 511).)

## VII.  ORDER

Accordingly, having found that Defendant is and will remain in substantial compliance with the requirements of the Consent Decree and of the Implementation Plan, it is CONSIDERED and ORDERED that Defendant's second motion for order terminating consent decree (Doc. No. 761) be and the same is hereby GRANTED, that the Consent Decree and Implementation Plan be and the same are hereby TERMINATED, and that the injunction entered in this case be and the same is hereby DISSOLVED.

It is further CONSIDERED and ORDERED that, in accordance with paragraphs 88-90 of the Consent Decree (Doc. No. 235), all costs herein occurred be and the same are hereby TAXED against Defendant for which let execution issue.

It is further CONSIDERED and ORDERED that any and all remaining pending motions be and the same are hereby DENIED as moot.

A judgment in accordance with this Memorandum Opinion and Order shall be entered separately.

Done this 16th day of January, 2007.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE